BALLON STOLL BADER & NADLER, P.C.
729 Seventh Avenue
New York, NY 10019
Telephone: (212) 575-7900
Facsimile: (212) 764-5060
Vincent J. Roldan
vroldan@ballonstoll.com

*Proposed Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 11 |
| MEZZ57TH LLC<br>d/b/a John Barrett | Case No.: 20-11316 |
| Debtor | |

--------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 11 |
| JOHN BARRETT INC. | Case No.: 20-11318 |
| Debtor | |

--------------------------------------------------------X

**AFFIDAVIT PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

STATE OF NEW YORK     )
                                           )    ss.:
COUNTY OF NEW YORK   )

I, John Barrett, being duly sworn, deposes and says:

1. I am the managing member of Mezz57th LLC d/b/a John Barrett (the "Operating Debtor"), which operates the John Barrett salon located at 36 E 57th Street (the "Salon"), and the sole shareholder and President of John Barrett Inc. ("JBI"), which among other things, operated the salon at Bergdorf Goodman (collectively the Operating Debtor and JBI will be referred to as the "Debtors"). I am familiar with the facts and circumstances as recited herein.

1

2. To minimize any business disruption caused by the commencement of these Chapter 11 cases, the Debtors seek various types of relief through "first-day" applications and motions filed herewith.

### Background on John Barrett, the Individual

3. Growing up, home was not an easy place for me. I was the 5th son in an impoverished family, brought up solely by my mother, in Limerick, Ireland. I got my first job at 13 and left home at 14. I moved to London shortly thereafter and was drifting from job to job – until I stumbled into my passion. In those days, on order to find a job, you had to canvass businesses asking for work. Sometimes the work was only a few hours, sometimes a few days and on the extremely rare occasion, you could find something more.

4. One day, I went into a fancy salon, without thought of anything, asking if they had any work for me. One thing led to another and I was suddenly an apprentice. Unlike today, an apprenticeship then was a grueling endeavor, with little pay and long hours. The word that comes to mind is survival. Despite all the hardships, I knew that this was what I wanted to do with my life. Since that time, it is all I have ever done. Over time, I worked my way up in the apprenticeship system in London, eventually working for the top salons and for high profile clients. Throughout that time, I continued to develop my skills, training, and client services.

5. In the mid-80's, a friend opened a salon in Beverly Hills and asked me to join him. That was my first real taste of America. After about 18 months, I had to return to London. That stint in the United States was enough to show me that I wanted to make a life here in the United States. I kept working at my craft and applying for a green card hoping one day I could go back.

6. Then one day in 1991 – it finally happened. I received the green card. Despite knowing that New York was vastly different than Los Angeles, I jumped at the opportunity to return to America and particularly New York. New York to me was the center of the fashion world and just felt like the place I should be. So, I decided to move New York City, from London, in 1991, without knowing a single soul. I still remember that on the flight over to New York, I struck up a conversation with the person next to me. When I mentioned that I was the recipient of the green card lottery and was coming over here to make a fresh start of it here in the United States, he said to me, "America is the most extraordinary place where amazing things happen." My experience here, has proven that to be true for me.

7. After arriving in New York and looking at the various top salons, I took an offer to work at Frederick Fekkai at Bergdorf Goodman. From no one, I slowly started to become someone. With my talent and hard work, I built up my reputation and attracted clients, who then told their friends to see me. This momentum continued to build and build until out of the blue, in 1995, I was requested to come to the home of the then president of Bergdorf Goodman. I was informed that my employer was leaving Bergdorf Goodman and they needed someone to take over and operate the salon at Bergdorf Goodman.

8. Bergdorf Goodman wanted me to fill the shoes of Frederick Fekkai. I was stunned. To say the least, the scope of the responsibility was intimidating, but it was the opportunity I had worked for all these years. I accepted and that then started my long history of operating the John Barrett Salon at Bergdorf Goodman though JBI.

9. At the time, high end hairdressers in New York were celebrities and were as important as their clientele – at least in their own minds. Clients would come for their appointment, be treated very disrespectfully, be kept waiting for hours, and then at the end

3

charged a fortune. I hated this dynamic and it always made me uncomfortable. At the helm of the salon at Bergdorf Goodman, I had the opportunity to change that culture. Clients would receive high-end cutting-edge services and have their time respected, all in a welcoming atmosphere. I also sought to nurture and cultivate talent, as was done with me in London (albeit under much less grueling conditions). With these changes, my salon immediately had success. Soon celebrities and other high-profile people started regularly coming to the salon. Just like when I first started in New York, the salon's reputation continued to organically grow and eventually became part of New York City pop culture (i.e. Bergdorf Blondes by Plum Sykes).

