# EXHIBIT A



# Standby Letter of Credit Application and Agreement

This application is a part of, and subject to the terms and conditions of, the following Agreement - Standby Letter of Credit between the Applicant identified below ("Applicant") and Signature Bank (the "Issuer").

The Applicant hereby requests that the Issuer issue an irrevocable Standby Letter of Credit with the following terms and conditions:

**IF ANY INFORMATION PROVIDED CHANGES, A NEW APPLICATION WILL BE REQUIRED.**
**PLEASE CONFIRM INFORMATION WITH YOUR BENEFICIARY BEFORE SUBMITTING.**

## Please enter information:

### APPLICANT

Applicant's Name: **MEZZ57TH LLC**

Applicant's Address: **754 FIFTH AVE 9 FL  NEW YORK  NY  10019**  Telephone: **2128722701**

Contact Name: **JOHN F. BARRETT**　　　　　Email: **jb@jbnyc.com**

### ACCOUNT PARTY (If different from applicant)

Account Party's Name: _____

Account Party's Address: _____Telephone: _____

Contact Name: _____ Email: _____

### BENEFICIARY

Beneficiary's Name: **MIP 57TH Development Acquisition LLC**

Beneficiary's Address: **C/O MACKLOWE PROPERTIES 737 FIFTH AVE NEW YORK NY 10153** Telephone: **212-265-5900**

Contact Name: **ELLEE KIM**　　　　　　Email: _____

### ADVISING BANK (If applicable)

*If left blank, issuer may choose bank*

Advising Bank: _____

Address: _____

SWIFT Code: _____

600089-0518

Amount: USD $ 1,050,720.⁰⁰

Final Expiration Date: 3 | 31 , 20 29.

**If Automatic Extension Clause is required:**

         Initial Expiration Date: 11/15 , 20 19

         Notification Period (check one): ☐ 30 ☐ 60 ☑ 90

         **Extension Period:** 1 year

**Partial Drawings:** ☑ Permitted    or    ☐ Not permitted

**Transferable:** ☑ Permitted    or    ☐ Not permitted

**Drafts must be accompanied by beneficiary's signed statement that:**

"_____

_____

_____

_____

_____

_____ "


**Available draft(s) drawn on Signature Bank New York at sight**

In consideration of the Issuer's issuance of an irrevocable letter of credit substantially in accordance with the foregoing application (the "Application") on the pages 1 and 2, the Applicant by its signature below hereby acknowledges and agrees to be bound by the terms and conditions of the following Agreement - Standby Letter of Credit, which terms and conditions are set forth on pages 3 through 10 below.

**AGREED TO:**

JOHNFBARRETT                                                                MEMBER
Print Name            Client's Authorized Signature            Title


_____                    _____              _____
Print Name            Second Client's            Title
           Authorized Signature if required


Please advise which Monogram Business Checking account number to debit for fees: ██████████████

---

**Signature Bank Use Only**

Group Director Name: Roseann Manos

Signature: Roseann Manos

Date: 10/31/18

Lender Name: _____

Signature: _____

Date: _____


## AGREEMENT – STANDBY LETTER OF CREDIT

**TO: SIGNATURE BANK**

We, [Insert Applicant's Name] **MEZZ57TH LLC** _____ (hereinafter referred to as the "Applicant"), hereby request SIGNATURE BANK (hereinafter referred to as the "Issuer") to issue a standby letter of credit (the "Credit") substantially in accordance with the foregoing application (as modified or amended from time to time by the Applicant with the Issuer's consent, the "Application"), which is part of this Agreement, in consideration for which the Applicant hereby agrees as follows (terms with their initial letter(s) capitalized having the meanings assigned to such terms in paragraph 5 of this Agreement):

1. **Prepayment/Reimbursement (U.S. Currency).** As to Drafts or drawings under or purporting to be under the Credit (including but not limited to any Drafts or drawings made by any Transferee Beneficiary(ies) or purportedly by any Transferee Beneficiary(ies) or purported Transferee Beneficiary(ies)), which are payable in United States currency, the Applicant agrees in the case of each Draft or drawing, whether or not the Credit calls for Deferred Payments, to reimburse the Issuer at its office at once, in United States currency in immediately available funds the amount paid on such Draft or drawing, or, if so demanded by the Issuer, to pay to the Issuer at its office in advance at such time as the Issuer shall specify in United States currency in immediately available funds, the amount required to pay such Draft or drawing.

2. **Prepayment/Reimbursement (Foreign Currency).**

    (a) As to Drafts or drawings under or purporting to be under the Credit (including but not limited to any Drafts or drawings made by any Transferee Beneficiary(ies) or purportedly made by any Transferee Beneficiary(ies) or purported Transferee Beneficiary(ies)), which are payable in currency other than United States currency, the Applicant agrees in the case of each Draft or drawing, whether or not the Credit calls for Deferred Payments, to reimburse the Issuer at its office at once, the equivalent in United States currency of the amount paid, in the currency in which such Draft is drawn or drawing is made, in immediately available funds, at the Issuer's selling rate of exchange then current in New York, to the place of payment or, if the Issuer so requests, to pay to the Issuer at its office, on demand, at such time as the Issuer shall specify, the equivalent in United States currency of such Draft or drawing, in the currency in which such Draft or drawing is payable, in immediately available funds, at the Issuer's selling rate of exchange then current in New York, to the place of payment.

    (b) Absence of Exchange Rate. If for any cause whatsoever there exists at the time in question no rate of exchange generally current in New York for transfers of the sort described above, the Applicant agrees to pay the Issuer an amount in United States currency in immediately available funds, equivalent to the actual cost to the Issuer of settlement of its obligation to the payor of the applicable Draft or any holder thereof, as the case may be, however and whenever such settlement shall be made by the Issuer, whether directly or through correspondent or confirming banks, including interest on the amount (in dollars) payable by the Applicant, from the date of payment of such Draft to the date of the Applicant's payment to the Issuer, at the rate provided for in subparagraph 4(b) of this Agreement. The Applicant's payment to the Issuer shall be due and payable at once upon the Issuer effecting such settlement.

3. **Refinancing.** In the event that (a) the Issuer or its correspondent, at the Applicant's request, extends, renews or refinances any of the Liabilities arising under paragraphs 1 and 2 of this Agreement, by means of notes made by the Applicant or (b) the Issuer or any correspondent further extends, renews or refinances, from time to time, any such note, then, and in consideration thereof, the Applicant agrees to pay to the Issuer the amount plus applicable interest of each such note in the manner provided in said note. The Applicant further agrees that with respect to any such extension, renewal or refinancing, all of the terms, conditions, agreements and obligations contained in this Agreement shall apply thereto and that the Issuer shall have all the rights and remedies set forth in this Agreement as well as those set forth in any other document signed by the Applicant or on its behalf.

4. (a) **Commissions.** The Applicant agrees to pay the Issuer, on demand, (i) the Issuer's commission in connection with the Credit, at the Issuer's customary rates in effect at the time of the Application (or at any special rate on which the Issuer shall agree with the Applicant, in writing), (ii) any commission(s) of any correspondent, or confirming, paying, accepting or negotiating banks, at their customary rates in effect at the time of their taking any action in connection with the Credit, and (iii) if the Credit provides for automatic extension(s) as provided in subparagraph 8(f) of this Agreement, or for transfer by the Beneficiary, the Issuer's commission therefor at its customary rates in effect at the time of such automatic extension, or such transfer, or at any special rate on which the Issuer shall agree with the Applicant, in writing.

