Jonathan L. Flaxer
Moshie Solomon
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, New York 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0777

*Counsel for MIP 57th Development Acquisition LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | | |
|---|---|---|
| In Re | : | Chapter 11 |
| | : | |
| MEZZ57TH LLC, et al. | : | Case No. 20-11316 (SHL) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

---------------------------------------------------------x

**OBJECTION OF MIP 57TH DEVELOPMENT ACQUISITION LLC TO THE DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) APPROVING RELIEF RELATED
TO THE INTERIM BUDGET AND (II) GRANTING RELATED RELIEF,
AND CROSS-MOTION OF MIP 57TH DEVELOPMENT ACQUISITION LLC
TO COMPEL THE DEBTORS TO (I) PERFORM THEIR POSTPETITION
OBLIGATIONS AND, ALTERNATIVELY, (II) PROVIDE ADEQUATE PROTECTION**

MIP 57th Development Acquisition LLC (the "**Landlord**"), by its counsel Golenbock

Eisenman Assor Bell & Peskoe, LLP, hereby files this (i) objection (the "**Objection**") to the

Debtors' *Motion for Entry of an Order (I) Approving Relief Related to the Interim Budget and (ii)*

*Granting Related Relief* (the "**Motion**")[1] [Dkt. No. 35], and (ii) cross-motion seeking entry of an

order (A) compelling the above-captioned debtors to comply with section 365(d)(3) of chapter 11

of title 11 of the United States Code (the "**Bankruptcy Code**") and perform all of its obligations

under the lease, including but not limited to keeping the Landlord's property free from liens, and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(B) alternatively, requiring payment of adequate protection (the "**Cross-Motion**").  In support of the Objection and Cross-Motion, Landlord respectfully states as follows:

**Preliminary Statement**

1. Landlord understands the hardship and unpredictability that the current Covid-19 crisis has imposed on all parties.  This unforeseen circumstance, however, does not compel the conclusion that Landlord bear all the risk without any protection or other means to mitigate its losses, and should not be used as a shield for a debtor that has been in default of its obligations under the Lease since June 2019, long before the current crisis began.  In addition to not paying hundreds of thousands of dollars of pre-petition rent, the Operating Debtor failed to pay its subcontractors, which caused more than $715,000 of mechanic's liens against the Premises in violation of the Lease.  The Operating Debtor now exacerbates its history of defaults under the Lease by making an extraordinary request in violation of Bankruptcy Code § 365(d)(3) for a rent deferral for at least 120 days from the Petition Date, without making any provision for (i) when such deferral period will actually end, (ii) how and whether it will make rent payments on a going forward basis at the conclusion of such deferral period, (iii) when it will catch up on all missed payments of rent during the deferral period, and (iv) how and when it intends to discharge the Liens as required under the Lease.  This extraordinary request for relief is also predicated on the faulty premise that the Operating Debtor will be fully closed or operating at a severely limited capacity during the deferral period, neither of which is true - the Operating Debtor was operating as of the date of the Motion, and is now able to provide all services to its customers that it has always provided prior to the Covid-19 crisis.  The Motion has no basis in law or fact, fails to provide adequate protection to the Landlord, serves to cause further harm to the Landlord and a continued diminution of the Landlord's interest in the Premises, and therefore must be denied.  For

the same reasons, the Landlord requests that the Court grant the Cross-Motion compelling the Operating Debtor under Bankruptcy Code § 365(d)(3) to perform all of its obligations under the lease, including but not limited to keeping the Landlord's property free from the mechanic's liens.

## Background

2.	On May 29, 2020, Mezz57th LLC (the "**Operating Debtor**") and John Barrett, Inc. (together with Mezz57th, the "**Debtors**") commenced with this Court voluntary cases under Subchapter V of Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

3.	The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

### i.	Mexx57th's Pre-Petition Default Under the Lease

4.	On November 22, 2018, the Operating Debtor entered into an agreement (the "**Lease**") with the Landlord to lease retail space located at 432 Park Avenue a/k/a 36-46 East 57th Street, New York, New York (the "**Premises**").  A true and correct copy of the relevant sections of the Lease referenced in this pleading are attached hereto as **Exhibit "A"**.

5.	As security for its obligations under the terms of the Lease, on or about November 13, 2018, the Debtors caused the issuance of an irrevocable standby letter of credit (the "**Letter of Credit**") in favor of the Landlord in the maximum aggregate amount of $1,050,720.

6.	Pursuant to the terms of the Lease, the Operating Debtor is responsible for various charges related to its use and occupancy of the Premises, including, but not limited to minimum monthly rent and  additional rent, including charges for common area maintenance ("**CAM**"), and various other obligations that accrue and become due under the Lease, including its proportional share of real property taxes. [2]  Specifically, among other things, Debtor is required to pay minimum monthly rent of $90,186.80 in advance of the first day of each calendar month, plus its

---

[2] Under Article 23 of the Lease, the Operating Debtor is also liable for certain property tax and operating expense escalations as additional rent.  The most recent tax escalation year under the Lease was July 1, 2019 through June 30, 2020, which just concluded. The Landlord is now finalizing the calculation of the proportionate share of the Landlord's real property tax liability for which the Operating Debtor will be liable under Article 23 of the Lease, and will report this information to the Court at the hearing on the Motion.

proportionate share of CAM in the current amounts of $291.67, per month, for a minimum total monthly rental obligation of $90,478.47 per month due to the Landlord. *See* Lease, § 1.03.

