BALLON STOLL BADER & NADLER, P.C.
729 Seventh Avenue
New York, NY 10019
Telephone: (212) 575-7900
Facsimile: (212) 764-5060
Vincent J. Roldan
vroldan@ballonstoll.com

*Proposed Attorneys for Mezz57th LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In Re:

MEZZ57TH LLC et al.

        Debtors and
        Debtors in Possession
-----------------------------------------------------------X

Chapter 11

Case No.: 20-11316

(Jointly Administered)

## DECLARATION OF JOHN BARRETT IN SUPPORT OF CRITICAL VENDOR MOTION, RESPONSE TO LANDLORD MOTION, AND UPDATE WITH RESPECT TO POST-OPENING OPERATIONS

I, John Barrett, declare, certify, verify and/or state under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. §1746, as follows:

1. I am the managing member of Mezz57th LLC d/b/a John Barrett (the "Operating Debtor"), which operates the John Barrett salon located at 36 E 57th Street (the "Salon"), and the sole shareholder and President of John Barrett Inc. ("JBI"). I am familiar with the facts and circumstances as recited herein.

2. I submit this Declaration in support of the Operating Debtor's motion to pay critical vendors, to respond to pleadings filed by the Operating Debtor's landlord, and to inform the Court and parties in interest of the operations of Mezz57th LLC for the weeks starting June 29, 2020.

3. This Declaration supplements the declaration I submitted on or about June 30, 2020.

1

## Operations Post-June 30

4. Although the Operating Debtor had a strong start on reopening (week of June 22), the challenges we are experiencing now are very worrying. I attribute the Operating Debtor's strong opening week to accumulation of demand for haircuts during the three-month lock down. Unfortunately, that "bump" was short-lived. Revenues the week of June 29 were $101,826.20, and revenues the week of July 6 were only about $80,000. Even though the Salon is almost able to provide all of the services it would typically provide, it is still servicing only about 50% of the customers it typically would service.

5. The Operating Business relies heavily on cross-selling with local businesses and office buildings in the area. These businesses and offices, unfortunately, are not nearly back to full operation. Hotels, particularly the Four Seasons and others nearby, were due to open on July 15th. That date has now been put off for at least a month, probably longer. Many adjoining stores remain boarded up. All offices are virtually empty. The Broadway/ theater industry is completely shut down. Foot traffic is also decreased because pedestrians seek to avoid potential protests around Trump tower. All of the foregoing means fewer customers, and therefore fewer opportunities to up-sell and fewer referrals, during this pandemic.

6. Travel to New York City in general is limited by the pandemic. Many of the Operating Debtor's loyal clients visit New York from abroad, but they are currently restricted from travel. Many of our clients have also escaped New York City to the suburbs in Long Island, Upstate New York, Connecticut and the Jersey Shore. Many clients who have stayed in New York are strictly practicing social distancing and are not leaving their apartments. Our salon is not the only one going through struggles, as I know of other salons in New York that are closing

altogether. Finally, I am aware of news that other states are experiencing significant spikes in Covid-19 infections. I am very concerned about the possibility of another shelter in place order.

## Facts In Support of Critical Vendor Motion

7. Notwithstanding, the Operating Debtor believes it can emerge from these chapter 11 cases. As part of its efforts to emerge, it needs to stabilize relationships with its business partners. As part of the Operating Debtor's business, it requires various specialized beauty products and supplies for its customers. Aside from the Salon, the Operating Debtor's main asset is its good will. The Operating Debtor has a loyal base of customers and its business is dependent on brand name recognition and customer satisfaction. The Operating Debtor's ability to deliver on that model depends on its access to and relationships with a network of vendors and suppliers, and it is essential to the success of the Operating Debtor's restructuring efforts that it be able to maintain the supply of the specialized goods critical to the Operating Debtor's business operations and sales to customers. If the Operating Debtor cannot maintain access to these valuable specialized goods, it risks losing customers to other beauty salons. Accordingly, to maintain stability during this critical stage of these chapter 11 cases and to avoid jeopardizing the Operating Debtor's sales and business operations going forward, the Operating Debtor filed a motion to pay critical vendors up to an aggregate amount of $100,000.

8. The Operating Debtor has identified certain vendors (collectively, the "Critical Vendors") that supply products and services that are vital to the Operating Debtor's go-forward operations. These products (collectively, the "Critical Vendor Products") are generally single source styling products, specialized hair coloring, hair extensions, cleaning products, or distributors with access to unique combinations of all of the foregoing, critical service providers,

3

or are consignment vendors. The Operating Debtor does not have a contract with these vendors to rely on.

9. Most of the Critical Vendor Products are available from only a limited number of vendors. Not only does the Operating Debtor rely heavily on the Critical Vendors to deliver current orders, but it also relies on such Critical Vendors for all future deliveries. Any interruption in the provision of such Critical Vendor Products could frustrate customers and ultimately jeopardize sales.

10. Moreover, the Operating Debtor believes that jeopardizing its relationships with the Critical Vendors and attempting to procure the Critical Vendor Products from replacement vendors would impose a severe strain on its business operations (already reeling from the Covid-19 mandated closing) and would likely result in significant revenue loss.

