Jonathan L. Flaxer
Moshie Solomon
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, New York 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0777

*Counsel for MIP 57th Development Acquisition LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | | |
|---|---|---|
| In Re | : | Chapter 11 |
| | : | |
| MEZZ57TH LLC, et al. | : | Case No. 20-11316 (SHL) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

-----------------------------------------------------------x

## OBJECTION OF MIP 57TH DEVELOPMENT ACQUISITION LLC TO THE DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTION 1189(b) FOR AN ORDER EXTENDING TIME TO FILE CHAPTER 11 PLAN

MIP 57th Development Acquisition LLC (the "**Landlord**") hereby files this objection (the "**Objection**") to the Debtors' *Motion Pursuant to Bankruptcy Code Section 1189(b) For an Order Extending Time to File Chapter 11 Plan* [Dkt. No. 61] (the "**Motion**"). In support of the Objection, Landlord respectfully states as follows:

### Preliminary Statement

1. As further described below, the Operating Debtor's lease with the Landlord has been rejected by operation of law as of September 26, 2020 in accordance with Bankruptcy Code § 365(d)(4), and the Operating Debtor is now required to surrender the Premises. The Landlord also has a significant administrative expense claim against the Operating Debtor's estate exceeding $1.5 million. The Debtors' operating reports, as well as its own narrative in the Motion and other pleadings filed in this case, indicate that the Operating Debtor is struggling financially, and it

appears highly unlikely (if not impossible) that the Operating Debtor will be able to pay the Landlord's administrative expense claim in full - which it will have to do in order to confirm its chapter 11 plan. This was true before the Debtors allowed the lease to be rejected, and even moreso now that the Lease has been rejected. Without a location from which to operate, without the ability to assume the Lease, and without the financial wherewithal to present a feasible plan to the Court, an extension of the Debtors' time to file a plan would be fruitless and a burden on the very same creditors that Bankruptcy Code § 1189(b) is designed to protect. The Court should therefore deny the Motion.

## Background

1. On May 29, 2020 (the "**Petition Date**"), Mezz57th LLC (the "**Operating Debtor**") and John Barrett, Inc. (together with Mezz57th, the "**Debtors**") commenced with this Court voluntary cases under Subchapter V of chapter 11 of the Bankruptcy Code.

2. The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

### i. Mezz57th's Pre-Petition Default Under the Lease

3. On November 22, 2018, the Operating Debtor entered into an agreement (the "**Lease**") with the Landlord to lease retail space located at 432 Park Avenue a/k/a 36-46 East 57th Street, New York, New York (the "**Premises**").[1]

4. As security for its obligations under the terms of the Lease, on or about November 13, 2018, the Debtors caused the issuance of an irrevocable standby letter of credit (the "**Letter of**

---

[1] Copies of all documents referenced herein may be found attached to the *Objection of MIP 57th Development Acquisition LLC to the Debtors Motion for Entry of an Order (I) Approving Relief Related to the Interim Budget and (II) Granting Related Relief, and Cross-Motion of MIP 57th Development Acquisition LLC to Compel the Debtors to (I) Perform Their Postpetition Obligations and, Alternatively, (II) Provide Adequate Protection* [Dkt. No. 46] and the Response Declaration [Dkt. No. 51] (defined herein).

**Credit**") in favor of the Landlord in the maximum aggregate amount of $1,050,720.

5.  Pursuant to the terms of the Lease, the Operating Debtor is responsible for various charges related to its use and occupancy of the Premises, including, but not limited to minimum monthly rent and additional rent, and various other obligations that accrue and become due under the Lease, including its proportionate share of real property taxes. Specifically, among other things, Debtor is required to pay minimum monthly rent of $90,186.80 in advance of the first day of each calendar month, plus certain charges in the current amounts of $291.67, per month, for a minimum total monthly rental obligation of $90,478.47 per month due to the Landlord (the "**Rent**"). *See* Lease, § 1.03.

6.  Starting in June 2019, and through the Petition Date, the Operating Debtor failed to stay current with its obligations under the Lease. On November 1, 2019, and again on February 5, 2020, counsel for the Landlord served two separate Notices of Default. The defaults were never cured.

