# FIRST LEASE MODIFICATION AGREEMENT

THIS FIRST LEASE MODIFICATION AGREEMENT (this "**Agreement**"), entered into as of the ____ day of April, 2022, but effective as of the hereinafter defined Effective Date, by and between **MIP 57TH DEVELOPMENT ACQUISITION LLC**, a Delaware limited liability company, having an office at c/o Sterling Project Development Group, Four World Trade Center, 150 Greenwich Street, 49th Floor, New York, New York 10007; Attn: Richard Browne, as landlord ("**Owner**") and **MEZZ57th, LLC**, a New York limited liability company, having an address at 333 West 56th Street, #10F, New York, New York 10019, as tenant ("**Tenant**").

RECITALS:

A. Owner, as landlord, and Tenant, as tenant, entered into an Agreement of Lease dated as of November 12, 2018 (the "**Lease**") covering certain premises (the "**Demised Premises**"), in a portion of the condominium unit known as the Retail Unit, in the building known as 432 Park Condominium, 432 Park Avenue, in the Borough of Manhattan, City of New York (the "**Building**"), all as more particularly described in the Lease.

B. On May 29, 2020, Tenant commenced a voluntary case under Subchapter V of Chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). On April ___, 2022, Tenant filed its Amended Chapter 11 Plan (the "**Amended Chapter 11 Plan**") with the Bankruptcy Court, wherein Tenant has, *inter alia*, sought authorization and approval from the Bankruptcy Court to enter into this Agreement. Tenant will seek confirmation of the Amended Chapter 11 Plan at a hearing scheduled for May __, 2022.

C. As of March 31, 2022, Tenant was in arrears in the payment Fixed Rent and additional rent to Owner in the amount of Six Hundred Thirty-Eight Thousand Four Hundred Nineteen and 00/100 ($638,419.00) Dollars as more particularity set forth on the schedule annexed hereto as Exhibit A.

D. On _____, 2022, Owner drew the balance remaining on the Letter of Credit in the amount of Three Hundred Ninety Thousand and 00/100 ($390,047.00) Dollars in order to pay down a portion of the Arrears ("**Owner's Draw**").

E. Tenant and Owner desire to modify the Lease as hereinafter set forth in this Agreement.

NOW THEREFORE, in consideration of the terms and provisions herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, effective as of the Effective Date, the Lease is further modified as follows:

**Section (1)** Terms. The above-stated Recitals are true and correct and incorporated herein by this reference. Capitalized terms used herein and not herein defined shall have the respective meanings given to them in the Lease. Terms defined in the preamble to this Agreement or in the Recitals are incorporated herein as if set forth in full.

**Section (2)** Lease Modifications.

(a) Owner agrees that, subsequent to Owner's Draw, Tenant shall not be required to replenish the Letter of Credit as otherwise set forth in the Lease.

(b) Tenant acknowledges and agrees that Tenant hereby irrevocably waives any requirement for Owner to pay Tenant any unpaid portion of the Owner's Work Contribution.

(c) For the period commencing on the Effective Date and ending on May 31, 2025 (the "**Alternate Rent Period**"), in lieu of the Fixed Rent which is otherwise payable under the Lease during such period, Tenant shall pay Owner monthly sums in accordance with Exhibit B hereto (the "**Alternate Rent**").

(d) During the Alternate Rent Period, Tenant shall continue to pay all additional rent otherwise payable under the Lease, including, without limitation, Tenant's Tax Payment and Tenant's Operating Expense Payment. After expiration of the Alternate Rent Period, Tenant shall continue to pay Fixed Rent and all additional rent in accordance with the original terms of the Lease.

(e) Owner and Tenant agree that in the event of any future shutdowns of the Premises mandated by applicable Legal Requirements as a result of COVID-19, Owner and Tenant shall discuss

reasonable rent relief (whether through abatement or deferral) given the circumstances of such closure, but in no event shall be Owner be obligated to agree to any such relief.

(f) This Agreement shall become effective on the date that is the "Effective Date" as such term is defined in the Amended Chapter 11 Plan (the "**Effective Date**").

**Section (3)** <u>No Broker</u>. Each of Owner and Tenant represents and warrants to the other that no broker was responsible for bringing about this Agreement. Owner and Tenant shall indemnify each other from all loss, cost, liability, damage and expenses, including, but not limited to, reasonable counsel fees and disbursements, arising from any breach of the foregoing representation and warranty. The terms and conditions of this Section (3) shall survive the expiration or sooner termination of the Lease.

**Section (4)** <u>Miscellaneous</u>.

(a) Owner and Tenant specifically acknowledge that they have each had the opportunity to consult counsel of their choosing with respect to the negotiation of this Agreement and the rights and obligations set forth herein. Any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement or any schedules or exhibits hereto.

(b) Except as set forth herein, nothing contained in this Agreement shall be deemed to amend or modify in any respect the terms of the Lease and such terms shall remain in full force and effect as modified hereby, and the Lease as so modified is hereby ratified. If there is any inconsistency between the terms of this Agreement and the terms of the Lease, the terms of this Agreement shall be controlling and prevail.

