MANDELBAUM BARRETT PC
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Ph.: 973-736-4600
Fax: 973-736-4670
Vincent J. Roldan
vroldan@mblawfirm.com

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In Re:

MEZZ57TH LLC, et al.

                         Debtors
                and Debtors in Possession
--------------------------------------------------------X

Chapter 11

Case No.: 20-11316

(Jointly administered)

## <u><span style="color:red">SECOND</span> AMENDED PLAN OF REORGANIZATION FOR</u>
## <u>SMALL BUSINESS UNDER SUBCHAPTER V OF CHAPTER 11</u>

      Mezz 57th LLC (the "Operating Debtor") and John Barrett Inc. ("JBI, and collectively with the Operating Debtor, the "Debtors"), hereby propose the following Plan of Reorganization for Small Business Under Subchapter V of Chapter 11 (the "Plan").

## <u>BACKGROUND</u>[1]

### A. Description and History of the Debtors' Business

      The Operating Debtor is a high end hairdressing salon located on 57th Street in Manhattan, New York. Its founder, John Barrett, has been a leader in the industry for over 23 years. Mr. Barrett opened the Operating Debtor (d/b/a John Barrett Salon), in April 2019. Towards the end of 2019, it was in the process of certain talent acquisitions that would have driven the revenue and prestige, and most importantly client satisfaction. And then the Covid-19 Pandemic ground everything to an abrupt halt in early March 2020. Due to the regulations the Operating Debtor was forced to cease operations on March 16, 2020.

---

[1] This Plan is for a small business debtor under Subchapter V of Chapter 11 of the Bankruptcy Code. Section 1190 of the Bankruptcy Code requires that such a plan include "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization." The information in this section of this Plan is provided for that purpose.

## Business Operations

The Operating Debtor's salon is its main asset (the "<u>Salon</u>"). It is approximately 6,500 square feet of loft-like space that has vast floor-to-ceiling windows that look out onto 57th Street with art, books, jewelry, and talented hair stylists. The Salon operates pursuant to commercial property lease from the mezzanine level of 432 Park Condominium (the "<u>Building</u>"). The landlord is MIP 57th Development Acquisition LLC ("<u>Landlord</u>"). The lease with the Landlord (the "<u>Lease</u>") is a ten-year lease that terminates in December 2028.At the time of the bankruptcy filing, the monthly rent under the Lease was approximately $90,000, and the Operating Debtor was in default of its payment obligations under the Lease in the total amount of $588,645.04, as alleged by the Landlord.

The Operating Debtor generated over $5.9 million in gross revenue in for about 8 months of operations in 2019. Operating Debtor was projected to generate $7.8 million in revenue in 2020, without accounting for the Covid-19 Pandemic or any of the talent acquisitions that were delayed due to the Covid-19 Pandemic. With the talent acquisitions, which were in process before the Covid-19 Pandemic, revenue was expected to rise to above approximately $10 million and make the business significantly more profitable.

JBI is a separate entity. It operated its own high end salon at Bergdorf Goodman from 1997- March 30, 2019. It has no business operations and no assets other than about $100,000 in cash from a pre-petition SBA loan and certain intellectual property (the John Barrett name). JBI is also the beneficiary of a $10 million insurance policy on the life of Mr. Barrett. The premiums for this policy have been paid by the Operating Debtor as part of the compensation package for Mr. Barrett. It has approximately $485,000 in unsecured debt, some of which is disputed.

## Events leading to bankruptcy

As the excitement and rush of new customers steadied from the opening of the Salon, the Operating Debtor discovered significant discrepancies with what its then controller was advising and reporting to management. For instance, among other things, there were significant delays in entering payables into the operating budgets, incorrect amounts were logged, or monies misallocated, often showing the Operating Debtor to better position than it was in reality.

The Operating Debtor released the comptroller from his duties and hired an accounting firm to address and automate the accounting systems going forward. Golden Door Services LLC ("<u>Golden Door</u>") was then retained to act as the comptroller, as over time it would prove to be more cost effective than retaining in-house talent for limited work in what was then an extremely aggressive economy.

Given the cash flow issues that arose as a result of the comptroller, the Operating Debtor worked with its advisors and developed strategies to minimize overhead, while ensuring the customer experience was not significant altered. Through this process, the Operating Debtor cut $50,000 - $75,000 off of its monthly expenses.

As things began to right themselves, the Operating Debtor was in discussions for certain talent acquisitions that would have added significant revenue and profit to the business. Then the Covid-19 pandemic struck. In late February and early March 2020, the business began to slow

rapidly, as people were told that they should stay at home. The Salon was officially shut down on March 16, 2020 in accordance with and in anticipation of the effective date of a statewide shelter in place order.

**Operations While In Bankruptcy**

(i)    <u>Stipulation with Landlord</u>

The Debtors filed for bankruptcy on May 29, 2020. At the beginning of this case, the Operating Debtor and the Landlord litigated various issues surrounding the lease. On December 16, 2020, the Operating Debtor and the Landlord entered into a Stipulation and Consent Order to govern post-petition rent and related issues (the "<u>Lease Stipulation</u>"). The Lease Stipulation was approved by Court order on December 27, 2020 [Docket No. 101], and was extended from time to time. In accordance with the Lease Stipulation, *inter alia*, the Operating Debtor is obligated to pay 16.5% of its monthly gross sales to the Landlord as rent, but in any month that the Operating Debtor is unable to pay such amount, the Operating Debtor is required to pay a minimum of 10% of monthly gross sales, with the balance accruing as an administrative expense claim against the Operating Debtor under section 503(b) of the Bankruptcy Code. As of March 31, 2022, the Landlord asserted an administrative expense claim against the Operating Debtor of approximately $248,372.