10. Nevertheless, just as it did with my predecessor, things at Bergdorf Goodman eventually came to an end. I had to close the John Barrett Salon at Bergdorf Goodman and walk away from the place that had been my home – my heart and soul for 23 years. I am truly grateful for my time at Bergdorf Goodman and the people that came into my life through the salon there.

11. For those of us that are fortunate, when one door closes, another often opens. As the door at Bergdorf Goodman was being closed, an amazing opportunity arose. I discovered a new space where I could start over, just like I have done so many times before. The one thing that would not (and did not) change was my commitment to the clients, attention to my craft, and a working environment that nurtures and cultivates talent. While this may be a modern world, these simple "old fashioned" things I learned coming up in London during my apprenticeship are what I believe separates my salon from that of my peers, creating a warm and welcoming experience for all.

12. Things came together at and for the current space at 36 E 57th Street and I was able to start over again in a completely new (ad)venture. Rather than remain at Bergdorf Goodman or depart for other salons, given the environment that I have fostered, many, not all, of my employees chose to come work for me at the salon. Like all new businesses, there were some minor issues in building out a space in New York City, procuring talent, and just getting a new business up and running. The Operating Debtor was working through all of those issues and was expecting to be through them by late spring 2020 and on to stable operations.

13. As part of that, we were in the process of certain talent acquisitions that would have driven the revenue and prestige, and most importantly client satisfaction, even higher than it was at our launch. And then the Covid-19 Pandemic ground everything to an abrupt halt in early March. Due to the regulations we were forced to cease operations on March 16, 2020.

14. Everything that my staff (of approximately 85 people) and I had worked so hard for hangs in the balance. What we were told would be two weeks or three weeks has now turned into nearly three months. Based on the reopening plans of other states and the statements of Gov. Cuomo and Mayor DeBlasio, it is doubtful that we will be able to open until July sometime, assuming recent events do not significantly exacerbate the opening timelines. After everything I have been through, I never thought it would come to this, but I have to do what I have to in order to save the Salon and the livelihoods of my approximately 85 employees.

## Business Operations

15. The Salon is the Operating Debtor's main asset. It is approximately 6,500 square feet of recently-constructed loft-like space that has vast floor-to-ceiling windows that look out onto 57th Street with art, books, jewelry, and talented hair stylists. The Salon operates pursuant to commercial property lease from the mezzanine level of 432 Park Condominium. The landlord

5

is MIP 57th Development Acquisition LLC ("Landlord"). The lease with the Landlord (the "Lease") is a ten-year lease that terminates in December 2028 that calls for approximately $90,000 per month in rent currently.

16. The Operating Debtor generated over $5.9 million in gross revenue in for about 8 months of operations in 2019. Operating Debtor was projected to generate $7.8 million in revenue in 2020, without accounting for the Covid-19 Pandemic or any of the talent acquisitions that were delayed due to the Covid-19 Pandemic. With the talent acquisitions, which were in process before the Covid-19 Pandemic, revenue was expected to rise to above approximately $10 million and make the business significantly more profitable.

17. Aside from the Salon, the Operating Debtor's main asset is its good will. As of May 29, 2020, (the "Petition Date"), the Operating Debtor has approximately $300,000.00 in cash, $700,000 in fixtures and equipment, and $120,000 in inventory. The Operating Debtor has approximately $6,000,000 - $7,000,000 million in liabilities, of which a majority is long term debt used for start-up and build out of the salon and equipment leases. A portion of the long term debt is secured; the rest of the debt is unsecured.

18. As mentioned, JBI operated the salon at Bergdorf Goodman. It has no assets other than certain intellectual property relating to the John Barrett the individual. It has approximately $100,000 in cash and has remaining debts ranging from $250,000 - $500,000.

**Events leading to bankruptcy**

19. As the excitement and rush of new customers steadied from the opening of the Salon, the Operating Debtor discovered significant discrepancies with what its then controller was advising and reporting to management. For instance, among other things, there were significant delays in entering payables into the operating budgets, incorrect amounts were

logged, or monies misallocated, often showing the Operating Debtor to better position than it was in reality.