    (b) **Interest.** Except as expressly provided for elsewhere in this Agreement or otherwise in writing signed or accepted by the Issuer, any and all amounts due the Issuer from the Applicant under this Agreement and/or the Application shall bear interest from the date due until paid in full at the lesser of the maximum rate allowed by law or a rate per year equal to five percent (5%) above the Issuer's stated Prime Rate, as reflected on its books and records (the "Prime Rate") which rate shall fluctuate from time to time when and as the Prime Rate shall change. The Issuer's determination of the Prime Rate shall be conclusive and final. The Applicant recognizes and acknowledges that the Issuer may extend credit to others at rates below the Prime Rate.

    (c) **Fees, Costs and Expenses.** The Applicant agrees to pay or reimburse the Issuer on demand for, and to indemnify the Issuer against all costs, charges, and fees arising in any manner, from, out of or in connection with (i) the Application, (ii) this Agreement, (iii) the Credit, (iv) compliance with governmental exchange regulations applicable to the purchase of foreign currency, (v) collection of the Liabilities, (vi) protection of any of the Issuer's rights or interests in connection with any of the foregoing, (vii) any fees or obligations of the Beneficiary or a Transferee Beneficiary or purported Transferee Beneficiary of the Credit if not paid by such Beneficiary, Transferee Beneficiary or purported Transferee Beneficiary when due, and (viii) any litigation in connection with any of the foregoing. The foregoing obligation to pay, reimburse and indemnify shall apply except to the extent that any such costs, charges or expenses result from the Issuer's own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable decision.

    (d) **Payments Free of Taxes.** Any and all payments made to the Issuer under this Agreement shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges, or withholdings, and all liabilities with respect thereto, in any jurisdiction worldwide, excluding income taxes imposed on the Issuer. All such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities which are imposed with respect to this Agreement or any amount payable hereunder are hereinafter called "Taxes". If the Applicant shall be required by law to deduct any Taxes from or in respect of any sum payable under this Agreement, (i) the sum payable shall be increased as may be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this subparagraph 4(d)), the Issuer shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) the Applicant shall make such deductions and (iii) the Applicant shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. The Applicant will indemnify the Issuer for the full amount of Taxes (including, without limitation, any Taxes imposed by any jurisdiction on amounts payable under this subparagraph 4(d)) paid by the Issuer for its own account, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted. Payment pursuant to this indemnification shall be made upon written demand therefor. Within 30 days after the date of any direct payment of Taxes the Applicant will furnish to the Issuer the original or a certified copy of a receipt evidencing payment thereof. The Applicant's obligations under this subparagraph 4(d) shall survive the termination of this Agreement, the payment of all Liabilities and the expiration or cancellation of all Credits.

(e)   Reserves, Assessment Charges, Capital Requirements and Other Regulatory Costs.

(i)   In the event that the Issuer, or any of its offices issuing the Credit or handling any Specified Transactions, is required by, or as a result of any action or policy position taken by, any Regulatory Authority to pay, institute, increase, maintain at any particular level or otherwise to incur any Specified Costs in connection with or as a result of any Specified Transactions, in order for the Issuer to be in compliance with any present or future applicable law or governmental, regulation, guideline, order, interpretation (including but not limited to an interpretation by a court or any Regulatory Authority that any present law or regulation requires or permits the imposition of Specified Costs in connection with or as a result of Specified Transactions) or request (whether or not having the force of law), the Applicant agrees to pay the Issuer on demand and to indemnify and hold harmless the Issuer from and against all costs and expenses of, or of establishing or maintaining, such Specified Costs, as such costs and expenses shall be reasonably determined by the Issuer.

(ii)   The Applicant's indemnity in this subparagraph 4(e) shall be effective only with respect to Specified Transactions the existence, issuance or creation of which triggers the imposition of Specified Costs.

(iii)   The Issuer's certificate as to any amount(s) the Applicant is required to pay under this subparagraph 4(e) shall be conclusive evidence of the Applicant's obligation.

(iv)   The Applicant's obligations under this subparagraph 4(e) shall survive the termination of this Agreement, the payment of all Liabilities and the expiration or cancellation of all Credits.

5.   **Definitions.** As used in this Agreement:

(a)   "Acceleration" shall include any acceleration of payment or requirement of prepayment of any Debt, or any Debt's becoming due and payable prior to stated maturity.

(b)   "Assessment Charges" shall mean any assessments, insurance premiums or other special charges (however described).

(c)   "Beneficiary" shall mean the beneficiary of the Credit.

(d)   "Capital Requirements" shall mean any capital, capital equivalency ledger account, ratio of assets to liabilities or other or similar capital substitute, or any pledge to any Regulatory Authority, any of which shall be based on amounts of assets, liabilities or deposits.

(e)   "Contract" shall include any agreement or instrument (including but not limited to this Agreement), no matter when made, under which any Party is obligated to any other Person.

(f)   "Debt" or "Debts" shall include any Party's debt for the payment of money to any other Person, or any part of such debt, whether absolute or contingent, secured or unsecured, joint, several or independent, now or hereafter existing, due or to become due.

(g)   "Default" shall mean any breach, default or event of default under, or failure to comply with any covenant, term or condition contained in, any Contract.

(h)   "Deferred Payment" shall mean an arrangement provided for in the Credit pursuant to which the Beneficiary shall have the right or obligation to present Documents for examination by the Issuer in advance of presenting a Draft or Drafts drawn under the Credit.

(i)   "Documents" shall mean any and all certificates, documents and statements accompanying or relating to the Credit, to requests for Transfer of Beneficiary or for amendment of the Credit, and/or to Drafts drawn under the Credit, but shall not mean Drafts.

(j)   "Draft" shall mean a written request, order or demand for the payment of money, whether or not negotiable.

(k)   "Exchange Control Permit" shall mean a permit or license issued by a governmental authority outside the United States under which any Party is permitted to incur and pay all of the Liabilities in the United States in United States currency.

(l)   "ISP 98" shall mean the International Standby Practices 1998, ICC Publication No. 590.

(m)   "Liabilities" shall include any and all of the Debts under or with reference to the Credit, the Application, this Agreement, any other letter of credit issued by the Issuer upon the application or for the account of the Applicant and any and all other of the Applicant's debts to, or held or to be held by, the Issuer in any jurisdiction worldwide, for the Issuer's own account or as agent for another or others, whether created directly or acquired by assignment or otherwise.

(n)   "Other Regulatory Costs" shall mean any costs (other than Reserves, Assessment Charges, Capital Requirements and those items referred to in subparagraphs 4(c) and (d) of this Agreement) of any nature whatsoever.

(o)   "Party" shall include (i) the Applicant, (ii) any guarantor, surety or accommodation party with respect to, or any party that provides any collateral as security for, or any party that provides a comfort letter, letter of awareness, letter of intent or similar document with respect to, any of the Liabilities, and (iii) if any Party is a partnership, any general partner of such Party. The term "Party" may refer to a natural person or an entity.

(p)   "Property" shall mean any and all goods, merchandise, securities, funds, choses in action, and any and all other forms of property whether real, personal or mixed, tangible or intangible, and any right or interest therein.

(q)   "Regulatory Authority" shall mean any regulatory authority or entity (including but not limited to the Federal Reserve Board, any Federal Reserve Bank, the Federal Deposit Insurance Corporation and any state banking authority) having jurisdiction over or with respect to the Issuer or any of its offices.

(r)   "Reserves" shall mean any reserves or special deposits of any type, including but not limited to any reserves or similar requirements applicable against assets, liabilities or deposits.

(s)   "Specified Costs" shall mean Reserves, Assessment Charges, Capital Requirements and Other Regulatory Costs.