7.  Starting in June 2019, and through the Petition Date, the Operating Debtor failed to stay current with its obligations under the Lease.  On November 1, 2019, and again on February 5, 2020, counsel for the Landlord served two separate Notices of Default, copies of which are annexed hereto as **Exhibit "B"**.  The defaults were never cured.

8.  As of the Petition Date, the Operating Debtor was in default of its payment obligations under the Lease since June 2019 in the total amount of $588,645.04 (the "**Pre-Petition Rent**").

9.  On or about June 8, 2020, in accordance with the terms of the Lease and the Letter of Credit, the Landlord drew down on the Letter of Credit to pay the Pre-Petition Rent, as well as the June 2020 rent that became due as of June 1, 2020, in the aggregate amount of $660,673.  The amount of future draws available under the Letter of Credit is approximately $390,000.

**ii.     The Operating Debtor's Pre-Petition Actions Caused Mechanic's Liens to be Filed Against the Premises**

10.  Pursuant to Section 3.02 of the Lease, the Operating Debtor is required to discharge, by bond or otherwise, any mechanic's liens filed against the Premises within thirty (30) days after being notified thereof. Lease, § 3.02.

11.  As of this date, upon information and belief, the following mechanic's liens have been filed against the Premises for services rendered to, but unpaid by, the Operating Debtor, in an aggregate amount in excess of $715,000 (collectively, the "**Liens**"):

| Claimant | Date of Lien Filing | Amount |
|---|---|---|
| Visual Millwork & Fixture Mfg. Inc. | August 15, 2019 | $5,360.00 |
| The Ridgeway Corporation | November 1, 2019 | $14,345.00 |
| Platinum Maintenance Services Corp. | May 22, 2020 | $14,908.85 |
| CCG Construction LLC | May 22, 2020 | $54,652.47 |
| Sweet Construction Group Ltd. | June 9, 2020 | $586,098.55 |

| Henick-Lane, Inc. | June 16, 2020 | $40,366.27 |
|---|---|---|
| | | |
| **TOTAL** | | **$715,731.14** |

True and correct copies of the lien notices received from the various mechanic's lien creditors (the "**Lien Notices**") are attached hereto as **Exhibit "C"**.

12.     As a result of the Operating Debtor's failure to satisfy its obligations to discharge the Liens filed against the Premises, Landlord has incurred and will continue to incur claims, attorneys' fees and costs to defend any actions filed by the mechanics' lien claimants to preserve its interest in the Premises, as well as potential administrative claims against the Operating Debtor for their failure to bond against or discharge the Liens.

### iii.     The Operating Debtor's Post-Petition Operations

13.     As of the Petition Date, the Operating Debtor was closed for business due to the Covid-19 pandemic and related state and city government regulations.  The Debtors did however initially anticipate that it would be allowed to reopen on or after July 6, 2020. *See Affidavit Pursuant to Local Bankruptcy Rule 1007-2* [Dkt. No. 5] ( the "**First Day Affidavit**"), Para. 24.

14.     On June 8, 2020, the Debtors filed a *Motion For Order (I) Authorizing Mezz57th LLC's Use of Cash Collateral Pursuant to 11 U.S.C. Sec. 363(c)(2) and Bankruptcy Rule 4001 on an Interim Basis and Providing Adequate Protection Therefore Pursuant to 11 U.S.C. Sec. 361 And 362 and (II) Scheduling A Final Hearing* (the "**Cash Collateral Motion**") [Dkt. No. 12], which was approved by the Court on an interim basis pending a final hearing to be held on July 23, 2020 (the "**Final Hearing**") [Dkt. No. 26].  The Cash Collateral Motion seeks the use of the Debtors' lenders' cash collateral.  In exchange, the Debtors and their lenders agreed to a budget (the "**June Budget**", annexed to the Cash Collateral Motion as Exhibit "B"), which projected no income (presumably since the Operating Debtor was not operating as of the Petition Date) and also

did not provide for the payment of the rent owed to the Landlord for use of the Premises after the Petition Date (the "Rent").[3]  Consequently, Landlord filed an objection to the Cash Collateral Motion [Dkt. No. 37], which has been continued to the Final Hearing.

15.     On June 22, 2020, New York City entered Phase 2 of its Covid-19 reopening plan, and the Operating Debtor reopened on that date (two weeks earlier than the Operating Debtor initially predicted in the First Day Affidavit).  *See Declaration of John Barrett with Respect to Post-Opening Operations* (the "**Operations Declaration**")  [Dkt. No. 42], ¶ 4.