11. Prior to the Petition Date, and in the face of their liquidity struggles, the Operating Debtor has significantly delayed payments on outstanding invoices for the Critical Vendor Products. As such, the Operating Debtor believes that the Critical Vendors have already reached their limits and if the Operating Debtor further delays payments for the Critical Vendor Products, the Critical Vendors may cease to supply the Critical Vendor Products altogether.

12. Accordingly, in light of the potential for immediate irreparable consequences if the Critical Vendors does not continue to provide uninterrupted and timely deliveries of goods and services, the Operating Debtor has determined, in the exercise of its business judgment, that payment of the prepetition claims of Critical Vendors (the "<u>Vendor Claims</u>") necessary to the go-forward business is essential to avoid costly disruptions to its operations.

13. With the assistance of its advisors, the Operating Debtor has spent significant time reviewing to identify certain critical business relationships and suppliers of goods —the loss of

which would immediately and irreparably harm its businesses. In this process, the Operating Debtor considered a variety of factors, including:

- whether certain specifications prevent, directly or indirectly, the Operating Debtor from obtaining goods or services from alternative sources;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Operating Debtor's business operations;

- whether an agreement exists by which the Operating Debtor could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide the requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Operating Debtor would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- the likelihood that a temporary break in the vendor's relationship with the Operating Debtor could be remedied through use of the tools available in this chapter 11 case.

14. Following this analysis, the Operating Debtor identified just handful of vendors as Critical Vendors for purposes of the relief requested herein, who are collectively owed about $100,000 prior to the Petition Date. A large part of these claims are for consigned goods worth approximately $33,000. Out of an abundance of caution, the Operating Debtor is seeking payment to these consignment vendors in the context of the critical vendor motion.

15. Accordingly, by its critical vendor motion, the Operating Debtor requests authorization, but not direction, to pay all outstanding prepetition obligations on account of Vendor Claims, in an aggregate amount up to $100,000 on a final basis. This represents about 2.5% of the Operating Debtor's Schedule F unsecured claims.

16. The interruption of business with or absence of the Critical Vendors would reduce the efficiency of the Operating Debtor's operations. Any material interruption in the provision of

the Critical Vendor Products—however brief—would disrupt the Operating Debtor's operations and could cause irreparable harm to the Operating Debtor's go-forward businesses, goodwill, employees, customer base, and market share. Such harm would likely far outweigh the cost of payment of the Vendor Claims. Accordingly, by its critical vendor motion, the Operating Debtor seeks authorization to pay the Vendor Claims subject to the limitations set forth in the proposed order.

**Response to Landlord Motion**

17. I have read the motion of MIP 57th Development Acquisition LLC ("Landlord") for entry of an order (i) compelling the debtors to comply with section 365(d)(3) of chapter 11 of title 11 of the United States Code and perform their obligations under its lease and (ii) alternatively, requiring payment of adequate protection (the "Landlord Motion").

18. The Landlord Motion (and related objection to the Operating Debtor's motion for temporary relief from rent) is based on the presumption that operations are strong. As demonstrated above, that is not the case. The fact that the Operating Debtor did open a week early is indicative of its good faith attempts to successfully emerge. The Operating Debtor's reporting on revenue, as is being done through this affidavit, is a further indication of good faith. Unfortunately, the Operating Debtor's cash flow simply cannot sustain rent payments at $90,000 per month at the moment. Similarly, the Landlord's request that the Operating Debtor pay $715,000 in mechanic's liens is not realistic.

19. The Landlord Motion is also based upon the premise that the Landlord is currently being harmed. The facts demonstrate that the Landlord is actually doing better than most creditors. Notably, the Landlord has drawn on its letter of credit for all pre-petition months, including March, April, and May even though the Operating Debtor was closed the middle of March. I understand

that most landlords were offering to defer payment for those months to the end of the respective lease or to amortize over the term of the lease. If the Landlord is able to apply the letter of credit towards all pre-petition debt plus June, then there are no arrears at all, and there is apparently $390,000 left to draw on the letter of credit- sufficient for four more months of rent.

20. Next, the Landlord complains about mechanics liens being placed on the property. Under the lease, it is the Landlord's obligation to pay a portion of tenant improvement costs. A copy of the relevant portion of the lease is attached hereto as Exhibit A. I believe that the Landlord is withholding at least $350,000 that should go towards discharge of liens.

21. Last, the Landlord is requesting adequate protection payments in the form of payments for insurance, tax, and utilities. But the Operating Debtor is already making those payments, as they are separate and apart from the lease. The only component of rent not separately covered by the lease is water, which the Operating Debtor is willing to pay.

22. The Operating Debtor had sought authority to temporarily cease making these payments through September 25, 2020. Between now and then, the Operating Debtor intends to communicate with the Landlord towards a viable solution. Ultimately, the Operating Debtor is aware that the Landlord's claims, to the extent valid, must be addressed in a plan of reorganization.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
July 16, 2020

_____
John Barrett