7.  As of the Petition Date, the Operating Debtor was in default of its payment obligations under the Lease since June 2019 in the total amount of $588,645.04 (the "**Pre-Petition Rent**").

8.  On or about June 8, 2020, in accordance with the terms of the Lease and the Letter of Credit, the Landlord drew down on the Letter of Credit to pay the Pre-Petition Rent, as well as the June 2020 rent that became due as of June 1, 2020, in the aggregate amount of $660,673. The amount of future draws available under the Letter of Credit is currently $390,047.[2]

    ii.    **The Operating Debtor's Pre-Petition Actions Caused Mechanic's Liens to be Filed Against the Premises**

---

[2] Under section 35.03 of the Lease, the Operating Debtor is obligated to restore the Letter of Credit to the original amount, and its failure to do so is a monetary default in the payment of Rent under the Lease. Lease, § 35.03. To date, the Operating Debtor has not restored the Letter of Credit.

9.  Pursuant to Section 3.02 of the Lease, the Operating Debtor is required to discharge, by bond or otherwise, any mechanic's liens filed against the Premises within thirty (30) days after being notified thereof. Lease, § 3.02.

10. As of this date, upon information and belief, the following mechanic's liens have been filed (the "**Lien Notices**") against the Premises for services rendered to, but unpaid by, the Operating Debtor, in an aggregate amount in excess of $715,000 (collectively, the "**Liens**"):[3]

| Claimant | Date of Lien Filing | Amount |
|---|---|---|
| Visual Millwork & Fixture Mfg. Inc. | August 15, 2019 | $5,360.00 |
| The Ridgeway Corporation | November 1, 2019 | $14,345.00 |
| Platinum Maintenance Services Corp. | May 22, 2020 | $14,908.85 |
| CCG Construction LLC | May 22, 2020 | $54,652.47 |
| Sweet Construction Group Ltd. | June 9, 2020 | $586,098.55 |
| Henick-Lane, Inc. | June 16, 2020 | $40,366.27 |
| | | |
| **TOTAL** | | **$715,731.14** |

11. In Paragraph 19 of the *Declaration of John Barrett in Support of Critical Vendor Motion, Response to Landlord Motion, and Update with Respect to Post Opening Operations*, dated July 16, 2020 (the "**Response Declaration**") [Dkt. No. 51], the Debtors assert that "it is the Landlord's obligation to pay a portion of tenant improvement costs", and "the Landlord is withholding at least $350,000 that should go towards discharge of [the mechanics'] liens," therefore seeking to shift the burden of payment of the Liens from the Operating Debtor to the Landlord. Response Declaration at ¶ 20. This contention is not supported by the terms of the Lease. Under Paragraph 3.11 of the Lease, the Landlord is indeed obligated to contribute a

---

[3] After investigation, upon information and belief, the Landlord believes that most of the Lien Notices were filed by subcontractors of Sweet Construction Group, Ltd. ("**Sweet**"), and may in fact be subsumed in the Lien Notice filed by Sweet, which, if true, would reduce the total amount of the mechanics' liens against the Premises to amount of the Lien Notice filed by Sweet in the amount of $586,098.55.

maximum of $1,020,200 (the "**Owner's Work Contribution**") in three phases (of 33% each) towards the cost and expense of certain of the Operating Debtor's alterations to the Premises, "[p]rovided that Tenant is not then in default under any of the terms, covenants or conditions of th[e] Lease", and the tenant provides certain documentation and information at each stage to allow the payment of such funds. Lease, § 3.11(A) and (B). The Operating Debtor acknowledges in the Response Declaration that the Landlord has previously released payments of approximately $680,000, or approximately 66% of the Owner's Work Contribution, to the Operating Debtor in satisfaction of its obligations under section 3.11 of the Lease. This leaves a balance of approximately $340,000 remaining to be paid under section 3.11(B)(iii) of the Lease, which is only required to be paid if the following conditions are met:

> [T]he balance of Owner's Work contribution shall be paid to Tenant within thirty (30) days after notice to Owner of the satisfaction of the following conditions: (a) Tenant shall have opened the Demised Premises for the conduct of business to the general public with Tenant's Initial Installation complete, (b) delivery to Owner of evidence, in form reasonably acceptable to Owner, of the payment of the total costs and expenses of Tenant's Initial Installation in an amount at least equal to the amount of Owner's Work Contribution, (c) delivery to Owner evidence that all consents, approvals, or signoffs be obtained by Tenant under any Legal Requirements or as required by any Governmental Authority have been obtained, (d) delivery to Owner of final waivers of mechanic's liens from all contractors, subcontractors, materialmen and laborers who were hired to perform any services or deliver any materials in connection with Tenant's Initial Installation and (e) Tenant shall have paid the first month's Fixed Rent due under this Lease.