(c) This Agreement (together with the Lease) contains the entire agreement of the parties with respect to its subject matter and all prior negotiations, discussions, representations, agreements and understandings heretofore had among the parties with respect thereto are merged herein. The terms of any sublease and/or assignment of the Lease shall be expressly made subject to this Agreement.

(d) This Agreement shall be binding upon and inure to the benefit of Owner and Tenant and their successors and permitted assigns.

(e)     This Agreement shall be governed by the laws of the state in which the Building is located without giving effect to conflict of laws principles thereof.

(f)     The captions, headings, and titles in this Agreement are solely for convenience of references and shall not affect its interpretation.

(g)     Owner and Tenant represent and warrant to each other that they each have the right to execute this Agreement, and the execution of this Agreement by each party does not require the approval or joinder of any other person.

(h)     This Agreement shall not be binding upon Owner or Tenant unless and until Owner shall have delivered a fully executed counterpart of this Agreement to Tenant.  Any facsimile or other electronic transmittal of original signature versions of this Agreement shall be considered to have the same legal effect as the execution and delivery of the original document and shall be treated in all manner and respects as the original document.  This Agreement may be executed in duplicate counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

(i)     Every term, condition, agreement or provision contained in this Agreement which imposes an obligation on Owner or Tenant, shall be deemed to also be a covenant by such party.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**OWNER:**

**MIP 57TH DEVELOPMENT ACQUISITION LLC**

By: _____
    Name:
    Title:

**TENANT:**

**MEZZ57th LLC**

By: _____
    Name:
    Title:

The undersigned acknowledges this Agreement as being a part of the Lease for the purpose of his Agreement and Guarantee dated November 12, 2018 and further acknowledges and reaffirms his continued obligations under such Agreement and Guarantee, to guaranty the Tenant's obligations under the Lease and any amendments, modifications or alterations thereto (including this Agreement), for the benefit of Owner.

GUARANTOR

_____
John Barrett

# **EXHIBIT A**

Arrears Schedule

# EXHIBIT B

**Section 1.06**.  **Alternate Rent**:

A.  During the Alternate Rent Period, Tenant shall pay monthly Alternate Rent equal to the greater of (i) Seventy Thousand and 00/100 ($70,000.00) Dollars and (ii) twelve and 50/100th percent (12.5%) of Gross Sales (any amount payable pursuant to the foregoing subsection (ii), the "**Gross Sales Alternate Rent**"); provided, however, in the event that Tenant is obligated to pay Gross Sales Rent as set forth above, Tenant may defer payment of a portion of the Gross Sales Rent so that Tenant only pays the greater of (a) Seventy Thousand and 00/100 ($70,000.00) Dollars and (b) eleven percent (11%) of Gross Sales to Owner in such month (any such deferred amounts, the "**Deferred Amounts**").  Any Deferred Amounts which accrue between January through June in any year shall be paid on or before July 31st of such year and any Deferred Amounts which accrue between July through December in any year shall be paid on or before the next occurring January 31st.  Tenant shall submit to Owner a monthly report not later than the tenth (10th) day following each calendar month of the Alternate Rent Period, which shall set forth the amount of Gross Sales for the preceding calendar month and which shall be accompanied by the Alternate Rent payable for such month.  The report shall be certified as complete and correct by Tenant's Chief Financial Officer, or if the Chief Financial Officer is not reasonably available, by an officer of Tenant or by Tenant's certified public accountant.

B.  "Gross Sales" means the dollar aggregate of: (1) the entire amount of the price charged for all goods, wares and merchandise sold, leased, licensed or delivered and all charges for all services sold or performed by Tenant at, upon or from the Demised Premises, whether made for cash, by check, on credit, by charge account or otherwise, without reserve or deduction for inability or failure to collect the same, including, but not limited to, the following transactions: (A) where the orders originated at or are accepted by Tenant in the Demised Premises, but delivery or performance thereof is made from or at any other place; all sales made and orders received in or at the Demised Premises shall be deemed as made and completed therein, even though the payment of account may be transferred to another office for collection, and all orders which result from solicitation off the Demised Premises but which are conducted by personnel operating from or reporting to or under the control or supervision of any employee of Tenant at the Demised Premises shall be deemed part of Gross Sales; (B) pursuant to mail, telephone, video, electronic or other similar orders received or billed at or from the Demised Premises; (C) by means of mechanical or other vending devices (unless in non-sales areas and for the exclusive use of Tenant's employees); and (D) originating from whatever source and which Tenant in the normal and customary course of Tenant's operations would credit or attribute to Tenant's business conducted in the Demised Premises; and (2) all monies or other things of value received by Tenant from Tenant's operations at, upon or from the Demised Premises which are neither included in nor excluded from Gross Sales by other provisions of this definition, but without any duplication, including, without limitation, finance charges, cost of gift or merchandise certificates and all deposits not refunded to customers.  Notwithstanding the foregoing, Gross Sales shall not include the following:  (1) the exchange of merchandise between stores of Tenant (or affiliates of Tenant) where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has been made at, upon or from the Premises; (2) returns to shippers or manufacturers; (3) sales of fixtures which are not part of Tenant's stock in trade and which are not sold in the regular course of Tenant's business; (4) cash or credit refunds made upon transactions included within Gross Sales but not exceeding the selling price of the merchandise returned by the purchaser and accepted by Tenant; (5) any discounts offered to employees where Tenant determines to be appropriate and part of its ordinary business practice; (6) the amount of any city, county, state or federal sales, luxury, excise, or similar tax on such sales provided such tax is both added to the selling price and paid to the taxing authority by Tenant (but not by any vendor of