(ii)    <u>Operations During Covid-19 era</u>

The Operating Debtor's business operations have been negatively impacted by Covid-19. Still, the Operating Debtor withstood two variants (Delta and Omicron) and has not terminated any of its 80+ employees. Indeed, towards the end of 2021 the Operating Debtor was grossing $138,000 per week in revenue. The Operating Debtor believes it is reasonable to anticipate the continued pace of growth as life normalizes.

(iii)    <u>Negotiations with Sweet Construction Group</u>

~~The Operating Debtor has an agreement in principle with a construction creditor~~On June 23, 2020, Sweet Construction Group ("<u>Sweet</u>~~"), who put a~~") filed a mechanic's lien on the ~~Landlord's building. Under~~ Operating Debtor's demised business premises known as 432/400 Park Ave., New York, New York, Block 1292, Lot 1302 Unit RETL in ~~the parties' agreement,~~ amount of $586,098.55, which lien has been extended (the "Sweet ~~will~~Lien") The Operating Debtor has an agreement in principle with Sweet to release ~~its lien~~ the Sweet Lien on terms <u>as</u> set forth below, which helped clear a path towards negotiating a long term lease with the Landlord.

(iv)    <u>Tax Refund</u>

During this case, the Debtors retained Mazars as its accountants to file amended tax returns. One amended return filed in Q1 2021 seeks a refund of about $308,000. This refund has been approved and the Operating Debtor expects to receive it, but no time frame has been given by the Internal Revenue Service. The Operating Debtor filed an amended return for Q2 2021 and seeks a refund of about $361,000. The Operating Debtor has not heard from the IRS as to whether this return has been approved.

4876-8502-6859, v. 1

(v)     Sale of Life Settlement

JBI is the owner of a "key man" life insurance policy with Principal Life Insurance Policy (the "Policy"). The Policy is a $10 million term policy that can be converted to permanent, thereby making the Policy saleable on the open market. John Barrett (the individual) is the beneficiary.

On May 10, 2022, the Court approved JBI's application to retain Valmark Securities Inc. as life settlement broker. ~~JBI intends to file a motion~~On July 2, 2022, the Court entered an order authorizing the Debtor to sell a portion of the Policy, and the proceeds will be used as set forth below. JBI believes that ~~it could~~the approved sale will net at least $1.~~1~~4 million from the sale of the Policy after payment of its broker fees ~~(after court approval)~~.

(iv) Motion to Covert/ Dismiss by U.S. Trustee

On March 23, 2022, the United States Trustee filed a motion to convert or dismiss these bankruptcy cases [Dkt. 181]. The motion asserts in part that the cases should be converted or dismissed because the Debtors had failed to file pre and post-petition taxes. As set forth below, the Debtors have cured this issue by filing all tax returns. The U.S. Trustee has voluntarily agreed to adjourn its motion as the Debtor seeks confirmation of the instant Plan.

**B. Liquidation Analysis**

To confirm this Plan, the Court must find that all creditors who do not accept this Plan will receive at least as much under this Plan as such claim holder would receive in a chapter 7 liquidation. For purposes of demonstrating this requirement, the Debtors have prepared a liquidation analysis attached hereto as *Exhibit "A"*.

**C. Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Debtors must also show that they will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtors' business. For purposes of demonstrating this requirement, the Debtors have prepared projected financial information attached hereto as *Exhibit "B"*, which reflects that the Debtors will have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2) to make the distributions to the creditors.

Notably, the foregoing projections are a conservative estimate. JBI is the beneficiary of a $10 million insurance policy on the life of John Barrett (the individual). The Plan contemplates that half of this Policy is monetized. JBI intends to sell additional portions of the Policy, if necessary, to help fund any shortfall of the Debtors' obligations to pay administrative claims or priority tax claims. In addition, the Operating Debtor anticipates a tax refund in the amount of $669,598 a portion of which will be used to pay ~~its obligations to Sweet in accordance with this Plan as well as~~ unpaid professional fees and any other unpaid administrative expenses.

4876-8502-6859, v. 1

# ARTICLE I

## SUMMARY

The Operating Debtor has negotiated an amended lease with its landlord. A copy of this amended lease is attached hereto as Exhibit C, and the terms are summarized below. With a long term lease in place, the Operating Debtor intends to emerge as a reorganized entity.

The Plan proposes to pay creditors of the Operating Debtor from funds generated by its operations as a going concern and from monies loaned from JBI. Creditors from JBI are to be paid from existing cash held by JBI and from the proceeds of the sale of the Policy.

The Plan provides for classes of claims for secured creditors, non-tax priority creditors, and unsecure creditors. The Plan also provide for separate classification among Operating Debtor's creditors and JBI's creditors.

The Plan provides for the full payment of administrative and priority claims in accordance with the Bankruptcy Code. The Operating Debtor's secured creditors (class 1(a), (b) and (c)) will not be paid in full and consent to that treatment; their claims are limited to the value of their collateral and deficiency claims are treated as general unsecured claims. Secured creditors in class 1(d) shall be paid in full. General unsecured creditors of the Operating Debtor holding Allowed Claims will receive distributions in accordance with the Debtor's projected disposable income as set forth in Exhibit B herein, which the Operating Debtor has valued at approximately <1%, over a period of five (5) years. General unsecured creditors of JBI will be paid in full. The actual distribution(s) percentage to general unsecured creditors will depend upon the total final Allowed general unsecured claims.

All creditors should refer to Articles III through VI of the Plan for information regarding the precise treatment of their claim.

# ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTEREST

2.01     Class 1(a) Claim – Larry Flick secured claims

Class 1(a) consists of the Allowed secured claim of Larry Flick.

2.02     Class 1(b) Claim – SAW Investment Fund LLC secured claims

Class 1(b) consists of the Allowed secured claim of SAW Investment Fund LLC.

2.03     Class 1(c) Claim – Jeffrey Seller secured claim

5

Class 1(c) consists of the Allowed secured claim of Jeffrey Seller.

2.04     <u>Class 1(d) Claim</u> – Misc. Operating Debtor secured claims

Class 1(d) consists of miscellaneous Allowed secured claims against the Operating Debtor.

2.05     <u>Class 1(e) Claim</u> – Misc. JBI secured claims

Class 1(e) consists of miscellaneous Allowed secured claims of against JBI.

2.06     <u>Class 2(a) Claims</u> – Misc. Operating Debtor priority non-tax claims

Class 2(a) consists of Allowed priority non-tax claims against the Operating Debtor.

2.07     <u>Class 2(b) Claims</u> – JBI priority non-tax claims

Class 2(b) consists of Allowed priority non-tax claims against JBI.

2.08     <u>Class 3(a) Claims</u> – Operating Debtor general unsecured claims

Class 3(a) consists of Allowed general unsecured claims against the Operating Debtor.

2.09     <u>Class 3(b) Claims</u> – JBI general unsecured claims

Class 3(b) consists of Allowed general unsecured claims against JBI.

2.10     <u>Class 4(a) Interests</u> – Operating Debtor membership interests

Class 4(a) consists of Allowed membership interests of the Operating Debtor.

2.11     <u>Class 4(b) Interests</u> – JBI equity interests

Class 4(b) consists of Allowed membership interests of JBI.

4876-8502-6859, v. 1

**ARTICLE III**

**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,**
**PRIORITY TAX CLAIMS AND COURT FEES**

3.01    *Unclassified Claims* – Pursuant to § 1123 of the Bankruptcy Code, statutory fees, administrative expense claims and priority tax claims are not classified.

3.02    *Administrative Expense Claims* - Each holder of an administrative expense claim Allowed under § 503 of the Bankruptcy Code, other than the claim of Sweet ~~and tax authorities~~, will be paid in twenty (20) equal quarterly payments or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.  ~~—~~The unpaid portion of NYS Department of Taxation and Finance's administrative expense claims as of the Effective Date, shall be paid in twenty (20) equal quarterly payments with interest continuing to accrue at the NYS statutory rate of 14.5% per annum.

~~——Provided that~~  In accordance with the settlement agreement between the Operating Debtor, Sweet ~~releases its lien on the Landlord's building, the claim of,~~ and John Barrett attached as Exhibit D ("Settlement Agreement"), Sweet ~~will be~~ shall have an allowed ~~as an~~ administrative claim in the amount of ~~$550~~Four Hundred Twenty Five Thousand Dollars ($425,000 ~~and will)~~ (the "Allowed Sweet Claim"), which Allowed Sweet Claim shall be paid ~~as follows:  (i) $200,000~~in full by bank check, certified check or wire transfer on the Effective Date, ~~(ii) after the Effective Date as follows (a) $150,000 upon the Operating Debtor's receipt~~ of the Plan (the "Settlement Payment").  Upon payment of ~~its tax refund,~~the Settlement Payment, Sweet shall ~~execute~~ and ~~(b) $200,000 payable in twenty (20) equal quarterly payments~~deliver a release and discharge of the Sweet Lien (the "Release") in accordance with the terms and conditions of the Settlement Agreement.

The Debtors have also filed their overdue tax returns.  The Operating Debtor has paid approximately $~~117~~155,000 in post-petition sales taxes.  The ~~Operating Debtor believes that as~~principal portion of the ~~Effective Date, there will be about $371,000 in~~ unpaid ~~post-petition~~ sales taxes. ~~The Debtors anticipate that with the sale of the Policy by JBI, sufficient funds will be available for the Operating Debtor to pay post-petition sales taxes and commercial rent taxes in full~~ will be paid [2] (approximately $351,000); the Operating Debtor is attempting to have interest and penalties waived.[3]  Any interest and penalties that are unpaid shall be paid in twenty (20) equal quarterly payments.

_____

[2] ~~On April 27, 2022, New York State filed an amended claim and asserted $491,588 in unpaid post-petition sales taxes.  The Operating Debtor believes that the claim does not incorporate $117,000 in sales taxes that the Operating Debtor has paid post-petition.  In addition, the Operating Debtor is attempting to have penalties and interest waived.~~
[3] On April 27, 2022, New York State filed an amended claim and asserted $491,588 in unpaid post-petition sales taxes.

7

Administrative fees of professionals are subject to Court application and approval (and continue to accrue). Unpaid professional fee claims are estimated to be as follows: Formatted: Keep with next

| Name | Title | Amount |
|------|-------|--------|
| Ballon Stoll Bader & Nadler PC | Counsel to the Debtors | $150,000 (estimated) [4] |
| Mandelbaum Barrett PC | Counsel to the Debtors (substitute) | $35,000 (estimated) [5] |
| Charles Persing | Sub-Chapter V Trustee | $80,000 (estimated) [6] |
| Mazars | Accountants to the Debtors | $37,500 (estimated) [7] |

3.03    *Priority Tax Claims* – holders of priority tax claims against the Operating Debtor, allowed under § 507(a)(8) of the Bankruptcy Code, will be paid, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, in twenty (20) equal quarterly payments with ~~10~~14.5% interest.  Priority tax claims consist of sales taxes owed by the Operating Debtor to New York State in the approximate aggregate amount of $~~400~~420,000.[8]  JBI also owes taxes in the amount of $~~27~~136,000, a portion of which ~~will be paid~~JBI believes is subject to objection.  The Debtors' projections demonstrate the ability to pay these $136,000 tax claims in full on the Effective Date of the Plan.