20. The Operating Debtor released the comptroller from his duties and hired an accounting firm to address and automate the accounting systems going forward. Golden Door Services LLC ("Golden Door") was then retained to act as the comptroller, as over time it would prove to be more cost effective than retaining in-house talent for limited work in what was then an extremely aggressive economy.

21. Given the cash flow issues that arose as a result of the comptroller, the Operating Debtor worked with its advisors and developed strategies to minimize overhead, while ensuring the customer experience was not significant altered. Through this process, the Operating Debtor cut $50,000 - $75,000 off of its monthly expenses.

22. As things began to right themselves, the Operating Debtor was in discussions for certain talent acquisitions that would have added significant revenue and profit to the business. Then the Covid-19 Pandemic struck. In late February and early March, the business began to slow rapidly, as people were told that they should stay at home. The Salon was officially shut down on March 16, 2020 in accordance with and in anticipation of the effective date of a statewide shelter in place order.

23. The Operating Debtor currently has no revenue and its limited operations are funded by a Paycheck Protection Program loan. New York City is slowly allowing businesses to reopen. But because the of the type of business the Operating Debtor engages in, it is likely to be included only in the last phase of New York City's reopening, which may now be delayed as a result of the events of the last few days.

24. As of the filing date, Operating Debtor optimistically believes it will be able to

reopen the Salon on or about July 6, 2020. The Operating Debtor and its advisors are monitoring the situation on a day to day basis currently. Even after reopening, the Operating Debtor believes that there will be regulations governing and limiting the flow of customers. As a result, the Operating Debtor currently projects that it will only operate at 50% capacity, at best, once the shelter in place order is lifted for the foreseeable future. It has developed plans to expand its business within that framework, by extending hours and days open.

### **Additional Information Pursuant to Local Rule 1007-2(a)**

25. This case was not originally commenced under chapter 7 or 13. Local Rule 1007-2(a)(2).

26. No committee was organized prior to the order for relief. Local Rule 1007-2(a)(3).

27. The Debtor's 20 largest unsecured creditors are listed on Exhibit A. Local Rule 1007-2(a)(4).

28. The Debtor's secured creditors are listed on Exhibit B. Local Rule 1007-2(a)(5).

29. The Debtor's assets and liabilities are summarized above. Local Rule 1007-2(a)(6).

30. There are no classes of stock or other securities held by the public. Local Rule 1007-2(a)(7).

31. None of the Debtor's assets are in the possession of third parties. Local Rule 1007-2(a)(8).

32. The Debtor operates the Salon. Local Rule 1007-2(a)(9).

33. The Debtor's substantial assets and books and records are located at the Salon. Local Rule 1007-2(a)(10).

34. There are no actions or proceedings where a judgment against the Debtors or a seizure of property may be imminent. Local Rule 1007-2(a)(11).

35. The names of the individuals who comprise senior management are as follows:

| Name | Title | Tenure, Responsibilities & Experience |
|---|---|---|
| John Barrett | Managing Member/President | Founder |

Local Rule 1007-2(a)(12).

36. The estimated amount of the bi-weekly payroll to employees (exclusive of officers and directors) (not including deductions for taxes) for the 30 day period following the commencement of the case is $9,403.86 estimated to be paid for the 30 day period. Local Rule 1007-2(b)(1).

37. I will be paid $16,000 by the Operating Debtor in the next 30 days. I will not receive any salary from JBI during this time. There are no other officers and directors of the Operating Debtor, and no officers or directors of JBI, who are to receive salary in the next 30 days. Local Rule 1007-2(b)(2)(A).

38. The Operating Debtor intends to pay Golden Door $4,800 in the next 30 days, subject to Court approval. Local Rule 1007-2(b)(2)(C).

39. The estimated cash flow for the Debtor for the 30-day period following the bankruptcy case, as well as an estimate of any accrued but unpaid expenses for that time period, is attached as Exhibit C.

_____
John Barrett

Notary Public
Sworn to before me this
3rd day of June, 2020

**OMAR S. BRUNSON**
Notary Public, State of New York
No. 01BR6213086
Qualified in Queens County
Commission Expires November 2, 2021

9