(t)   "Specified Transaction(s)" shall mean this Agreement, the Credit, any Document, and any loans made in connection with any of the foregoing.

(u)   "Transfer" shall include any negotiation, assignment, participation, grant of a security interest, delegation or any other transfer of a complete or partial interest or obligation, including but not limited to any such action with regard to the rights of the Beneficiary or the Issuer's rights under the Application or this Agreement; such terms shall also mean to make a Transfer.

(v)     "Transferee" shall include any person or entity to whom a Transfer shall be made.

(w)    "Transferee Beneficiary" shall include any person or entity to whom a Transfer of the rights of the Beneficiary under the Credit shall be made, or shall purportedly be made.

(x)     "UCC" shall mean the New York Uniform Commercial Code.

(y)     "UCP" shall mean the Uniform Customs and Practice for Documentary Credits adopted by the Congress of the International Chamber of Commerce ("ICC"), 2007 revision, ICC Publication No. 600.

6.     Acceptable Documents Under the Credit.

(a)     **Substantial Compliance.** Except as expressly provided otherwise on the Application, the Applicant authorizes the Issuer to accept as complying with the Credit any Drafts and/or Documents which are in substantial but not strict compliance with the Credit without affecting or relieving the Applicant of any of the Liabilities. Nevertheless, the Issuer may in its discretion refuse to accept any or all such Drafts and/or Documents unless they are in strict compliance with the Credit.

(b)     **Absence of Drafts.** If the Credit provides that it will be available by presentation of Documents unaccompanied by Drafts, then all references in this Agreement to Drafts, Documents, and the presentation or payment of Drafts shall refer to Documents presented for payment without drafts, the presentation and acceptance thereof and payment upon such presentation. The Applicant's obligations and the Issuer's rights, privileges and remedies shall be the same as though payments have been made upon presentation of Drafts drawn under the Credit accompanied by the Documents.

(c)     **Execution by Legal Representatives.** In the Issuer's discretion, it may but shall not be obligated to honor, as complying with the terms of the Credit and the Application, any Draft or Document otherwise in order, even if signed, drawn or issued (or purportedly signed, drawn or issued) by an administrator, executor, trustee in bankruptcy, debtor in possession, assignee for benefit of creditors, liquidator, receiver or other legal representative of, or by the successor in interest (by merger or consolidation or by operation of law) of, the party authorized under the Credit to sign, draw or issue such Draft or Document. Any such honoring or refusing to honor such Drafts or Documents shall not affect or relieve the Applicant of any of the Liabilities.

(d)     **Applicant's Instructions.** In administering the Credit, the Issuer and any correspondents may act in reliance upon any oral, telephonic, telegraphic, electronic or written request, agreement, notice, consent, waiver or other communication believed in good faith to have been authorized by the Applicant, whether or not actually given or signed by an authorized person.

7.     **Modifications, Extensions and Increases.** If this Agreement is signed by two or more parties, any of such parties (with or without notice to or consent of any other(s)) may agree to or request any renewal of, or extension of the maturity or time for presentation of, Drafts or Documents, any increase or decrease in the amount of the Credit and/or any extension or any other modification of the terms of the Credit (including but not limited to Transfer of Beneficiary). Any such agreement shall be deemed to be on behalf of, and shall be binding upon, all of such parties. This Agreement shall be binding upon all of such parties with regard to the Credit as so modified, to Drafts and Documents and to any action taken by the Issuer or any correspondent(s) in accordance with any such modification. Before being effective, any such agreement to modify the Credit shall require the Beneficiary's consent. In the Issuer's discretion, the Beneficiary's consent need not be in writing and may be indicated by the Beneficiary's acquiescence in modifications communicated to and received by the Beneficiary.

8.     Division of Responsibilities.

(a)     Applicant's Responsibilities.

(i)     **Beneficiary's Acts.** The Beneficiary, any Transferee Beneficiary or purported Transferee Beneficiary, or any other users of the Credit shall be deemed the Applicant's agents and the Applicant assumes all risks of their acts or omissions.

(ii)     **Bona Fide Transactions.** The Applicant warrants and represents that the Application is made in connection with a good faith transaction with the Beneficiary.

(iii)     **Document Examination.** The Applicant will promptly examine (a) the copy of the Credit (and of any amendments thereof) sent to   the Applicant by the Issuer and (b) all Documents delivered to the Applicant from time to time by the Issuer. The Applicant will immediately notify the Issuer in writing of any claim of non-compliance with the Application by the Credit as issued or amended, of any claim of noncompliance of any such Documents with the Credit, and of any claim of any other irregularities. The Applicant agrees that it shall be conclusively deemed to have waived any such claim against the Issuer and its correspondents unless the Applicant shall immediately give the Issuer such notice. Any such waiver regarding non-compliance of Documents with the Credit or other irregularities shall apply not only to the specific Documents in question but also in the Issuer's discretion to any subsequent Documents of the same nature or containing the same discrepancy or involving the same irregularity.

(iv)     **Compelled Honor.** In the event the Issuer is compelled by any binding judgment, decree, order or award to make any payment under the Credit or to honor any Drafts or Documents as complying with the Credit, the Applicant's obligations arising under this Agreement to reimburse the Issuer for such payment (and for any additional penalties, damages, interest, fees or expenses (including but not limited to attorneys' fees related thereto)) shall continue to apply or, if previously expired, shall be immediately restored, upon the rendering of any such judgment, decree, order or award, or the making of any payment pursuant thereto, after the expiration of the Credit.

(b)     **Selection of Paying, Accepting and/or Negotiating Bank.** The Issuer shall have the discretion to provide that the Credit is either negotiable or non-negotiable and, if negotiable, to name the negotiating bank (including any of the Issuer's offices) or the country within which a Draft under the Credit must be negotiated. The Issuer shall also have the discretion to name any bank to pay or accept, including the Issuer or any of its branches.

(c)     **Non-responsibility of Banks.** In the Issuer's sole discretion, the Issuer may use, in connection with the Credit, any correspondent selected by the Issuer. None of the Issuer's rights or powers under this Agreement shall be affected or impaired by reason of, and, subject to subparagraph 8(g) of this Agreement, neither the Issuer nor any of its correspondents shall be responsible or liable for, any of the following:

(i)     **Lack of Control.** any matter or event beyond the reasonable control of the Issuer or any of its correspondents;

(ii)     **Documents.** the truthfulness or accuracy of any statement contained in any Document, or the validity, sufficiency, or genuineness of Documents or Drafts, even if such Documents or Drafts should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged (and regardless whether the Applicant shall have notified the Issuer thereof);

(iii)     **Persons Issuing Documents.** the solvency or responsibility of any person issuing any Document;

(iv)  **Arrival of Documents.** any delay in arrival or failure to arrive of any Documents relating to the Credit;

(v)  **Notices.** any delay in giving or failure to give any notice;

(vi)  **Local Laws.** any laws, acts, decrees, customs or regulations, legal or illegal, of any government or governmental agency or of any authority actually in control of, or which may be effective in, places of negotiation and/or payment of the Credit or otherwise relating to the Credit, Documents or Drafts under the Credit;

(vii)  **War.** any declared or undeclared war or any military, guerilla or terrorist operation;

(viii)  **Compliance With Credit Terms.** failure of any Draft or Document to bear any reference or adequate reference to the Credit; failure of Documents to accompany any Draft at negotiation; or failure of any person to note the amount of any Draft on the reverse of the Credit or to surrender or take up the Credit or to send forward Documents apart from Drafts as required by the terms of the Credit; it is agreed that each of the provisions referred to in this subparagraph 8(c)(viii), if appearing as a requirement in the Credit itself, may be waived by the Issuer;

(ix)  **Communications.** errors, omissions, mutilations, losses, failures, defaults, interruptions or delays in transmission, delivery, receipt, or recording of any messages, by mail, telex, cable, telegraph, wireless, telecopier, SWIFT, or otherwise, whether or not arising out of the use of codes;

(x)  **Correspondents.** any act, error, neglect, default, insolvency or failure in business of any of the Issuer's correspondents, or of correspondents of said correspondents except that any such correspondent shall be liable, if at all, solely for its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable decision.