16.     According to Mr. Barrett, New York City's Phase 2 reopening guidelines required the Operating Debtor to operate at a maximum 50% capacity, and also restricted the Debtor from offering certain services, resulting in an 18% reduction of its regular services.  *See* Operations Declaration, ¶¶ 5 and 7.  Despite these restrictions, Mr. Barrett acknowledged that the salon's revenue in the first week of opening was a success, exceeding the Debtors' average summer weekly revenue by as much as 12%. *See* Operations Declaration, ¶ 8.  Further, the Debtor's operating budget for the month of July 2020 (the "**July Budget**", as annexed to the Second Interim Cash Collateral Order and hereto as **Exhibit "D"**) shows an anticipated weekly revenue stream of $150,000 – which is very close to the Operating Debtor's typical summer season weekly revenue of about $156,000.  *Id.*

17.     Further, as of July 6, 2020, New York City has entered Phase 3 of its reopening plan, which allows the Operating Debtor to offer the remaining 18% of its usual and customary services, such as waxing, manicure/pedicure, make up services and applications.[4]  Operational

---

[3] The thirty day budget annexed as Exhibit "C" to the First Day Affidavit also does not provide for any payment of Rent to the Landlord.

[4] *See Covid-19: Restart Guidance for Businesses*, https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page.

Declaration, ¶ 7. The resumption of these services should only increase the Operating Debtor's forecasted revenue as set forth in the July Budget.

**Jurisdiction and Statutory Predicates**

18.     This Court has jurisdiction over the Cross-Motion pursuant to 28 U.S.C. §§ 157 and 1334. The venue for this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

19.     The statutory predicates for the relief sought in the Cross-Motion are Bankruptcy Code §§ 331(e) and 365(d).

**I.      OBJECTION TO THE MOTION**

20.     The Motion requests authority from this Court to defer all Rent to the Landlord (the "**Deferred Lease Obligations**") through September 25, 2020 (the "**Extension Date**"). The Operating Debtor does not guarantee the payment of the Deferred Lease Obligations by the Extension Date, nor does it even have a plan on how such obligations will be repaid (by, for example, reserving rent in its operating budget, or intending to seek any additional DIP funding). To the contrary, the proposed Order simply states that the Operating Debtor shall only "make reasonable efforts" to pay the Deferred Lease Obligations on or before the Extension Date, and requests that the Court grant the Operating Debtor the ability to seek additional extensions of time to make such payments without prejudice and without limits. The Motion further seeks the imposition of a stay on any pleadings or motions filed by the Landlord that would seek relief from the automatic stay or to compel the rejection, assumption or assignment of the Lease with the Operating Debtor, regardless of whether such pleadings or motions seek relief related to obligations that have been suspended to the Extension Date.

21.     The entire Motion is predicated on the premise that the Operating Debtor will either be fully closed or operating at a severely limited capacity prior to and including the Extension Date, and therefore should be excused from fulfilling its obligations under the Lease as required by Bankruptcy Code § 365(d)(3).   However, this is not true - and was not true when the Motion was filed on June 23, 2020.   The Operating Debtor has been open since June 22, 2020.  Further, as of July 6, 2020, the Operating Debtor has been permitted under Phase 3 of New York City's reopening plan to provide all services to all of its customers without any limitations (aside from following social distancing guidelines and proper Covid-19 safety protocols).   The fact is that the Operating Debtor was opened and operating as of the date of the Motion, and is able to provide all services to its customers that it has always provided prior to Covid-19, which undercuts the factual foundation of the Motion.

22.     The Motion is modelled on (and takes substantially all of its arguments from) an almost identical motion filed by debtor Pier 1 Imports, Inc. (the "**Pier 1 Motion**") in its bankruptcy case that is currently pending in the United States Bankruptcy Court for the District of Delaware (Case No. 20-30805). This Objection will separately address each argument made by the Operating Debtor in its Motion, but it is important to first point out the most obvious distinguishing factor between Pier 1 and the Operating Debtor – at the time that the Pier 1 Motion was filed on March 31, 2020, and at the time that Court issued its decision granting the motion on May 10, 2020, this country was at the apex of the Covid-19 pandemic and every retail store across the country was closed due to shelter in place orders issued by state and local governments. *See In re Pier 1 Imports, Inc.*, 615 B.R. 196, 198 (Bankr. E.D. Va. 2020).   In fact, the predominant factor in Judge Huennekens' decision granting the Pier 1 Motion was that, with Pier 1's stores ordered closed, there was no feasible alternative to the rent deferral requested in the motion, since "the debtors are

unable to open their stores to conduct the sales and customers are unable to come to the stores to buy the inventory marketed for sale." *Id.* at 203-204.

23.     In contrast to the debtor in Pier 1, which was unable to open any physical stores and had no income at each physical premises to pay rent for that location, the Operating Debtor is now open and operating, and has been for over two weeks, with the ability to offer all of its services to its customers.   Despite the limitations of social distancing that have allegedly reduced the number of customers and additional precautions for Covid-19 safety and hygiene, the Operating Debtor thrived during the first week of its operations, and has projected weekly revenue in the July Budget on the same scale as its average summer season.   The Operating Debtor's situation today stands in stark contrast to the much more dire circumstances faced by Pier 1 on May 10, 2020 that caused the court to grant the Pier 1 debtor such extraordinary relief.