Lease, § 3.11(B)(iii).

12. Section 3.11 of the Lease only applies, in the first instance, if the Operating Debtor is not in default of the terms of the Lease, which the Operating Debtor was and has been since June 2019. Second, section 3.11(B)(iii)(d) requires "delivery to Owner of final waivers of mechanic's liens from all contractors, subcontractors, materialmen and laborers who were hired to perform any services or deliver any materials in connection with Tenant's Initial Installation." In light of the Lien Notices, the Operating Debtors have not been able to comply with this condition. Finally,

the Landlord has also been made aware of an electrical permit on the Premises that had been opened but not closed by the Operating Debtor which is interfering with the Landlord's operation of the Premises, and violates the condition of payment under section 3.11(B)(iii)(c). The Landlord estimates the cost of closing the permit to be approximately $15,000 to $20,000. The Landlord therefore is not obligated to pay the final installment of the Owner's Work Contribution, and the Operating Debtor is responsible for paying its contractors for construction costs on the Premises and discharging the Liens as obligated under section 3.02 of the Lease.[4]

13. As a result of the Operating Debtor's failure to satisfy its obligations to discharge the Liens filed against the Premises, Landlord will incur claims, attorneys' fees and costs to defend any actions filed by the mechanics' lien claimants to preserve its interest in the Premises, as well as potential administrative claims against the Operating Debtor for their failure to bond against or discharge the Liens.

### iii. The Operating Debtor's Post-Petition Operations

14. On June 23, 2020, the Operating Debtor filed the *Motion for Entry of an Order (I) Approving Relief Related to the Interim Budget and (ii) Granting Related Relief* (the "**Rent Deferral Motion**") [Dkt. No. 35], which sought, *inter alia*, authority from this Court to defer all Rent to the Landlord through September 25, 2020 (the "**Extension Date**"). On July 8, 2020, Landlord filed an objection to the Rent Deferral Motion, and a cross-motion to compel the Operating Debtor to timely perform its post-petition obligations under Bankruptcy Code § 365(d)(3) (the "**365(d)(3) Cross-Motion"**) [Dkt. No. 46].

---

[4] Even if the Operating Debtor is correct and the Landlord would have an obligation to pay the Liens in accordance with section 3.11 of the Lease, the remaining amount of the Owner's Work Contribution is approximately $340,000, which is at least $250,000 short of the payoff amount of the Liens, an amount that would be the obligation of the Operating Debtor under section 3.02 of the Lease.

15. The Landlord and the Operating Debtor subsequently entered into an agreement with respect to the Rent Deferral Motion, on the terms set forth in the Order of this Court entered on August 11, 2020 (the "**Rent Deferral Order**") [Dkt No. 66], whereby, *inter alia*, the Operating Debtor agreed to make partial rent payments for the months of June, July, and August 2020, with all parties reserving all rights to the balance of the Rent. The parties further agreed to (i) attempt to negotiate a modification of the Lease in good faith, and (ii) adjourn the final hearing on the 365(d)(3) Cross-Motion to October 8, 2020.

16. In order to confirm a plan, the Operating Debtor must satisfy in full the Landlord's post-petition administrative expense claim against the Estate, which it estimates at approximately $1.5 million. In accordance with the Rent Deferral Order, the Operating Debtor made partial rent payments of $45,000 towards its post-petition rent obligation for July, August and September 2020, leaving a balance of approximately $226,434 due and owing to the Landlord for that period, plus use and occupancy from the Rejection Date (as defined below). If the Landlord is forced to discharge the Liens (which, again, is the obligation of the Operating Debtor under section 3.02 of the Lease), the Operating Debtor will be obligated to reimburse the Landlord for any and all amounts paid of no less than approximately $586,000. The Debtor is also obligated to restore the Letter of Credit (which has been drawn down to $390,047) to the original amount of $1,050,720 (with the failure to do so a monetary default under the Lease). Lease, § 35.03. In all, the post-petition defaults under the Lease aggregate to at least $1,500,000, which constitutes a post-petition administrative expense claim against the Estate that the Operating Debtor must pay in full in order to confirm its chapter 11 plan under Bankruptcy Code § 1129(a)(9)(A).