Tenant); provided, however, no franchise or capital stock tax and no income or similar tax based upon income, profits or Gross Sales as such shall be deducted from Gross Sales; (7) bad debts determined in accordance with generally accepted accounting principles, unpaid balance on credit sales or uncollected bad checks written off or uncollected or uncollectible credit card accounts, bank charge backs, penalties or charges for returned checks determined in accordance with generally accepted accounting principles; (8) interest, service, finance or sales carrying charges respecting credit cards, debit cards or otherwise actually paid by Tenant (other than the foregoing imposed pursuant to Tenant or an affiliated entity initiated financing program); (9) shipping and delivery charges, at Tenant's actual cost; (10) insurance proceeds (other than proceeds of business interruption insurance); and (11) the proceeds of sales of gift certificates or other similar vouchers in either case prior to the time that such certificates or vouchers have been converted into a sale by redemption at the Premises.

        C.        Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale is made, irrespective of the time when Tenant shall receive payment (whether full or partial) therefor. No deduction shall be allowed for uncollectible credit accounts.

        D.        For the purposes of this Section, the term "<u>Tenant</u>" shall include any licensee, concessionaire or subtenant of Tenant, but Gross Sales shall not include any amount which is based upon the net income or profit of any occupant.

        E.        Tenant shall keep and maintain (and shall cause any licensee, concessionaire and subtenant to keep and maintain) in its main accounting office, full and accurate books of account and records from which Gross Sales can be determined and which shall be conveniently segregated from other business matters. Such records shall be so kept and maintained (properly totaled and added) for at least thirty six (36) months after the end of the period in question. The books and records shall be used and maintained in the same manner as Tenant uses and maintains the same for all of its other stores, provided that such records shall be maintained in accordance with generally accepted accounting principles, consistently applied. Such records shall be so kept and maintained (properly totaled and added) for at least twelve (12) months after the end of the Alternate Rent Period.

        F.        Owner shall have the right upon reasonable prior notice and during regular business hours but not more than once with respect to the Alternate Rent Period, to inspect and audit all such books and records and all other papers and files of Tenant and any licensee, concessionaire or subtenant relating to Gross Sales only (but in no event shall Owner be entitled to review Tenant's budgeting information or cost of goods information). Tenant and each licensee, concessionaire or subtenant shall produce the appropriate books and records on request of Owner related to Tenant's Gross Sales only. The acceptance by Owner of payments of Alternate Rent shall be without prejudice to Owner's right to conduct an audit of Tenant's and Tenant's subtenant's, concessionaire's, and licensee's books and records. All such audits shall be conducted either electronically or at Tenant's main accounting office or at the office of Tenant's certified public accountant, so long as each such office is located in the United States.

        G.        If any such audit shows that the amount of Gross Sales on any such statement was understated by more than five (5%) percent of Gross Sales, then Tenant shall pay to Owner the reasonable cost of its audit and investigation, which cost, if the audit was not conducted by an independent accountant, shall be determined on a "time-and-expense" basis and the rate per hour shall not exceed that charged for similar personnel by a national firm of independent certified public accountants. If any audit shows that the amount of Gross Sales was understated by more than five (5%), so that Owner shall have been paid less Alternate Rent than that to which it would have been entitled had Tenant not understated its Gross Sales, then Tenant shall pay to Owner the amount of Alternate Rent Tenant should

have paid but did not pay to Owner, plus interest thereon at the rate which is the greater of (i) twelve (12%) percent per annum, or (ii) the then effective prime rate as published from time to time in the "Money Rates" section of the Wall Street Journal (or any successor publication thereto) plus two (2%) percent per annum for the period from the original due date such Alternate Rent should have been due until the date that payment was made, compounding on a six (6) month basis. If, at any time within twelve (12) months after the end of the Alternate Rent Period, Owner shall contend that an error may exist with respect to any of Tenant's books, records, papers or files related to Gross Sales, then the period referred to in this Section shall be extended until Owner's contention has been finally determined.

H. Owner shall hold in confidence all sales figures and related information obtained from Tenant's records, except as may be necessary for the enforcement of Owner's rights under this Lease, in connection with prospective financing or prospective sale of the Demised Premises or the Retail Unit, any tax proceedings, or pursuant to any legal requirements. Owner shall in no event be construed, held or become in any way or for any purpose a partner, associate or joint venturer of Tenant or any party associated with Tenant in the conduct of Tenant's business or otherwise.