3.04    *Statutory Fees* – All fees and charges required to paid under 28 U.S.C. § 1930, including any applicable interest, shall be fully paid.  Such fees and charges that are due on or prior to the Effective Date of the Plan, shall be paid on the Effective Date.  Such fees, together with any applicable interest thereon, that may become due after the Effective Date of the Plan shall be paid as they become due by the Reorganized Debtor until this case is closed, dismissed, or converted to another chapter of the Bankruptcy Code.  Because this case was filed as a Subchapter V case, the Debtors expect there to be no statutory fees.

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

---

[4] On November 20, 2020, the Court entered an order [Docket 92] authorizing Ballon Stoll to apply its prepetition retainers of $82,000 from the Operating Debtor ($26,796 of which was applied towards pre-petition work) and a portion of its $25,000 retainer from JBI ($3,998.25 of which was applied to pre-petition work).  Thus, Ballon Stoll has been paid $56,304 for post-petition services for the Operating Debtor and $3,734.50 for post-petition services for JBI. The amounts set forth here are after application of Ballon Stoll's retainers.  Fees stopped accruing when Mandelbaum Barrett was substituted as counsel.

[5] Upon Court approval, after application of retainer of $20,000 from Operating Debtor and $2,500 from JBI; fees will continue to accrue through confirmation of the Plan.  The Debtors' projections call for initial payments to Mandelbaum Barrett of up to $40,000.

6 The Debtors' projections call for an initial payment made to Mr. Persing of $60,000 upon approval of his fees, and the balance to be paid in 20 equal quarterly payments.

7 The Debtors' projections call for an initial payment made to Mazars of $27,500 upon approval of its fees, and the balance to be paid in 20 equal quarterly payments.

[8] On April 22, 2022, New York State filed an amended claim asserting a $400,000 priority claim.  The Debtors have not had an opportunity to reconcile claims and use the proof of claim amount for purposes of disclosure.

4.01    On April 19, 2022, the Court entered an order setting June 1, 2022 as the deadline to file proofs of claim [Dkt 194].  Because the bar date has not yet passed, the Debtors are unable to estimate the proposed treatment of each class.  The Debtors reserve the right to object to any claims.  For purposes of disclosure, Allowed claims and interests shall be treated as follows under the Plan:

| Class | Impairment | Amount | Treatment |
|---|---|---|---|
| Class 1(a) – Larry Flick secured claims | Impaired | $90,303 | Class 1(a) consists of the Allowed Secured Claim of Larry Flick, to the extent of the value of this creditor's collateral (pro rata share of $382,643 value on assets in liquidation analysis).  This creditor's deficiency claim is treated as a Class 3(a) claim.  Upon the Effective Date of the Plan, the Class 1(a) claimant will be paid monthly installments of its proportionate share of $40,000 set aside annually for Class 1(a), (b), and (c) creditors until its Class 1(a) claims are paid in full.  The Class 1(a) claimant shall retain its lien. <br><br> The Class 1(a) Claim is impaired, and therefore the holder of the Class 1(a) Claim is entitled to vote to accept or reject the Plan. |
| Class 1(b) – Saw Investment Fund LLC secured claims | Impaired | $55,483 | Class 1(b) consists of the Allowed Secured Claim of Saw Investment Fund LLC, to the extent of the value of this creditor's collateral (pro rata share of $382,643 value on assets in liquidation analysis).  This creditor's deficiency claim is treated as a Class 3(a) claim.  Upon the Effective Date of the Plan, the Class 1(b) claimant will be paid monthly installments of its proportionate share of $40,000 set aside annually for Class 1(a), (b), and (c) creditors until its class 1(b) claims are paid in full.  The Class 1(b) claimant shall retain its lien. <br><br> The Class1(b) Claim is impaired, and therefore the holder of the Class 1(b) Claim is entitled to accept or reject the Plan. |
| Class 1(c) – Jeffrey Seller secured claims | Impaired | $236,473 | Class 1(c) consists of the Allowed Secured Claim of Jeffrey Seller, to the extent of the value of this creditor's collateral (pro rata share of $382,643 value on assets in liquidation analysis).  This creditor's deficiency claim is treated as a Class 3(a) claim.  Upon the Effective Date of the Plan, the Class 1(c) claimant will be paid monthly installments of its proportionate share of $40,000 set aside annually for Class 1(a), (b), and (c) creditors until its Class 1(c) claims are paid in full.  The Class 1(c) claimant shall |