(xi)  **Failure to Identify.** any failure to identify or locate any person or entity;

(xii)  **Exchange Rates.** any change in currency exchange rates;

(xiii)  **Inadequate Instructions.** any consequence resulting from any error in, or an absence of, adequate instructions or information on the Application or otherwise relating to the Credit;

(xiv)  **Invalid Instructions.** any consequence resulting from the fact that any instructions or requests, oral or written, given to the Issuer purporting to be by or on behalf of the Applicant or the Beneficiary, and believed by the Issuer in good faith to be valid, which pertain to the issuance of the Credit, payments against Documents despite discrepancies, any modification of the Credit or any other action to be taken or omitted in connection with the Credit were, wholly or in part, unauthorized, fraudulent or otherwise invalid;

(xv)  **Uniform Governing Conventions.** any matter as to which banks assume no liability or responsibility pursuant to ISP 98 or the UCP, as may be applicable; or

(xvi)  **Translations.** any consequence resulting from errors in or inadequacy of any translation of or in connection with:

(A)  the Application, if not entirely written in English,

(B)  the Credit if the Credit is requested to be written in any language other than English, or

(C)  any Document or Draft not entirely written in English.

(d)  **Payments by Correspondents; Failure to Receive Transmitted Documents.** If the Credit provides that payment is to be made by the Issuer's correspondent, neither the Issuer nor such correspondent shall be responsible for failure to receive any of the Documents specified in the Credit or for any delay in connection with them. The Applicant's obligation to make reimbursement shall not be affected by any such failure or delay.

(e)  **Delivery of Documents.**

(i)  If the Credit calls for sight Drafts without providing for Deferred Payments, Documents presented under the Credit shall be released by the Issuer to the Applicant or at the Applicant's instruction promptly after the respective Draft is paid, once the Applicant shall have complied with paragraph 1 or 2 of this Agreement, as appropriate.

(ii)  If the Credit calls for Deferred Payments, Documents presented under the Credit in advance of Drafts may be released by the Issuer to the Applicant or at the Applicant's instruction promptly after the Issuer examines the Documents, provided the Documents conform to the terms and conditions of the Credit, but such release shall not affect or reduce the Applicant's obligations under paragraph 1 or 2 of this Agreement.

(f)  **Automatic Extension.**

(i)  If the Applicant shall have requested in the Application that the Credit provide for automatic extension(s), then, if the Issuer agrees, the Credit shall provide substantially that:

(A)  it will expire on a date specified in the Credit, but shall be deemed automatically extended for additional successive periods of one year(or such other period as shall be specified in the Application) unless the Issuer notifies the Beneficiary by no later than a specified number of days prior to the original expiration date, or the expiration of any extension period, that the Issuer has elected not to extend the Credit for any additional period, and

(B)  upon the Issuer giving such notification, the Beneficiary shall have the right to draw up to the entire then outstanding amount of the Credit by a drawing accompanied, if so specified in the Application, by its statement that the Credit has not been extended and that the Applicant has not supplied a satisfactory substitute. The Credit may also specify such other or further conditions for a drawing in the event of such notification as the Applicant and the Issuer shall mutually agree.

(ii)  The Issuer's decision as to whether or not to extend the Credit and whether or not to give the Beneficiary notice of such decision not to extend shall be made by the Issuer in its sole and unfettered discretion, based on its consideration of whatever factors it deems appropriate, including but not limited to the Applicant's financial status, the Issuer's relationship with the Applicant as to any or all transactions or matters, local or worldwide, or the occurrence of one or more Events of Default as delineated in paragraph 16 of this Agreement.

(iii)  The Issuer shall give the Applicant notice of the Issuer's election not to extend the Credit no later than the applicable date specified for such notice to the Beneficiary in accordance with subparagraph 8(f)(i)(A) of this Agreement.

(g)    Good Faith Actions. In furtherance and extension and not in limitation of the specific provisions set forth in this paragraph 8 and the other provisions of this Agreement, the Applicant agrees that any action, inaction or omission in good faith by the Issuer or by any of its correspondents under or in connection with the Application, this Agreement, the Credit, or any Drafts or Documents relating to the Credit shall be binding on the Applicant and neither the Issuer nor any of its correspondents shall be liable to the Applicant as a result, except, respectively, solely for the Issuer's or any such correspondent's own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable decision. In any event, neither the Issuer nor any such correspondent shall have any liability for any special, indirect, consequential or punitive damages.

9.    Indemnity. In addition to the Applicant's obligations under other provisions of this Agreement, the Applicant hereby indemnifies and holds harmless the Issuer, its agents, and its correspondents from and against any and all costs, expenses (including but not limited to attorneys' fees), losses, claims, obligations and liabilities arising in any manner from, out of, or in connection with, the Application, this Agreement or the Credit (including but not limited to any extension or purported Transfer of Beneficiary thereof) and the issuance of the Credit or acting in connection therewith, including but not limited to all obligations and responsibilities imposed by contract, foreign law and usages and any and all claims resulting from the endorsement and/or transfer to the Applicant or at its request of any Documents and/or the Issuer acting in accordance with the Applicant's or the Beneficiary's purported instructions, unless such costs, expenses (including but not limited to attorneys' fees), losses, claims, obligations and liabilities are caused by the Issuer's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable decision. The Applicant hereby similarly holds harmless and indemnifies each and every correspondent and each of the Issuer's agents acting in connection with the Credit, except with respect to any such correspondent's or agent's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable decision.

10.    Governmental Compliance.

(a)    Compliance. The Applicant agrees:

(i)    to comply with all applicable foreign and United States governmental laws, rules, regulations, orders and other requirements, including without limitation those arising under or relating to international agreements, relating to the transactions in connection with the Credit, and

(ii)    to furnish such documentation and certificates regarding compliance with governmental requirements as the Issuer may at any time require.

(b)    Import and Export Restrictions, etc. Without limiting the foregoing, the Applicant represents and warrants that every transaction in connection with the Credit will be in compliance with, and will not be prohibited under, any applicable governmental law, rule, regulation, licensing requirement or order regarding foreign asset controls, export controls, import controls, antiboycott requirements, foreign funds controls and foreign sanctions.

11.    Law Governing Credit. The Credit shall be subject to and interpreted in accordance with ISP 98 or the UCP, as determined by the Issuer and, if and to the extent so provided by the Issuer in its discretion in the Credit, and to the extent not inconsistent with ISP 98 or the UCP, as applicable, the internal law (excluding conflict of laws principles) of the State of New York including without limitation Article 5 of the UCC.

12.    Cross-Collateralization. The Liabilities shall be secured pursuant to the terms of and shall be deemed obligations secured by any collateral under, and the Issuer shall have all rights granted to it under, any security agreement executed in its favor by the Applicant, unless the obligations secured thereby are limited to specific obligations other than the Liabilities.