24.     Further, the court in Pier 1 pointed out that Pier 1 has represented to the court that it expected to (i) reopen all of its stores by May 31, 2020 (limiting the rent deferment period to two months), (ii) make all rent payments starting on June 1, 2020, and (iii) catch up on all missed rent payments in the middle of July, 2020.   *Id.*  The Court concluded that that such representations provided adequate protection to the lessors under Bankruptcy Code § 363(e), and granting the motion was in the best interest of the estate and all parties involved. *Id.*  Unlike the debtors in Pier 1, the Operating Debtor has not proposed (i) when the Extension Date will end, (ii) whether the Operating Debtor will guarantee to make all rent payments on a going forward basis as of the Extension Date, and (iii) when the Operating Debtor will catch up on all missed payments of Rent. To the contrary, the Operating Debtor simply requests a rent deferral for three months, proposes that it will make "reasonable efforts" to pay outstanding rent due on the Extension Date, and requests that the Court allow it to extend such relief without prejudice and with no end in sight.

This failure to provide proper adequate protection to the Landlord is unfair and unequitable, and is not supported by Judge Huennekens' decision in Pier 1.[5]

25.     Turning to the legal arguments in the Motion, the Operating Debtor argues four separate grounds to alleviate its obligation under Bankruptcy Code § 365(d)(3) to pay Rent during this case.  None of the grounds have any merit and should be rejected by the Court.

**A.     Bankruptcy Code § 105(a) Does Not Permit the Court to Circumvent the Clear Dictate of Bankruptcy Code § 365(d)(3).**

26.     The Operating Debtor argues that Bankruptcy Code § 105(a) grants the Court the authority to defer payment of rent up to and including the Extension Date. Bankruptcy Court § 105(a) states, in relevant part, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  The Operating Debtor, without any case support or authority whatsoever, is asking the Court to utilize its broad equitable powers under Bankruptcy Code § 105(a) to grant it a "breathing spell" for the payment of the Deferred Lease Obligations for approximately 120 days from the Petition Date, and authority to extend such period for an indeterminate amount of time.[6]

---

[5] The Motion also cites to and relies on the Order issued in the United States Bankruptcy Court for the District of New Jersey, in *In re Modell's Sporting Goods, Inc.*, Bankr. D. N.J. Case No. 20-14179 [Dkt. No. 166].  However, the Modell's case is factually distinguishable in that (i) Modell's sought relief under Bankruptcy Code § 305 to suspend its bankruptcy cases pending the lifting of Covid-19 related shelter-in-place orders so that the company could move forward with its liquidation and going out of business sales when all of its locations can be reopened; (ii) similar to the Pier 1 situation, all of Modell's stores were closed at the time of the relief being granted by the court, and the debtor only sought a suspension of its obligations until such date that the applicable governmental entities allowed the debtors to reopen their physical locations for business; and (iii) the debtors' budget projected sufficient funds for the Debtors to satisfy their lease obligations in full.  *See Debtors' Omnibus Response in Opposition to the Landlord and Utility Responses and in Support of an Order Further Suspending Their Chapter 11 Cases Pursuant to 11 U.S.C. §§ 105 and 305*. *Id.* [Dkt. No. 287].  In contrast,  the Operating Debtor (i) is seeking relief solely under Bankruptcy Code § 105(a), (ii) is open and operating at this time, and (iii) has made no attempt to explain how (and if) it intends to satisfy all post-petition lease obligations in full.

[6] Aside from the recent decisions in Modell's and Pier 1 (both of which were distinguished above), none of the cases cited in the Motion support the extraordinary relief requested by the Operating Debtor, either under Bankruptcy Code § 105(a) or any other section of the Bankruptcy Code, and are barely even relevant factually to the relief requested.

27.     The Bankruptcy Code does, however, directly addresses this type of "breathing spell" which the Operating Debtor is requesting.  Bankruptcy Code § 365(d)(3) states in relevant part:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. ***The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period….***

11 U.S.C. § 365 (emphasis added).  Bankruptcy Code § 365(d)(3), for cause, allows the Court to grant an extension to fulfill all lease obligations for up to 60 days, but ***the statute expressly and unambiguously prohibits any extension beyond 60 days after the petition date***.  Courts have uniformly acknowledged and given effect to this clear and strict limitation. *See In re Papercraft Corp.*, 126 B.R. 926, 928 (Bankr. W.D. Pa. 1991) ("Section 365(d)(3) allows the Court, for cause, to extend the time for a debtor's performance of any obligation pursuant to a lease which arises within sixty (60) days after the date of the order for relief, provided that the performance is not extended beyond such sixty (60) days."); *In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969, 972 (Bankr. E.D. Pa. 1987) ("[W]hile the court may extend, for cause, the deadline for payment of rental payments falling due within the sixty day period, the deadline may not be extended beyond the sixty day period itself."). *See also In re Equity Res., Inc.,* 2008 Bankr. LEXIS 5170, *8-10 (Bankr. D. Nev. July 3, 2008) (denying debtor's request to extend period for performance under section 365(d)(3) because debtor did not identify cause for extension and requested extension for 120 days, holding that "[s]ection 365(d)(3) flatly prohibits a 120-day extension even if it was properly requested").