17. Since the entry of the Rent Deferral Order, the Landlord and Operating Debtor engaged in a good faith effort to resolve all issues with respect to the Lease, but were not able to reach a mutually agreeable modification of the Lease prior to its rejection.

**iv. The Rejection of the Lease Under Bankruptcy Code § 365(d)(4)**

18. Under Bankruptcy Code § 365(d)(4)(A), an "unexpired lease of nonresidential property under which the debtor is the lessee shall be deemed rejected and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of – (i) the date that is 120 days after the date of the order for relief; or (ii) the date of the entry of an order confirming the plan." Bankruptcy Code § 365(d)(4)(A). "The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause." *See* Bankruptcy Code § 365(d)(4)(B).

19. The Debtors commenced this Bankruptcy Case on May 29, 2020. The 120th day from the Petition Date was September 26, 2020. In accordance with Bankruptcy Code § 365(d)(4), the Lease was due to be rejected as a matter of law as of September 26, 2020, unless the Debtors filed a motion to extend the deadline prior to that date. The Debtor allowed the deadline to expire without filing a motion requesting an extension of the deadline, and therefore the Lease was rejected by operation of law as of September 26, 2020.

20. On October 1, 2020, the Landlord, through counsel, sent an email to Operating Debtor's counsel requesting that the Debtor comply with its obligations under Bankruptcy Code § 365(d)(4)(A) and immediately vacate and surrender the premises to the Landlord.

3587100.2

**Objection**

21.     Subchapter V of the Bankruptcy Code is intended to be an expedited process, providing qualifying debtors with some powerful and cost-saving restructuring tools not otherwise available to other Chapter 11 debtors, including:

(1) elimination of the absolute priority rule, which allows equity holders to retain their ownership interests without paying all creditors in full;

(2) no mandatory appointment of a creditors committee;

(3) no mandatory requirement to file a disclosure statement;

(4) appointment of a Subchapter V trustee to assist in developing a consensual plan, while leaving the debtor in possession of its assets and in control of its business;

(5) the exclusive right (which cannot be terminated) to file a plan;

(6) the ability to modify a claim secured only by a security interest in the debtor's principal residence, if new value received in connection with granting the security interest was used primarily in connection with the debtor's business and not primarily to acquire the property;

(7) the ability to confirm a plan even if all classes reject the plan;

(8) the ability to pay administrative expenses over time under a plan;

(9) modification of the disinterestedness requirements of Section 327(a) for a professional that holds a prepetition claim of less than $10,000; and

(10) elimination of the requirement to pay quarterly U.S. Trustee fees;

*In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 340 (Bankr. S.D. Fla. 2020)

22.     Despite all of the benefits granted to a Debtor in Subchapter V, "[t]he overall purpose and function of the Bankruptcy Code is to strike a balance between creditor protection and debtor relief." *In re Travel 2000, Inc.*, 264 B.R. 444, 448 (Bankr. W.D. Mich. 2001). To "balance the special new powers available to small business debtors, Congress granted *creditors* a very important protection: the requirement that a Subchapter V case proceed expeditiously. In

furtherance of that *creditor* protection, Subchapter V requires. . . the debtor to file a plan within 90 days of the order for relief." *Seven Stars*, 618 B.R. at 341 (emphasis added). In a chapter that is focused so much on the benefits it provides to small businesses, Bankruptcy Code § 1189(b) was therefore specifically designated to protect creditors' interests, and not the interests of the debtor.

23. As with many other deadlines in the Bankruptcy Code, the deadline under Bankruptcy Code § 1189(b) can be extended. However, for a court to grant an extension, the court must find that the "need for the extension is attributable to circumstances for which the debtor should not justly be held accountable." Bankruptcy Code § 1189(b).