4876-8502-6859, v. 1

| Class | Impairment | Amount | Treatment |
|---|---|---|---|
| | | | retain its lien. |
| | | | The Class 1(c) Claim is impaired, and therefore the holder of the Class 1(c) Claim is entitled to vote to accept or reject the Plan. |
| Class 1(d) – Miscellaneous secured claims against Operating Debtor. | Unimpaired | $296,328 | Class 1(d) consists of the Allowed Secured Claim of miscellaneous secured creditors of the Operating Debtor. These claims will be reinstated and paid according to their terms or the collateral will be returned. |
| | | | The Class 1(d) Claim is unimpaired, and therefore the holder of the Class 1(d) Claim is not entitled to vote to accept or reject the Plan. |
| Class 1(e) – Miscellaneous secured claims against JBI. | Unimpaired | $0.00 | Class 1(e) consists of the Allowed Secured Claim of miscellaneous secured creditors of JBI. These claims will be reinstated and paid according to their terms or the collateral will be returned. |
| | | | The Debtors believe there are no creditors in this class. |
| | | | The Class 1(e) Claim is unimpaired, and therefore the holder of the Class 1(e) Claim is not entitled to vote to accept or reject the Plan. |
| Class 2(a) – Priority Claims (Wages, Commissions, related) against Operating Debtor | Impaired | $0.00 | Class 2(a) consists of the Allowed Priority (Non-Tax) Claims against the Operating Debtor. Upon the Effective Date of the Plan, in full satisfaction of its Allowed Priority Claim, each holder of an Allowed Priority Claim will be paid in full in equal monthly payments over 5 years, except as otherwise agreed. |
| | | | The Debtors believe there are no creditors in this class. |
| | | | Class 2(a) Claims are impaired, and therefore holders of Class 2(a) Claims are entitled to vote to accept or reject the Plan. |
| Class 2(b) – Priority Claims (Wages, Commissions, related) against JBI | Impaired | $0.00 | Class 2(b) consists of the Allowed Priority (Non-Tax) Claims against JBI. Upon the Effective Date of the Plan, in full satisfaction of its Allowed Priority Claim, each holder of an Allowed Priority Claim will be paid in full in equal monthly payments over 5 years, except as otherwise agreed. |
| | | | The Debtors believe there are no creditors in this class. |
| | | | Class 2(b) Claims are impaired, and therefore holders of Class 2(b) Claims are entitled to vote to accept or reject the Plan. |

4876-8502-6859, v. 1

| Class | Impairment | Amount | Treatment |
|-------|-----------|--------|-----------|
| Class 3(a)– General Unsecured Claims against Operating Debtor | Impaired | $3,900,000 plus deficiency claims of $2,550,000 | Class 3(a) consists of the Allowed General Unsecured Claims against Operating Debtor (including deficiency claims of Class 1(a), (b), and (c) creditors). Upon the Effective Date of the Plan, in full satisfaction of its Allowed General Unsecured Claim, on December 15 of every year thereafter for five consecutive years, each holder of a Class 3(a) Allowed General Unsecured Claim will receive a Pro Rata Distribution, of the Operating Debtor's projected disposable income as set forth in Exhibit B (approximately in aggregate the sum of <1%[9]), except as otherwise agreed. The Operating Debtor's annual projected disposable income is $15,000.<br><br>Class 3(a) Claims are impaired, and therefore holders of Class 3(a) Claims are entitled to vote to accept or reject the Plan. |
| Class 3(b)– General Unsecured Claims against JBI | Impaired | $485,000[10] | Class 3(b) consists of the Allowed General Unsecured Claims against JBI. Upon the Effective Date of the Plan, in full satisfaction of its Allowed General Unsecured Claim, on December 15 of every year thereafter for five consecutive years, each holder of a Class 3(b) Allowed General Unsecured Claim will receive a Pro Rata Distribution from JBI's available cash after payment priority tax claims.<br><br>In the event JBI is able to obtain court approval of the sale of the Policy, the proceeds of the Policy will be used to pay JBI Class 3(b) Allowed General Unsecured Claims in full.<br><br>JBI estimates that Class 3(b) creditors will be paid in full on account of their allowed claims.<br><br>Class 3(b) Claims are impaired, and therefore holders of Class 3(b) Claims are entitled to vote to accept or reject the Plan. |

---

[9] The actual distribution(s) percentage to general unsecured creditors will depend upon total final Allowed general unsecured claims.

[10] This figure includes a $198,000 disputed claim of Hand Baldachin & Amburgey. JBI reserves the right to object to this claim in the event Hand Baldachin & Amburgey files a proof of claim. This figure is based on JBI's schedules and does not include approximately $295,000 owed from JBI to the Operating Debtor.

4876-8502-6859, v. 1

| Class | Impairment | Amount | Treatment |
|---|---|---|---|
| Class 4(a) – Interests in Operating Debtor | Unimpaired | N/A | Upon the Effective Date of the Plan, the holder of the Interests of the Operating Debtor shall retain such Interests. Class 4(a) Interests are unimpaired, and therefore holders of Class 4(a) are deemed to have voted to accept the Plan. |
| Class 4(b) – Interests in JBI | Unimpaired | N/A | Upon the Effective Date of the Plan, the holder of the Interests of JBI shall retain such Interests. Class 4(b) Interests are unimpaired, and therefore holders of Class 4(b) are deemed to have voted to accept the Plan. |

## ARTICLE V

## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01   *Objections to Claims*.  The Debtors may continue to prosecute any objection to any claim filed prior to confirmation of the Plan after the Effective Date.  Any Claim subject to an objection which has not been adjudicated by Final Order or otherwise resolved prior to Confirmation will be treated as a Disputed Claim under the Plan.   Any further objections to Claims shall be filed by the Debtors no later than one hundred and twenty (120) days after the Effective Date, which deadline may be extended by the Court upon application or motion of the Debtor without notice filed prior to the deadline.  In the event that any proof of claim is filed, asserted or amended after the Effective Date, the Debtors shall have one hundred twenty (120) days from the date of such filing or notice to object to such claim, which deadline may be extended by the Court upon application or motion of the Debtors without notice filed prior to the deadline.  All objections shall be litigated (or settled) to Final Order.  The Bankruptcy Court shall retain jurisdiction to adjudicate any and all objections to claims whether filed prior to or after the Effective Date.