13.    Warranties and Representations. The Applicant warrants and represents to the Issuer as follows:

(a)    If the Applicant is a partnership, limited liability company or corporation, it has been duly formed under applicable law and is in good standing in the jurisdiction where it has been organized.

(b)    The Applicant is authorized to do business in each jurisdiction where it is doing business.

(c)    The Application and this Agreement have been and are duly authorized and validly executed in accordance with applicable law and all governing documents and agreements.

(d)    The Application and this Agreement are the Applicant's legal, valid and binding obligations and are enforceable against the Applicant in accordance with their terms.

(e)    No authorization, consent or approval of any governmental or regulatory authority is or will be required or, if required, each such authorization, consent or approval has been duly obtained, in connection with all matters relating to the Application, this Agreement and the Credit.

(f)    No document executed or thing done in connection with the Application, this Agreement or the Credit is or shall be in conflict with or constitute a default under (i) any agreement or instrument, or any applicable law, rule, regulation, judgment, order or decree to which the Applicant is a party or by which the Applicant is bound or (ii) if the Applicant is a partnership, limited liability company or corporation, any of its governing, organizational or constitutive documents or instruments.

(g)    There is no action, suit or proceeding pending or, to the Applicant's knowledge, threatened against the Applicant which (i) could have a material adverse affect on the Applicant's financial or other condition or business, except as disclosed in writing to the Issuer, or (iii) questions the validity or enforceability of the Application or this Agreement.

14.    Supplying Information. The Applicant agrees to furnish to the Issuer, promptly upon request therefor, copies of the Applicant's financial statements (audited and/or unaudited), documents and forms filed with the United States Securities and Exchange Commission, and such other information respecting the Applicant's business or properties or the Applicant's condition or operations, financial or otherwise, as the Issuer may from time to time or at any time reasonably request.

15.    Set-Off. As security for the payment and performance of all Liabilities, the Applicant hereby pledges to the Issuer and/or gives to the Issuer a general banker's lien upon and/or rights of set-off against, and security interest in, all right, title and interest of the Applicant in and to the balance, whether or not denominated in the same currency or currencies as any of the Liabilities, of every deposit, custody or other account with or claim against the Issuer or at any of the Issuer's offices worldwide, or at any offices worldwide of the Issuer's subsidiaries or affiliates, or with any of the Issuer's agents or correspondents acting in connection with the Credit, and in and to any instrument, credit, chose in action, claim or demand, or any interest in any thereof, and in any other Property rights and interests of the Applicant, or any evidence thereof, which have been or at any time shall be delivered to or otherwise to come into the Issuer's possession, custody or control at any of the Issuer's offices worldwide, or offices worldwide of the Issuer's subsidiaries or affiliates, or into the possession, custody or control for any purpose of any of such agents or correspondents, whether or not accepted for the purpose or purposes for which they were delivered or intended; and the Issuer shall be deemed to have possession, custody or control of any such Property actually in transit to or set apart for the Issuer or any of such agents, correspondents or others acting on its behalf.

16. **Charge to Deposit Account.** Each amount which may become due and payable to the Issuer under this Agreement may, in the Issuer's discretion and if not otherwise paid, be charged by the Issuer to the Applicant's account, without prior notice to the Applicant, either against any available funds then in the Applicant's account, or by creating an overdraft.

17. **Events of Default.** Each of the following shall be an Event of Default:

(a) **Nonpayment.** The nonpayment or non-performance when due of any part of the Liabilities.

(b) **Bankruptcy; adverse proceedings.** (i) The commencement of any proceeding by or against any Party under the United States Bankruptcy Code (or any successor statute); (ii) the commencement of any proceeding by or against any Party under any other bankruptcy law or under any reorganization, insolvency, arrangement, adjustment, composition, relief, receivership, liquidation, dissolution or moratorium law; (iii) the appointment of, or the commencement of any proceeding seeking the appointment of, a trustee, receiver or similar official for any Party or for any property of any Party; (iv) the making by any Party of an assignment for the benefit of creditors; (v) any action taken by any Party to authorize any of the actions set forth in any of clauses (i)-(iv) of this subparagraph 17(b); (vi) the issuance of any warrant, process, order of attachment, garnishment or other lien or levy and/or the filing of a lien as a result thereof against any material portion of any property of any Party; (vii) any Party is generally not paying (or admits in writing its inability to pay) its debts as they become due; or (viii) one or more judgments for the payment of money shall be rendered against any Party, and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or the commencement of any proceeding under, or the use of any of the provisions of, any law relating to the enforcement of judgments of any jurisdiction by any judgment creditor against any material portion of any property of any Party or the issuance of any material injunction against any Party.

(c) **Noncompliance.** (i) Any Default with respect to any Contract; (ii) the appearing at any time that any representation, warranty, statement or information given or hereafter given to you by or on behalf of any Party is or was when give incorrect or incomplete; (iii) the failure of any Party to furnish to you, promptly when required or when requested by you, copies of its financial statements in such form, and such other information respecting its business, properties, condition or operations, financial or otherwise, as you may reasonably request; (iv) the validity, binding effect or enforceability of any Party's obligations under any Contract with you (including but not limited to any of the Liabilities) being challenged or questioned, whether or not by the institution of proceedings; (v) the failure of any Party at all times to keep security with you at a margin above the Liabilities satisfactory to you or to insure in your favor and to your satisfaction any of its property.

(d) **Adverse changes.** (i) The occurrence of a material adverse change in any Party's financial condition; (ii) any Party's death, incapacity or incompetence (if a person) or dissolution or liquidation (if a corporation, partnership or other entity); (iii) any material Default with respect to any material Contract other than with you; (iv) any Default pursuant to which any Person shall have the power to effect an Acceleration; (v) any Acceleration or demand of payment with respect to any Debt; (vi) any Party's insolvency however evidenced; (vii) your deeming yourself insecure; (viii) the suspension of business of any Party; (ix) any Party's material failure to pay any tax when due; (x) the expulsion of any Party from any exchange or any loss, non-renewal or invalidity of any Party's material license, permit, franchise, patent, copyright, trademark or the like.

(e) **Business structure changes.** (i) The condemnation, seizure, appropriation or taking of possession of any material part of the property of, or the assumption of control over the management of, any Party by, or on order of, any court or governmental authority; (ii) any change in control of any Party; (iii) any merger or consolidation involving any Party; (iv) any Party's sale or other transfer of substantially all of its assets; (v) any bulk sale by any Party; (vi) any change in the nature or structure of any Party's business.

(f) **Exchange controls; Licenses.** (i) Any Party's failure to obtain any Exchange Control Permit or other license deemed by you to be necessary or appropriate; (ii) if any Exchange Control Permit or other license shall have been issued, the failure to obtain the renewal of such Exchange Control Permit or other license at least 30 days prior to its expiration date.

(g) **Grant of Security Interest.** The mortgage or pledge of, or creation of a security interest in, any assets of any Party, other than security interests in favor of the Issuer.

(h) **Invalid Security Interest.** Any lien purported to be created by, or referred to in paragraph 12 of, this Agreement shall cease to be, or shall be asserted by any Party not to be, a valid, perfected first priority (except as otherwise provided in this Agreement or the security agreement referred to in paragraph 12 of this Agreement) lien on any of the collateral described therein.

(i) **Invalid Agreement.** This Agreement, any other document or agreement executed by any Party in connection with the Liabilities, or any provision hereof or thereof, shall at any time and for any reason become, or is declared to by a court of competent jurisdiction to be, null and void, invalid or unenforceable against any Party, or any Party shall challenge the validity or enforceability of this Agreement or such other document or agreement or any provision hereof or thereof or shall assert in writing, or engage in any action or inaction based on any such assertion, that this Agreement or such other document or any provision hereof or thereof is null and void, or has ceased to be or otherwise is not valid, binding or enforceable in accordance with its terms; or any Party shall repudiate or deny any portion of its liability or obligation for its obligations (or any portion thereof) under this Agreement or such other document to which it is a party.