28.     Since Bankruptcy Code § 365(d)(3) clearly and unambiguously provides the "breathing spell" that the Operating Debtor is requesting, but restricts such period to 60 days after the petition date only upon a showing of cause, the Bankruptcy Court's equitable powers under section 105(a) of the Bankruptcy Code or otherwise do not allow for an extension of time beyond such 60 day statutory deadline. "It is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code. Section105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits." *Law v. Siegel*, 571 U.S. 415, 421 (2014) (internal citations and quotations omitted). *See also In re Headlee Mgmt. Corp.,* 519 B.R. 452, 459 (Bankr. S.D.N.Y. 2014) ("Nor can the court use § 105(a) to fashion a remedy where the Bankruptcy Code provides one."); *In re Motors Liquidation Co.,* 591 B.R. 501, 517 (Bankr. S.D.N.Y. 2018)("…[t]he principal restraint on the exercise of equitable power under section 105 is that it cannot contravene another section of the Bankruptcy Code or the applicable rules.").

29.     Accordingly, the equitable powers granted to the Court under Bankruptcy Code § 105(a) cannot override section 365(d)(3)'s requirement that the Debtors timely satisfy all post-petition lease obligations to the Landlord no later than the sixtieth day of these cases, which is July 29, 2020.  As a result, even if the Court determines that there is "cause" for an extension, the extension cannot stretch to September 25, 2020 or beyond as requested in the Debtors' Motion, and the Operating Debtor must be required to satisfy all Deferred Lease Obligations  (including but not limited to payment of Rent and the cure of all Liens) by no later than July 29, 2020.

**B.**     **The  Takings Doctrine, Doctrine of Intervening Impossibility, and the Frustration of Purpose Doctrine are Inapplicable to this Matter and Are Not Bases for the Operating Debtor's Request for Relief.**

**i.**     **<u>The Takings Doctrine</u>**

30. The Operating Debtor next argues that the government's current Covid-19 regulations constitute a taking of the Premises, thereby triggering the eminent domain provision of the Lease which, if true, could arguably entitle the Operating Debtor to an abatement of rent. *See* Lease, Article 10.

31. The only case cited by the Operating Debtor in support of this argument is *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922). As succinctly paraphrased in the Motion, the Supreme Court held in *Pennsylvania Coal* that government regulation which makes an activity "commercially impracticable . . . has very nearly the same effect for constitutional purposes as appropriating or destroying it". *Id.* at 414. The Operating Debtor claims in the Motion that "the regulatory orders resulting in the closing of the Operating Debtor's stores has rendered the Operating Debtor's activity of operating the Salon commercially impracticable and has deprived the Operating Debtor of the right to operate." Motion at ¶ 18. This is simply untrue and did not reflect the reality of the Operating Debtor's operations on the date that the Motion was filed. As of June 22, 2020 (which was the day before the Motion was filed), New York City entered Phase 2 of its reopening plan, which allowed the Operating Debtor the right to operate its salon with limited restrictions. On July 6, 2020, most of those restrictions were lifted as New York City entered Phase 3. The Operating Debtor is now operational and open for business (with limited capacity controls for social distancing and requirements for hygiene and safety), and the forecasts for its July 2020 revenue remains strong. *See* Operations Declaration, ¶ 8; *see also* July Budget. To claim that the current government regulations renders its business "commercially impracticable" such that the Premises has been subject to eminent domain by the government is simply preposterous.

32.    Additionally, in a recent decision, the U.S. District Court for the Southern District of New York addressed the governor's executive order regarding residential leases and determined, among other things, that the executive order did not constitute a taking that violated the Takings Clause of the Fifth Amendment.  In *Elmsford Apartment Associates, LLC, et al., v. Cuomo*, No. 20 Civ. 4062 (S.D.N.Y. June 29, 2020) (a copy of which is attached hereto as **Exhibit "E"**), three residential landlords asked a court to enjoin Executive Order 202.28 ("**EO 202.28**"), which temporarily permits tenants to apply security deposit funds to rents due and owning (provided the tenants replenish those funds at a later date) and prohibits landlords from initiating eviction proceedings against tenants facing financial hardship due to the pandemic.  The landlords argued that EO 202.28 violated, among other things, the Constitution's Takings Clause.  The District Court disagreed and denied the landlords' application. The District Court first determined that there was no physical taking of the property because there was no physical occupation of the property and the landlords failed to show that EO 202.28 otherwise denies them full control of their property.  *Id.* at 15-16.  The District Court also determined that there was no regulatory taking of the property, since: (i) EO 202.28 did not fully deprive the landlords of all economic and productive use of their land; (ii) the landlords' reasonable investment-backed expectations for their property are always subject to and conditioned on compliance with a variety of state laws; and (iii) EO 202.98 amounted to an "affirmative exploitation" on affected parties and not a "negative restriction" since nothing was affirmatively taken by the government. *Id.* at 18-23.  When all of these factors are applied to the current regulations governing the Operating Debtor's ability to engage in commercial activity in New York City, the only conclusion is that such regulations also do not constitute a taking under the Fifth Amendment with respect to the Operating Debtor, and the Lease's eminent domain clause is not applicable.