24. Bankruptcy Code § 1189(b) (as with all of Subchapter V) is a relatively recent addition to the Bankruptcy Code, and as such there is not much case law addressing the "circumstances for which the debtor should not justly be held accountable" that would justify an extension of time to file a plan. The few courts that have addressed the issue have compared Bankruptcy Code § 1189(b) with Bankruptcy Code § 1221, which utilizes almost identical language. *See, e.g., In re Trepetin,* 617 B.R. 841, 849 (Bankr. D. Md. 2020). Courts interpreting Bankruptcy Code § 1221 have held that "it effectively requires the bankruptcy court, before granting an extension request, to find that the delay necessitating the extension was caused by 'circumstances beyond the debtor's control.'" *Seven Stars*, 618 B.R. at 344. This is "a clearly higher standard than the mere 'for cause' standard set forth in both Federal Rule of Bankruptcy Procedure 9006(b) (governing extensions of time generally) and Bankruptcy Code section 1121(d)(1) (governing extensions of a non-Subchapter V debtor's exclusive period to file a Chapter 11 plan)." Id.

25. The Debtors' motion is entirely predicated on the COVID-19 pandemic, which the Debtors assert has affected their ability to prepare and file a chapter 11 plan. The Landlord understands the hardship and unpredictability that the current COVID- 19 crisis has imposed, and acknowledges that its occurrence compounded the Debtors' economic hardships. However, there was at least one deadline which was in the control of the Debtor, and that was the 120 day deadline to assume or reject the Lease under Bankruptcy Code § 365(d)(4). The Debtor did not seek to extend the deadline and accordingly the Lease has been rejected. With the rejection of the Lease, and the concomitant obligation of the Operating Debtor to vacate the Premises, it does not appear that the Debtors can continue to operate its business and successfully confirm a plan – especially a plan that will have to pay an administrative expense claim to the Landlord of at least $1.5 million. Without the ability to assume the Lease, the Operating Debtor will not be able to present a feasible plan to the Court, making an extension of the Debtor's time to file a plan fruitless and instead a burden on the very same creditors that section 1189(b) is designed to protect.

26. Even if the Lease had not been rejected, the Debtors would still have not met the high standards of "circumstances for which the debtor should not justly be held accountable." Bankruptcy Code § 1189(b). This case is not one in which the Debtors filed prior to the start of the COVID-19 pandemic, then found itself unable to prepare a plan due to the completely unexpected nature of the pandemic and is now therefore in need of additional time to figure out how the business will survive. Rather, the Debtors filed this case on May 29, 2020, and the Operating Debtor reopened on June 22, 2020. It has now been over 90 days since the Operating Debtor has been operating its business, which is exactly the amount of time that Congress allotted to a Subchapter V debtor to file a feasible plan. The Debtors chose to file a Subchapter V case, ostensibly for the benefits that it is entitled to under such chapter, and now it must face the

consequence of its own election. The deadline under Bankruptcy Code § 1189(b) "'is [one of] the primary protection[s] for creditors against a debtor's languishing in chapter [11] without confirming a plan,'" *Seven Stars*, 618 B.R. at 344 (*quoting* 8 *Collier on Bankruptcy* ¶ 1221.01[2] (16th ed. 2020)). While the Landlord certainly sympathizes with the Debtor and its financial troubles due to the COVID-19 pandemic, the pandemic is unfortunately not likely to disappear in the coming months, and the Debtors should be held to their election and either immediately file a feasible plan or dismiss or convert this case to a chapter 7 case. Any other result would be unfair to the Debtors' creditors in general and the Landlord in particular, who did not have the option to decide which type of chapter 11 case the Debtors would file, and who would now have to wait for several more months for a feasible plan while the Debtors enjoy the benefits of their Subchapter V election.

**WHEREFORE**, for the reasons set forth herein, Landlord respectfully requests that the Court enter an order (i) denying the Motion, and (ii) such other and further relief as the Court deems appropriate.

Dated: New York, New York
October 1, 2020

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, New York 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330

By:    /s/ Jonathan L. Flaxer
        Jonathan L. Flaxer
        Moshie Solomon

*Counsel for MIP 57th Development Acquisition LLC*