5.02   *Disputed Claim Reserve*. No distribution will be made on account of a Disputed Claim unless such Claim is Allowed. On any date that distributions are to be made under the terms of this Plan, the Disbursing Agent shall deposit in one or more accounts (either an attorney escrow account or a segregated account with a banking institution that is a depository authorized by the United States Trustee for bankruptcy cases in the Southern District of New York), cash equal to 100% of the cash that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as administrative expenses or as priority claims pursuant to §§ 503 and 507 of the Bankruptcy Code, (ii) claims of governmental units for any tax and (iii) any amount due but not payable on the Effective Date on account of administrative expenses or claims entitled to priority pursuant to §§ 503 and 507 of the Bankruptcy Code. The Disbursing Agent shall also segregate any interest, dividends or proceeds of such cash. Such cash together with any interest, dividends or proceeds thereof, be held in trust for the benefit of the holders of all such Disputed Claims pending

12

determination of their entitlement thereto. Within fourteen (14) days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all cash, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

## ARTICLE VI

## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01    Except as set forth in this Plan, all executory contracts or unexpired leases to which the Debtors are a party as of the Effective Date which were not previously rejected, assumed, or assumed and assigned by the Debtors shall be deemed assumed under the Plan as of the Effective Date in accordance with the provisions and requirements of §§ 365 and 1123 of the Bankruptcy Code.

The Operating Debtor intends to assume its Lease with MIP 57th Development Acquisition LLC. A copy of the form amended lease is attached hereto as Exhibit C. The amended terms are summarized as follows:

1.  For the period commencing on June 1, 2022 (or the Effective Date, if after June 1, 2022) and ending on May 31, 2025 (the "Alternate Rent Period"), in lieu of the Fixed Rent which is otherwise payable under the Lease during such period, Operating Debtor shall pay a monthly sum equal to the greater of (i) $70,000.00 and (ii) 12.5% of Gross Sales (any amount payable pursuant to the foregoing subsection (ii), the "Gross Sales Rent"); provided, however, in the event that Operating Debtor is obligated to pay Gross Sales Rent as set forth above, Operating Debtor may defer payment of a portion of the Gross Sales Rent so that Operating Debtor only pays the greater of (a) $70,000.00 and (b) 11% of Gross Sales to Landlord in such month (any such deferred amounts, the "Deferred Amounts"). Any Deferred Amounts which accrue between January-June in any year shall be paid on or before July 31st of such year and any Deferred Amounts which accrue between July through December in any year shall be paid on or before the next occurring January 31st.

2.  During the Alternate Rent Period, Operating Debtor shall continue to pay all additional rent otherwise payable under the Lease, including, without limitation, Tenant's Tax Payment and Tenant's Operating Expense Payment. After expiration of the Alternate Rent Period, Tenant shall continue to pay Fixed Rent and all additional rent in accordance with the original terms of the Lease.

3.  Gross Sales shall be calculated exclusive of customary merchant fees and taxes as to be more fully defined in the Lease. Operating Debtor shall submit monthly statements of Gross Sales to Landlord together with any payment due on or before the tenth (10th) day of each month during the Alternate Rent Period.

4876-8502-6859, v. 1

4. Landlord and Operating Debtor agree that in the event of any future shutdowns of the Premises mandated by applicable law as a result of COVID-19, Landlord and Operating Debtor shall discuss reasonable rent relief (whether through abatement or deferral) given the circumstances of such closure.

5. (i) after Landlord's application of the balance of the Letter of Credit against the current amount of arrears, and (ii) on the condition that the Operating Debtor waives and releases any claim to payment of the Owner's Work Contribution (as such term is defined in the Lease), then:

   a. The Landlord's "cure" claims under section 365(b)(1) and administrative claims under section 503 of the Bankruptcy Code are waived.
   b. The Landlord waives all prior defaults of the Operating Debtor

6.02  *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* All proofs of claim with respect to any Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within thirty (30) days after the date of the order confirming this Plan. The failure of any such counterparty to file a proof of claim within the period proscribed shall forever bar it from asserting against the Debtors or their estates any claim for damages arising from the rejection of its executory contract or unexpired lease with the Debtors. The filing of any such proof of claim shall be without prejudice to any and all rights that the Debtors may have to object to the allowance thereof on any and all available grounds.

## ARTICLE VII

## MEANS FOR IMPLEMENTATION OF THE PLAN

7.01  *Funding of Plan.* The distributions to the creditors of the Debtors that are to be made on and after the Effective Date under this Plan shall be funded from (i) the ongoing operations of the Operating Debtor, (ii) existing cash of the Debtors, (iii) proceeds from the sale of the Policy, and (iv) the tax refund expected by the Operating Debtor.

7.02  *Avoidance Actions and Other Litigations.* The Debtors will review and examine potential preference and other litigation claims against third parties in this case. Avoidance claims under Section 544, 547, 548 and 550 of the Bankruptcy Code as well as causes of action against third parties will be reviewed by the Debtors, and pursued in the exercise of the Debtors' business judgment, which are beneficial to the applicable Debtors' estate. Any and all litigation recoveries received by the Debtors, net of professional fees and costs, will be distributed 50% to the Debtors for operations and/or capital expenditures, and 50% to Allowed Claims in accordance with Articles III and IV above, and the claim priorities under the Bankruptcy Code and lien priorities under applicable non-bankruptcy law.

The Debtors reserve the right to prosecute all causes of action, including the counterclaims against Hand Baldachin & Amburgey listed in JBI's schedules.