(j) **USA PATRIOT Act and Related Events.** Any Party shall (i) be named on any list of Persons who are or may be engaged in or who have been or may be engaged in possible criminal activity or other wrongdoing, which list is promulgated under the Uniting and Strengthening America by Providing Appropriate Tools to Restrict, Intercept and Obstruct Terrorism Act of 2001, 107 Public Law 56 (October 26, 2001) (the "USA PATRIOT Act"), and other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices, related to the subject matter of the USA PATRIOT Act, including Executive Order 13224 effective September 24, 2001, (ii) be indicted, arraigned or custodially detained on charges involving money laundering or (iii) be criminally convicted under any law that would reasonably be expected to lead to a forfeiture of any property of any Party.

18. **Consequences of Default.** If any Event of Default shall occur, then:

(a) Any or all of the Liabilities (including, without limitation, all Liabilities under this Agreement or in connection with the Credit, whether or not then matured or otherwise payable, including but not limited to obligations to reimburse the Issuer for presented Drafts or to pay the Issuer in advance for Drafts which are not yet presented or due or which may be issued under the Credit, whether or not then issued) shall with respect to any Event of Default specified in subparagraph 17(b) of this Agreement, automatically, and with respect to all other Events of Default, at the Issuer's option, become at once due and payable without notice, presentment, demand for payment, protest, or notice of dishonor, which are hereby expressly waived;

(b) Any such amounts on account of Liabilities for payment in advance for Drafts which are not yet presented or due or which may be issued under the Credit whether or not then issued which the Applicant shall pay to the Issuer in advance, shall be for application to drawings under the Credit to the maximum amount which may then or thereafter be drawn and to the Applicant's other obligations under this Agreement. Twenty (20) business days after

(i) the expiration of the Credit, and

(ii) any reasonable additional time determined by the Issuer to be appropriate for the Issuer to receive and to take all necessary or appropriate

action (including but not limited to making payment or reimbursement) in connection with Documents and Drafts presented (either at the Issuer's counters or at other than the Issuer's counters) prior to the expiration of the Credit.

the Issuer shall repay to the Applicant any such amount (after deducting all amounts paid or applied, and/or a reasonable reserve for amounts anticipated by the Issuer to be or become payable, in accordance with this Agreement) as shall then remain on hand; and

(c)     The Issuer shall have all rights and remedies available to it under applicable law, including but not limited to the UCC.

19.     Waivers; Jury Trial Waiver.

(a)     No provision hereof and no right or remedy of the Issuer may be waived by any future action or course of dealing. The Issuer shall not be deemed to have waived any of its rights hereunder unless the Issuer or its authorized agent shall have signed an express waiver in writing. No such waiver, unless expressly stated otherwise therein, shall be effective as to any transaction which occurs subsequent to the date of such waiver, or as to any continuance of a breach after such waiver.

(b)     Neither the Issuer's failure nor any delay to exercise any right in connection with this Agreement shall operate as a waiver thereof or preclude any other or further exercise thereof, nor shall any single or partial waiver of any such right preclude any other or further exercise thereof, or the exercise of any other right, which is hereby waived.

(c)     Any judicial proceeding shall take place without a jury which the Applicant hereby waives. The Applicant also waives the right to assert any counterclaim or setoff in any litigation brought to enforce the Issuer's rights and remedies under this Agreement.

(d)     The Applicant waives all rights to special, indirect, consequential or punitive damages arising from, out of or in connection with this Agreement or any performance related to it.

20.     Joint and Several Liability. If this Agreement is signed by two or more parties, it shall be the joint and several agreement of such parties and they shall be jointly and severally liable.

21.     Transfers, Successors and Assigns.

(a)     Continuing Obligations. The Liabilities shall bind the Applicant and its, his or her heirs, executors, administrators, successors and permitted assigns and shall continue after the expiration or cancellation of the Credit and until all of the Liabilities shall have been paid, satisfied and performed in full.

(b)     Transfers by Issuer; Waivers of Defenses.

(i)     All rights, benefits and privileges hereby conferred on the Issuer shall be and hereby are extended to and conferred upon and may be enforced by any of the Issuer's successors and assigns. Without limiting the Issuer's rights hereunder, the Issuer may Transfer the Credit and whether or not in connection therewith, may Transfer all or part of its rights and obligations under (A) this Agreement, (B) any collateral, mortgage, lien or security interest, however denominated, securing this Agreement, (C) any guaranty of, any subordination to, and any other of the Issuer's rights against any third party(ies) in connection with, this Agreement, and/or (D) any document or instrument evidencing or relating to the foregoing.

(ii)     In connection with any such Transfer transaction, (A) the Applicant authorizes the Issuer to disclose any information it may have or acquire about the Applicant to any prospective or actual Transferee and (B) the provisions of paragraph 15 of this Agreement shall apply to any of the Applicant's accounts with and claims against any Transferee, to the extent of any Transfer.

(iii)     The Applicant hereby waives all defenses (except such defenses as may be asserted against a holder in due course of a negotiable instrument) which the Applicant may have or acquire against any Transferee who takes this Agreement, or any complete or partial interest in it, for value, in good faith and without notice that any of the Applicant's obligations hereunder are overdue or have been dishonored or of any defense against or claim to it on the part of any person.

(c)     No Transfers by Applicant. Without the Issuer's express written permission, the Applicant shall have no right to assign any of its rights or delegate any of its obligations under this Agreement, the Application or the Credit, and if the Applicant shall do so, such delegation shall be null and void.

(d)     Partnership Applicants. The obligations under this Agreement shall continue in force and shall apply, notwithstanding any change in the membership of any partnership executing this Agreement, whether arising from the death or retirement of one or more partners or the accession of one or more new partners.

22.     Applicable Law. This Agreement and all rights, obligations and liabilities arising hereunder shall be construed according to the internal laws of the State of New York, without giving effect to conflict of laws principles, including but not limited to, Article 5 of the UCC.

23.     Partial Unenforceability. Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non-authorization, without invalidating the remaining provisions hereof in that or any other jurisdiction and without affecting the validity, enforceability or legality of such provision in any other jurisdiction

24.     Submission to Jurisdiction.

(a)     Submission. The Applicant hereby submits to the non-exclusive jurisdiction of the federal and state courts sitting in the County of New York, State of New York, with respect to any dispute arising from, out of, or in connection with the Application, the Credit, this Agreement or any Document.

(b)     Sovereign Immunity Waiver. In connection with any such litigation, the Applicant hereby irrevocably waives any sovereign immunity it may have or hereafter acquire, including but not limited to immunity from jurisdiction of any court, from any legal process (whether through service, notice or otherwise), from attachment prior to judgment, from attachment in aid of execution, from execution or otherwise, with respect to itself or its Property.

(c)     Service of Process. Service may be made on the Applicant by mailing a copy of the legal process to the Applicant at its address appearing on the Application (unless the Issuer's department handling the transaction shall have received notice of change of address, in which case such legal process shall be mailed to the Applicant at such changed address).

25.     Notices. Any notice to the Issuer shall be deemed effective only if sent to, and when received at, the Issuer's department conducting the transaction or transactions in question relating to the Credit, the Application or this Agreement. Any notice to or demand on the Applicant shall be binding on the Applicant and shall be deemed effective when first delivered by hand or when sent to the Applicant by mail, telegraph, telex, SWIFT, cable, radio, telephone or otherwise to the Applicant's address or telephone number appearing on the Application or to such other address as the Applicant shall have notified the Issuer.