ii.    **Doctrine of Intervening Impossibility**

33.    The Operating Debtor next argues that it "is entitled to an abatement of rent and to suspend its obligations under the Lease on the equitable grounds of supervening impossibility." Motion at ¶ 19.  "Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible. Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Warner v. Kaplan*, 71 A.D.3d 1, 5–6, 892 N.Y.S.2d 311 (2009) (*citing Kel Kim Corp. v Central Mkts.*, 70 NY2d 900, 902 (1987)). The defense of impossibility of performance is applied narrowly. *Kel Kim Corp.*, 70 N.Y.2d at 902. "[W]here performance is possible, albeit unprofitable, the legal excuse of impossibility is not available." *Warner*, 71 A.D.3d at 6 (*citing 407 E. 61st Garage v Savoy Fifth Ave. Corp.*, 23 NY2d 275, 282 (1968)).

34.    New York courts have narrowly applied this doctrine to commercial tenant rent disputes in disaster scenarios similar to the current COVID-19 pandemic. In *Trinity Ctr. v. Wall St. Correspondents*, 798 N.Y.S.2d 348, 4 Misc. 3d 1026(A), at *1 (Sup. Ct. N.Y. Co. 2004), after the September 11th terrorist attacks in 2001, a landlord pledged to have a building located near Ground Zero fully operational and available by October 10, 2002.  The tenant however gave notice that it was vacating the premises, and landlord commenced an action for liquidated damages and the rent arrearage.  In denying the tenant's cross-motion for summary judgment on the doctrine of impossibility of performance, the court held, *inter alia*, that:

> The tragic events of 9/11 do not relieve defendants of their obligations under the lease. In their application for federal assistance, [defendant-tenant] stated that after September 11, as the operations at [defendant-tenant] "scaled down, the company has fewer employees and our lease for 55 Broadway is still running we decided to go back to this smaller space." A down turn in the economy partially resulting from the 9/11 tragedy, however, is not a valid reason for relieving a party from its responsibilities under a lease.

*Id.* at \*5.

35.     The Operating Debtor claims that "it is both impracticable and impossible for the Operating Debtor to perform under the Lease as a result of the guidelines that accompany most of these governmental regulations that now limit the Salon's operations." Motion at ¶ 20. Yet despite this "impossibility", the Operating Debtor has indeed reopened, and has done so successfully. The Operating Debtor's request to suspend its payment of Rent under the doctrine of impossibility must therefore be denied.

### iii.     Frustration of Purpose Doctrine

36.     Finally, the Operating Debtor seeks to suspend its rental payments under the doctrine of frustration of purpose since "it is not able to operate the Salon at full capacity". Motion at ¶ 26. Under New York law, the doctrine of frustration of purpose discharges a party's duties to perform under a contract where "an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible." *Sage Realty Corp. v. Jugobanka, D.D.*, 1997 WL 370786 at \*2 (S.D.N.Y. July 2, 1997) (*quoting Bank of America Nat'l Trust and Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F.Supp. 260, 266 (S.D.N.Y.)).

37.     The Operating Debtor is operating its business at the Premises under the Lease, and has been since June 22, 2020. The Operating Debtor is now also able to provide all of its services to its customers. The Lease therefore has value to the Operating Debtor and its business – without it, the Operating Debtor would not have a premises to provides its services and would cease operations immediately. Application of the frustration of purpose doctrine has been "limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." *United States v. General Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377,

381 (2d Cir.1974). It is difficult (if not impossible) to understand the Operating Debtor's argument that the current government regulation has frustrated the "purpose" of the Lease, especially since the Operating Debtor is utilizing the Premises exactly as contemplated under the Lease. The Operating Debtor's request to suspend its payment of Rent under the frustration of purpose doctrine must therefore be denied.

## II.    CROSS-MOTION TO COMPEL THE DEBTORS TO PERFORM POSTPETITION OBLIGATIONS PURSUANT TO 11 U.S.C. § 365(d)(3)

38.    The Landlord respectfully moves this Court for entry of an order compelling the Operating Debtor to comply with their postpetition obligations under the Lease and section 365(d)(3) of the Bankruptcy Code, by (i) making all Rent payments under the Lease, and (ii) taking requisite action to remove the Post-Petition Liens (defined below) against the Premises and/or compelling the Operating Debtor to pay to the Landlord a sum equal to all amounts, expenses, and costs necessary to resolve or otherwise remove the Post-Petition Liens.