4876-8502-6859, v. 1

7.03   *Sale of Policy.*   JBI intends to seek Court approval of the sale of the Policy.   Upon closing of such sale, JBI intends to (i) pay its creditors with Allowed claims in full, (ii) set aside a reserve to pay claims to which it shall object, and (iii) loan sufficient cash to the Operating Debtor to pay the following:

- The principal portion of NYS sales taxes in full (approximately $~~371~~351,000)
- The Effective Date payment to Sweet ($~~200~~425,000)
- Initial final fee application payment to Professionals ($60,000 to Mr. Persing as Subchapter V Trustee, $40,000 to Mandelbaum, $27,500 to Mazars)

JBI intends to sell additional portions of the Policy, if necessary, to help fund any shortfall of the Debtors' obligations to pay administrative claims or priority tax claims.   The Operating Debtor shall continue paying premiums associated with the Policy.

7.04   *Tax Refund.*

The Operating Debtor expects an additional $$669,598 in tax refunds.   There is no estimate on when these funds will be received.

7.05   *Exemption from Taxes*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan as confirmed by the Court, (including any instrument of transfer executed in furtherance of the sale of the Policy as contemplated by the Plan), shall not be subject to tax under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax or similar tax due on the sale or transfer of the property in connection with or in furtherance of the Plan as confirmed by the Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE VIII

## GENERAL PROVISIONS

8.01   *Definitions and Rules of Construction.*   The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

(i)      "Allowed" or "Allowed Claim" means any Claim or Interest against the Debtors that is scheduled by or on behalf of the Debtors as not disputed, contingent or unliquidated, or proof or request for payment of which has been filed timely with the Bankruptcy

Court and, in either case, a Claim (a) as to which no objection has been interposed within one hundred twenty (120) days after the Effective Date or (b) as to which an objection has been interposed and such Claim has been allowed by a Final Order of the Bankruptcy Court.

(ii)     "Bankruptcy Code" means title 11 of the United States Code (11 U. S.C. §§ 1101, *et seq.*).

(iii)     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as in effect on the Filing Date and as amended after the Filing Date and during the Debtor's chapter 11 case.

(iv)     "Claim" means any right to payment from the Debtors and/or any or all of the Released Parties arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date of this Plan, and based upon, concerning, relating to, or in any manner arising from, in whole or in part, the Debtors and/or the Debtor's operations, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date, if such breach gives rise to a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.     FOR THE AVOIDANCE OF DOUBT, "CLAIM" SHALL SPECIFICALLY AND EXPRESSLY INCLUDE ALL CLAIMS UNDER FEDERAL, STATE AND/OR LOCAL LAW OR REGULATION.

(v)     "Disputed Claim" means (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been filed; and (b) any Claim, or portion thereof, that has not been disallowed and with respect to which an objection or action concerning the allowance and/or extent thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection or action has not been resolved by a Final Order.

(vi)     "Debtor's Professionals" or "Professionals" means such attorneys, accountants and/or other professionals employed by the Debtors in connection with this case.

(vii)     "Disbursing Agent" for creditors of the Operating Debtor and JBI are as follows: the Operating Debtor shall be the Disbursing Agent for distributions to creditors of the Operating Debtor, and JBI shall be the Disbursing Agent for distributions to creditors of JBI.

(viii)     "Effective Date" means the first business day following the date that the Conditions to Effective Date set forth in section 8.15 herein are satisfied.  If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

4876-8502-6859, v. 1

(ix)     "Final Order" means an order of a court as to which (a) any appeal that has been taken has been determined finally or dismissed or (b) the time for appeal has expired and (i) no timely appeal has been filed and (ii) no order having the effect of tolling or otherwise extending the appeal period is in effect.

(x)     "Pro Rata Distribution(s)" means, with respect to any Allowed Claim, the proportions that such Allowed Claim bears to the aggregate amount of all claims in such class.

(vii)     "Reorganized Debtor" means the applicable Debtor in its post-Confirmation Order state.

8.02     *Authority to Effectuate Plan*.  Upon the Confirmation Order becoming a Final Order, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Debtor.  The Debtors shall be authorized, without further application to or order of the Bankruptcy Court to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

8.03     *Revesting of Assets*.   Consistent with §§ 1123(a)(5)(A) and 1141 of the Bankruptcy Code, and except as may be otherwise provided in this Plan, title to all assets and property of the estates of the Debtors shall pass to, and vest in, the respective Reorganized Debtor free and clear of all Claims, Liens, charges and other rights of creditors arising prior to the Effective Date.  On and after the Effective Date, the Reorganized Debtor may conduct their financial affairs and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided in this Plan or in the Confirmation Order.  Any distribution check that is issued by the Debtor but not deposited within one hundred twenty (120) days after its distribution will be deemed abandoned by such creditor and shall pass to and revert in the Reorganized Debtor free and clear of any claims to the distribution.  No distribution(s) shall be made to any Allowed creditor if such distribution is $50.00 or less.

8.04     *Retention of Jurisdiction.* Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed and the Final Decree has been entered closing the Chapter 11 Case, the Bankruptcy Court shall retain jurisdiction over this proceeding under the provisions of the Bankruptcy Code, including, without limitation, § 1142(b) thereof and the Bankruptcy Rules, to ensure that the intent and the purpose of the Plan is carried out and given effect.  Without limitation by reason of specification, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)     To consider any modification of the Plan pursuant to § 1127 of the Bankruptcy Code and/or any other modification of the Plan after substantial consummation thereof;

(b)     To hear and determine:

(i)     all controversies, suits and disputes, if any, as may arise in connection with the interpretation, implementation, consummation or enforcement of the Plan;

(ii)     all controversies, suits and disputes, if any, as may arise between or among the holders of any Class of Claim and the Debtors including, without limitation, proceedings to determine the allowance, classification, amount, or priority of Claims;

(iii)     all rights or Causes of Action which may exist on behalf of the estate, including actions commenced to recover preferential transfers, accounts receivable and other property of the estate;

(iv)     applications for allowance of compensation and expense reimbursement of the Debtor's Professionals, and the Subchapter V Trustee, for periods prior to the Effective Date;

(v)     any and all applications, adversary proceedings and litigated matters;

(vi)     to enter a final decree closing the Chapter 11 Case; and

(vii)     to the extent not expressly provided for above, any and all disputes arising under the Plan and proceedings in aid of the administration and/or consummation of the Plan.