26. **Changes.** Neither this Agreement nor the Application may be changed or terminated orally. Except as provided in subparagraph 6(b) of this Agreement, neither this Agreement nor the Application may be supplemented by any oral agreement whatsoever.

27. **Captions.** The captions in this Agreement are inserted for reference only and shall not modify the text or any provision or be considered parts of this Agreement.

**THE ISSUANCE OF THE CREDIT SHALL BE SUBJECT TO THE FOREGOING APPLICATION AND THE TERMS AND CONDITIONS OF THIS AGREEMENT.**

AGREED:

By: _____
(Applicant's signatory signs here)

Print Name: JOHN F. BARRETT

Title: MEMBER

Date: 10 — 30 — 18

By: _____
(Applicant's signatory signs here) *(If Applicable)*

Print Name: _____

Title: _____

Date: _____

**SIGNATURE BANK**

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER ███████

DATE OF ISSUE:    NOVEMBER 13, 2018

APPLICANT:    MEZZ57TH LLC
                754 FIFTH AVENUE, 9TH FLOOR
                NEW YORK, NY 10019

BENEFICIARY:    MIP 57TH DEVELOPMENT ACQUISITION LLC
                C/O MACKLOWE PROPERTIES
                737 FIFTH AVENUE
                NEW YORK, NY 10153

AT THE REQUEST AND FOR THE ACCOUNT OF APPLICANT, WE SIGNATURE BANK NEW YORK, NY ("ISSUER") ISSUE THIS IRREVOCABLE STANDBY LETTER OF CREDIT NO. ███████ ("STANDBY") IN FAVOR OF BENEFICIARY IN THE MAXIMUM AGGREGATE AMOUNT OF US$ 1,050,720.00.

THIS STANDBY IS DRAWN AGAINST BY PRESENTATION TO SIGNATURE BANK ONLY AT THE OFFICE LOCATED AT 6023 AIRPORT ROAD, ORISKANY, NY 13424, ATTENTION: MANAGER, STANDBY LETTER OF CREDIT, OR SUCH SUBSTITUTE LOCATION OF WHICH ISSUER NOTIFIES BENEFICIARY BY COURIER OR OTHER RECEIPTED MEANS OF DELIVERY SENT TO BENEFICIARY AT LEAST 10 DAYS BEFORE PRESENTATION.

DOCUMENTS REQUIRED:

FUNDS UNDER THIS STANDBY ARE AVAILABLE AGAINST THE BENEFICIARY'S DEMAND FOR PAYMENT DRAWN ON SIGNATURE BANK IN THE FORM OF ANNEXED PAYMENT DEMAND, WHICH IS AN INTEGRAL PART HEREOF. THE DRAFT MUST BE PURPORTEDLY SIGNED BY AN AUTHORIZED SIGNATORY OF THE BENEFICIARY.

THE ORIGINAL OF THIS STANDBY, AND ALL ORIGINAL AMENDMENTS, IF ANY, MUST ACCOMPANY ALL DRAWINGS OR OTHER TRANSACTIONS HEREUNDER.

SPECIAL INSTRUCTION(S):

ALL BLANKS ON DRAFTS OR ANY OTHER DOCUMENTS MUST BE FILLED IN. ALL DRAFTS AND DOCUMENTS MUST BE MARKED "DRAWN UNDER SIGNATURE BANK STANDBY NO. S9306070 DATED NOVEMBER 13, 2018."

SIGNATURE BANK IS AUTHORIZED TO ACCEPT AND SHALL ACCEPT ANY STATEMENT, DOCUMENT OR INSTRUMENT FURNISHED HEREUNDER AS BINDING AND CORRECT WITHOUT INVESTIGATION OR RESPONSIBILITY FOR THE ACCURACY, VERACITY, CONCLUSORY CORRECTNESS, OR VALIDITY OF THE SAME OR ANY PART THEREOF, OR OF ANY SIGNATURE THEREON.

PARTIAL AND MULTIPLE DRAWINGS UNDER THIS STANDBY ARE PERMITTED. ANY PAYMENT MADE UNDER THIS STANDBY SHALL REDUCE THE AMOUNT AVAILABLE UNDER IT.

THIS STANDBY IS TRANSFERABLE IN WHOLE AND NOT IN PART, AND MAY BE TRANSFERRED SUCCESSIVELY, AND ONLY UPON THE TERMS AND CONDITIONS SET FORTH IN THIS STANDBY AND IN ANNEXED TRANSFER DEMAND, WHICH IS AN INTEGRAL PART HEREOF.

DocuGard #04546 contains a security pantograph, blue background, heat-sensitive ink, coin-reactive watermark, and microtext printing on border.





SIGNATURE BANK



UNDER NO CIRCUMSTANCES SHALL THIS STANDBY BE TRANSFERRED TO ANY PERSON OR ENTITY WITH WHICH U.S. PERSONS OR ENTITIES ARE PROHIBITED FROM CONDUCTING BUSINESS UNDER U.S. FOREIGN ASSET CONTROL REGULATIONS OR IS OTHERWISE IN CONTRAVENTION OF U.S. LAW.

IN THE EVENT OF A REQUEST TO TRANSFER THIS STANDBY PLEASE EXECUTE ANNEXED TRANSFER DEMAND, WITH THE SIGNATURE VERIFICATION STAMP OF THE BENEFICIARY'S BANK, AND RETURN THE FORM TO SIGNATURE BANK AT THE ADDRESS SPECIFIED ON ANNEXED TRANSFER DEMAND, ALONG WITH THIS ORIGINAL STANDBY, AND THE ORIGINAL OF ANY AMENDMENTS.

UPON ANY SUCH TRANSFER, SIGNATURE BANK SHALL ENDORSE THE ORIGINAL OF THIS STANDBY TO THE NAME OF THE TRANSFEREE AND SEND AN ACKNOWLEDGMENT TO BOTH THE TRANSFEREE AND CURRENT BENEFICIARY.

ALL FEES FOR TRANSFER OF THIS STANDBY CHARGED BY SIGNATURE BANK SHALL BE FOR THE ACCOUNT OF THE APPLICANT. PAYMENT OF SUCH CHARGES SHALL NOT BE A CONDITION OF SUCH TRANSFER.

ALL FEES CHARGED BY SIGNATURE BANK SHALL BE IN ACCORDANCE WITH SIGNATURE BANK'S FEE SCHEDULE AND SHALL BE FOR THE ACCOUNT OF THE APPLICANT.

THE EXPIRATION DATE OF THIS STANDBY IS NOVEMBER 15, 2019.

THE EXPIRATION DATE OF THIS STANDBY SHALL BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE ONE YEAR PERIODS, UNLESS ISSUER NOTIFIES BENEFICIARY BY COURIER OR OTHER RECEIPTED MEANS OF DELIVERY SENT TO BENEFICIARY'S ABOVE-STATED ADDRESS 90 OR MORE DAYS BEFORE THE THEN CURRENT EXPIRATION DATE THAT THE ISSUER ELECTS NOT TO EXTEND THE EXPIRATION DATE. THE EXPIRATION DATE IS NOT SUBJECT TO AUTOMATIC EXTENSION BEYOND MARCH 31, 2035, AND ANY PENDING AUTOMATIC ONE-YEAR EXTENSION SHALL BE INEFFECTIVE BEYOND THAT DATE. SIGNATURE BANK'S NOTICE IS DEEMED TO HAVE BEEN GIVEN ON THE DATE IT IS RECEIVED. HOWEVER, IF DELIVERY BY ANY SUCH METHOD IS ATTEMPTED BUT REFUSED, SIGNATURE BANK'S NOTICE IS DEEMED TO HAVE BEEN GIVEN AT THE TIME OF SUCH REFUSAL.