39.    Section 365(d)(3) of the Bankruptcy Code provides, in relevant part, as follows:

> The trustee shall timely perform all the obligations of the debtor, ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(l) ....

11 U.S.C. § 365(d)(3).

40.    The term "obligations" in Bankruptcy Code § 365(d)(3) is not solely limited to the payment of postpetition rent, but rather encompasses all postpetition obligations arising under a lease. *See, e.g., Urban Retail Props. v. Loews Cineplex Entm 't Corp.*, 2002 U.S. Dist. LEXIS 6186 (S.D.N.Y. Apr. 8, 2002) (holding that "because the Lease provides for recovery of attorneys' fees and interest, their receipt deserves the same priority under Section 365( d)(3) as any of the Debtor's other obligations that arise postpetition"); *In re New Almacs*, 196 B.R. 244,248 (Bankr. N.D.N.Y.

1996) (holding that the lessors were entitled to expense claims arising postpetition for the rental obligations under their leases including "real estate taxes, common area maintenance charges and utility expenses").

41. Here, the Lease expressly requires the Operating Debtor to remove the Liens:

> Any mechanic's or other lien filed against the Demised Premises, the Retail Unit or the Building or the Real Property for work claimed to have been done for, or materials claimed to have been furnished to, Tenant or any person claiming through or under Tenant or based upon any act or omission or alleged act or omission of Tenant or any such person shall be bonded against or discharged by Tenant, at Tenant's sole cost and expense, within thirty (30) days after Owner's written request.

*See* Lease § 3.02.

42. As the language of the Lease makes clear, the Operating Debtors agreed that, to the extent any lien attaches to the Premises, within thirty (30) days after notice from the Landlord of any such lien, the Operating Debtor would remove such lien by bond or otherwise. In addition, the Lease contains indemnification provisions that require the Debtors to indemnify the Landlords with respect to all claims that arise from, or are related to, among other things, any violation of the Lease by the tenant or any of its agents, employees, or contractors. *See* Lease § 19.02.

43. Sweet Construction Group Ltd. and Henick-Lane, Inc. each filed post-petition mechanic's liens on June 9, 2020, and June 16, 2020, respectively (together, the "**Post-Petition Liens**"). In New York a mechanic's lien arises "from the time of filing a notice of such lien." N.Y. Lien Law § 3. Therefore, "claims for removing the [mechanic's] liens that arose postpetition and pre-rejection are administrative expense claims under §365(d)(3)." *In re BH S&B Holdings LLC*, 401 B.R. 96, 104 (Bankr. S.D.N.Y. 2009)

44. As a result, it is clear that the Operating Debtor is required and should be compelled under Bankruptcy Code § 365(d)(3) and pursuant to the provisions of the Lease to timely remove

the Post-Petition Liens. As noted above, under the Lease, the Operating Debtor is obligated to bond against or discharge all Liens, at tenant's sole cost and expense, within thirty (30) days after the Landlord's written request. See Lease § 3.02. To the extent necessary, this Motion constitutes written notice of the Post-Petition Liens to the Operating Debtor and, as a result, the Operating Debtor should be required to remove these liens pursuant to the explicit terms of the Lease and Bankruptcy Code § 365(d)(3). *Id.* at 102 (finding that to the extent notice to discharge post-petition mechanic's liens is required under a lease, a motion to compel discharge of those liens filed in the bankruptcy case serves as proper notice to debtor-tenant under such lease).

45.     In addition, with respect to the Post-Petition Liens, to the extent that the Landlord finds it necessary to deal directly with any contractors to resolve or otherwise remove any of the Liens, the Landlord is entitled to be compensated for all amounts paid and costs incurred by the Landlord as "additional rent under [the] Lease payable upon demand, without limitation as to other remedies available." *See* Lease § 19.02. Any such additional rent would also be an obligation of the Operating Debtor that would be required to be timely paid pursuant to Bankruptcy Code § 365(d)(3). Moreover, the Landlord is entitled to be indemnified by the Operating Debtor pursuant to the indemnification provision in the Lease. Any such indemnification would also be a post-petition obligation of the Debtors that must be timely performed, pursuant to Bankruptcy Code 365(d)(3). *Id.* at 104.

### III.     CROSS-MOTION FOR ADEQUATE PROTECTION

46.     If the Bankruptcy Court is inclined to grant the Motion, then the Bankruptcy Code requires the Operating Debtor to make certain minimum payments and provide adequate protection to the Landlord up to and including the Extension Date.

47. Section 363(e) provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. . . . .

11 U.S.C. § 363(e) (emphasis supplied).

48. Section 363(e) is straightforward and non-discretionary. If a creditor with an "interest" in property used by a debtor makes a request for adequate protection, then the court "shall" prohibit or condition the use of such property on the provision of adequate protection. 11 U.S.C. § 363(e); *In re Worldcom*, 304 B.R. 611 (Bankr. S.D.N.Y. 2004); *see also In re Metromedia Fiber Network, Inc.*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is not permissive or discretionary . . . ."). The U.S. Supreme Court has held that the term "interest" "is the most general term that can be employed to denote a right, claim, title, or legal share in something." *Russello v. U.S.*, 464 U.S. 16, 21 (1983).