8.05    *Headings*. Headings are used in the Plan for convenience of reference only and shall not constitute a part of the Plan for any other purpose.

8.06    *Revocation*. The Debtors shall have the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, it shall be deemed null and void, and in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor, or any other entity, or to prejudice in any manner, the rights of the Debtors or any entity in any further proceeding involving the Debtor.

8.07    *Successors and Assigns*. The rights, benefits and obligations named or referred to in the Plan shall be binding on, and shall inure to the benefit of the Debtors and all holders of Claims and Interests, their respective successors and assigns. The provisions of all documents executed under or in connection with this Plan shall be valid and enforceable and binding upon and inure to the benefit of the Debtors and all other parties thereto and their respective predecessors, successors, assigns, agents, officers and directors.

8.08    *Governing Law*. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York shall govern the construction and implementation of the Plan and, unless otherwise stated therein, any agreements, documents, and instruments executed in connection with the Plan.

4876-8502-6859, v. 1

8.09    *Saturday, Sunday or Legal Holiday*.  If any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date.

8.10    *Enforceability*.  Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of the Plan.

8.11    *Plan Controls*.  To the extent, the Plan is inconsistent with the Order confirming the Plan, the provisions of the Order shall be controlling.

8.12    *Reservation of Rights*.  Neither the filing of the Plan nor any statement or provision contained therein shall be or be deemed to be an admission against interest.  In the event that the Effective Date shall not occur, neither the Plan nor any statement contained therein may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or outside of the Chapter 11 Case.

8.13    *Substantial Consummation*.  The Plan will be deemed substantially consummated, as such terms is used in § 1101(2) of the Bankruptcy Code, upon the commencement of distributions to the holder of any Class of Claims under the Plan.  Following such substantial consummation, any appeal, rehearing or other post-confirmation motion of any nature with respect to the Plan or the Confirmation Order except as specifically provided herein or therein shall be rendered moot and no longer justiciable.

8.14    *Final Decree*.  The Debtors will file, on notice to the United States Trustee, an application and proposed order for a final decree pursuant to Bankruptcy Rule 3022, without prejudice to the Court's ability to reduce or extend the time to file such application.

8.15    *Conditions to Effective Date:*  The following are conditions to the Effective Date:

(a)     the Bankruptcy Court shall have entered a Final Order confirming the Plan.

(b)     all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, an amended lease with the Landlord on terms substantially as set forth in this Plan, each in form and substance reasonably satisfactory to the Debtors and the transactions and other matters contemplated thereby, shall have been effected or executed.

(c)     Sweet shall have released its lien on the Building.

(d)     The closing of the sale of the Policy.

19

# ARTICLE IX

## DISCHARGE; LIMITATION OF LIABILITY

9.01    *Discharge.*  (a) If this Plan is confirmed under § 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtors will be discharged from any debt and/or Claim that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtors will not be discharged of any debt:

      (i)    imposed by this Plan; or

      (ii)    to the extent provided in § 1141(d)(6).

9.02    If this Plan is confirmed under § 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the Court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code.  The Debtors will not be discharged of any debt:

      (i)    on which the last payment is due after the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code; or

      (ii)    excepted from discharge under § 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

9.03    *Continuation of Stays.*  All stays provided for in the Chapter 11 Case under § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the completion of all payments required under the Plan; except that this section shall not be applicable to Landlord.

9.04    *Injunction.*  Effective on the Confirmation Date, all creditors who have held, hold, or may hold Claims against the Debtors or their assets are enjoined from taking any of the following actions against or affecting the Debtors or the assets of the Debtors with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Debtors or the assets of the Debtor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Debtors or their assets; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or the assets of the Debtor; (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtors or its assets; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan; except that this section shall not be applicable to Landlord.

9.05    *Limitation of Liability.*  The Debtors and their Professionals shall have or incur no liability to the extent allowed under § 1125(e) of the Bankruptcy Code and, in all respects, the

Debtors and its Professionals shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Nothing in the Plan shall limit the liability of the Professionals of the Debtors for malpractice to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. Title 22, Section 1200.0, Rule 1.8(h)(1) nor release any party for any claims of fraud, *ultra vires* acts, gross mismanagement, or willful misconduct,  Additionally, the Plan shall not release or exculpate any person or entity from any Claim or Cause of Action existing as of the Effective Date (i) based on the Internal Revenue Code or other domestic state, city or municipal tax code; (ii) based on the environmental laws of the United States or any domestic state, city or municipality; (iii) based on any criminal laws of the United States or any domestic state, city or municipality; (iv) based on the Securities Exchange Act of 1934, as now in effect or hereafter amended, the Securities Act of 1933, as now in effect or hereafter amended, or other securities laws of the United States or any domestic state, city, or municipality.

[The remainder of this page intentionally left blank]

4876-8502-6859, v. 1

**ARTICLE X**

**CONFIRMATION REQUEST**

10.01  The Debtors hereby request Confirmation of the Plan pursuant to §§ 1129 and 1191 of the Bankruptcy Code.

Dated: ~~May 13~~July 26, 2022

Respectfully submitted,

MEZZ57TH LLC

By:      _____/s/ John Barrett_____

John Barrett

JOHN BARRETT INC.

By:      _____/s/ John Barrett_____

John Barrett

4876-8502-6859, v. 1