UPON RECEIPT OF A NOTICE THAT SIGNATURE BANK HAS ELECTED NOT TO RENEW, THE BENEFICIARY MAY DRAW UP TO ALL AVAILABLE FUNDS HEREUNDER IN ACCORDANCE WITH THE FOREGOING PROVISIONS HEREOF

ISSUER SHALL NOT MAKE ANY PAYMENT UNDER THIS STANDBY TO OR AT THE REQUEST OF ANY PERSON OR ENTITY IF SUCH PAYMENT IS PROHIBITED BY U.S. OFFICE OF FOREIGN ASSETS CONTROL REGULATIONS OR IS OTHERWISE IN CONTRAVENTION OF U.S. LAW.

THIS STANDBY IS SUBJECT TO THE PROVISIONS OF THE INTERNATIONAL STANDBY PRACTICES OF THE INTERNATIONAL CHAMBER OF COMMERCE EFFECTIVE JANUARY 1, 1999 (ISP98) AND, TO THE EXTENT NOT INCONSISTENT THEREWITH, SHALL ALSO BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, U.S.A (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PROVISIONS THEREOF) INCLUDING BUT NOT LIMITED TO ARTICLE 5 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT ON THE DATE OF ISSUANCE OF THIS STANDBY.

DocuGard #04546 contains a security pantograph, blue background, heat-sensitive ink, coin-reactive watermark, and microtext printing on border.

SIGNATURE BANK

SIGNATURE BANK HEREBY ENGAGES WITH THE DRAWERS OF DRAFTS AND DOCUMENTS PRESENTED DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS STANDBY, THAT THE SAME SHALL BE DULY HONORED ON PRESENTATION TO SIGNATURE BANK

AT THE AFOREMENTIONED OFFICE NOT LATER THAN THE EXPIRATION DATE OF THIS STANDBY ON OR BEFORE MARCH 31, 2035.

IN CASE OF ANY INQUIRIES IN CONNECTION WITH THIS STANDBY, YOU MAY CONTACT SIGNATURE BANK AT (646) 822-4162.

THIS IRREVOCABLE STANDBY LETTER OF CREDIT CONSISTS OF THREE (3) PAGES.


SIGNATURE BANK

AUTHORIZED SIGNATURE

DocuGard #04546 contains a security pantograph, blue background, heat-sensitive ink, coin-reactive watermark, and microtext printing on border.

THIS IS AN INTEGRAL PART OF THE STANDBY LETTER OF CREDIT NO. S93060770

**ANNEXED PAYMENT DEMAND**

FOR VALUE RECEIVED                                                    DATED: _____

PAY AT SIGHT TO

THE SUM OF _____

US DOLLARS (USD _____).

DRAWN UNDER SIGNATURE BANK STANDBY LETTER OF CREDIT NO. ▮▮▮▮▮, DATED NOVEMBER 13, 2018

ALL PAYMENTS WILL BE MADE BY WIRE TRANSFER ONLY: NO PAYMENTS WILL BE MADE BY CHECK. TO EXPEDITE PAYMENT, PLEASE INCLUDE CLEAR AND CORRECT WIRE TRANSFER INSTRUCTIONS

NAME OF RECEIVING BANK: _____

ABA NUMBER OF RECEIVING BANK: _____

ACCOUNT NAME OF BENEFICIARY: _____

BENEFICIARY ACCOUNT NUMBER: _____

THE BENEFICIARY ACKNOWLEDGES SIGNATURE BANK'S DISCLAIMER OF ANY RESPONSIBILITY IN THE EVENT UNCLEAR AND/OR INACCURATE WIRE TRANSFER INSTRUCTIONS ARE PROVIDED TO SIGNATURE BANK.

TO:
SIGNATURE BANK
ATTN: MANAGER, STANDBY LETTER OF CREDIT
6023 AIRPORT ROAD
ORISKANY, NY 13424

_____
AUTHORIZED SIGNATORY

_____
PRINT NAME AND TITLE

THE SIGNATURE BELOW CONSTITUTES AN ENDORSEMENT OF THIS SIGHT DRAFT.

_____
AUTHORIZED SIGNATORY

_____
PRINT NAME AND TITLE

DocuGard #04546 contains a security pantograph, blue background, heat-sensitive ink, coin-reactive watermark, and microtext printing on border

THIS IS AN INTEGRAL PART OF THE STANDBY LETTER OF CREDIT NO. ███████

## ANNEXED TRANSFER DEMAND

DATE:

SIGNATURE BANK
ATTN: MANAGER, STANDBY LETTER OF CREDIT
6023 AIRPORT ROAD
ORISKANY, NY 13424

RE:  STANDBY LETTER OF CREDIT NUMBER S93060770 ISSUED BY SIGNATURE BANK (THE "ISSUER") AT THE
REQUEST OF ITS CLIENT _____ (THE "APPLICANT").

FOR VALUE RECEIVED, THE UNDERSIGNED BENEFICIARY HEREBY IRREVOCABLY TRANSFERS ALL RIGHTS
OF THE UNDERSIGNED BENEFICIARY TO DRAW UNDER THE ABOVE STANDBY IN ITS ENTIRETY TO:

TRANSFEREE: _____

ADDRESS OF TRANSFEREE: _____

PHONE NUMBER FOR TRANSFEREE: _____

EMAIL ADDRESS FOR TRANSFEREE: _____

CONTACT NAME FOR TRANSFEREE: _____

BY THIS TRANSFER, ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY IN SUCH STANDBY ARE
TRANSFERRED TO THE TRANSFEREE AND THE TRANSFEREE SHALL HAVE THE SOLE RIGHTS AS
BENEFICIARY THEREOF, INCLUDING SOLE RIGHTS RELATING TO ANY AMENDMENTS, WHETHER INCREASES
OR EXTENSIONS OR OTHER AMENDMENTS, AND WHETHER NOW EXISTING OR HEREAFTER MADE.  ALL
AMENDMENTS ARE TO BE ADVISED DIRECT TO THE TRANSFEREE WITHOUT NECESSITY OF ANY CONSENT
OF OR NOTICE TO THE UNDERSIGNED BENEFICIARY.

THE ORIGINAL (AND ANY ADVICE) OF THE STANDBY IS RETURNED ENCLOSED HEREWITH, TOGETHER WITH
THE ORIGINALS OF ANY AMENDMENTS THERETO, AND WE ASK SIGNATURE BANK TO ENDORSE THE
ORIGINAL STANDBY TO THE NAME OF THE TRANSFEREE BENEFICIARY AND TO FORWARD IT DIRECTLY TO
THE TRANSFEREE WITH SIGNATURE BANK'S CUSTOMARY NOTICE OF TRANSFER, AT THE ABOVE LISTED
TRANSFEREE'S ADDRESS.

AUTHORIZED SIGNATORY

_____
PRINT NAME AND TITLE

BENEFICIARY SIGNATURE GUARANTEED:

_____
(BENEFICIARY'S BANK)

BY: _____.
AUTHORIZED SIGNATORY (GREEN MEDALLION STAMP REQUIRED)

DocuGard #04546 contains a security pantograph, blue background, heat sensitive ink, coin-reactive watermark, and microtext printing on border