49. A landlord undeniably holds an interest in property that it owns and leases to a debtor, as well as an interest in the lease itself, the rents due under that lease, and the proceeds of the lease. Thus, courts uniformly have held that Section 363(e) grants landlords rights to adequate protection. *See Matter of Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (finding that adequate protection is available under § 363(e) for a decrease in value due to the use, sale, or lease of an entity's interest in property) (emphasis added); *In re Ames Department Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) ("Section 363(e) of the Bankruptcy Code reserves for bankruptcy courts the discretion to condition the time, place and manner of Store Closing Sales, thereby providing adequate safeguards to protect shopping center landlords and their other tenants, while allowing the Trustee to fulfill its fiduciary obligations"); *In re P.J. Clarke's Rest. Corp.*, 265

B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (providing that a "landlord's right to adequate protection seems to follow clearly from the language of Section 363(e)"); *In re Ernst Home Center, Inc*., 209 B.R. 955, 966-67 (Bankr. W.D. Wash. 1997) (finding that adequate protection is available to real property lessors under Section 363(e)); *In re RB Furniture, Inc*., 141 B.R. 706, 713-14 (Bankr. C.D. Cal. 1992) (adequate protection under Section 363(e) may even be broader than the rights encompassed under Section 365(d)(3), given it "is a fluid concept that reflects all the circumstances surrounding a debtor's use of property"). Thus, the Landlord is entitled to adequate protection.

50.     The plain language of section 361 of the Bankruptcy Code dictates that adequate protection may take one of three forms: a debtor may (i) tender an upfront cash payment or periodic cash payments, (ii) grant replacement liens, or (iii) grant other related relief (other than an administrative claim under section 503(b)(1) of the Bankruptcy Code) amounting to the indubitable equivalent of the protected party's interest in the property. See 11 U.S.C. § 361; *In re Kellstrom Indus., Inc.,* 282 B.R. 787, 794 (Bankr. D. Del. 2002).

51.     The Landlord is entitled to adequate protection pursuant to sections 363(e) and 361 of the Bankruptcy Code up to and including the Extension Date and, as adequate protection, the Operating Debtor is required to provide the Landlord more than a deferred administrative claim. Under section 361 of the Bankruptcy Code, only a contemporaneous transfer of value satisfies the requirements of adequate protection.

52.     The Landlord is coming out of pocket for its proportional expense for the Premises, such as taxes, common area maintenance, utilities, and insurance. Currently, the Landlord is acting as an involuntary, post-petition, interest-free lender to the Operational Debtor.   No other administrative claimants are placed in this same position. Thus, to protect the Landlord's interests, the Landlord requests that the Operating Debtor pay that portion of the Rent that comprises the

Operating Debtor's proportional share of the real estate taxes, utilities, and insurance obligations due under the Leases for the period to and including the Extension Date. The Landlord should not have to bear the risk of administrative insolvency for these basic costs under the Leases.

53.     Moreover, Landlord's interest in the Premises is diminished by the Operating Debtor's failure to satisfy the Liens. The Operating Debtor has breached the Lease by allowing the Liens to be recorded against the Premises and failing to timely satisfy those Liens. This is an ongoing breach and results in ongoing harm to Landlord as it is required to defend its interest in the Premises against the mechanic's lien claimants.   Therefore, to further protect the Landlord's interests, the Landlord requests that the Operating Debtor satisfy its obligations under the Lease to bond against or discharge all of the Liens, which in the aggregate exceed $715,000.

### Reservation Of Rights

54.     Landlord reserve its rights to amend and supplement this Objection to address any additional terms or provisions either raised at the hearing or addressed in any subsequently filed budgets or other amendments or supplements to the Motion, and to otherwise assert any and all rights, claims or interests with respect to the Operating Debtor, the Rent, property of the estate or the Operating Debtor's creditors.

### Notice

55.     The Landlord has provided notice of this Objection and Cross-Motion by email (where known) and mail to (i) the Office of the United States Trustee, (ii) counsel for the Operating Debtor, (iii) the chapter 11 trustee, and (iv) such creditors that have a secured interest in the

Debtors' cash collateral. The Landlord believes that such notice is appropriate under the circumstances of this Cross-Motion.

**WHEREFORE**, for the reasons set forth herein, Landlord respectfully requests that the Court enter an order (i) denying approval of the Motion, (ii) compelling the Operating Debtor to comply with their post-petition obligations under the Lease, (iii) in the alternative, granting Landlord's request for adequate protection, and (iv) such other and further relief as the Court deems appropriate.

Dated: New York, New York
     July 8, 2020

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, New York 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330

By:    /s/ Jonathan L. Flaxer     
      Jonathan L. Flaxer
      Moshie Solomon

*Counsel for MIP 57th Development Acquisition LLC*