UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

IN RE:

MEZZ57TH LLC, et al.

    Reorganized Debtors.

-----------------------------------------------------------x

Chapter 11

Case No. 20-11316

Jointly Administered

## RESPONSE OF HAND BALDACHIN & ASSOCIATES LLP TO DEBTORS' OBJECTION TO CLAIMS

Hand Baldachin & Associates LLP ("HBA") hereby responds to the objection ("Objection") filed by the Debtors John Barrett Inc. ("Barrett Inc.") and Mezz57th LLC, d/b/a John Barrett ("Mezz57", and together with Barrett Inc., the "Debtors") to the claims filed by HBA (the "Claims"), and states and represents as follows:

### PRELIMINARY STATEMENT

Debtors ask the Court to expunge HBA's Claims arguing that HBA did not perform legal services for the Debtors. The Objection is without merit and should be denied in its entirety. In 2015 HBA entered into a written engagement agreement with John Barrett Holdings LLC to provide legal services. Barrett Holdings is a close affiliate of Barrett Inc. as both entities are closely held private firms owned and controlled by a single individual, John Barrett ("Barrett"). Along with Barrett, all three entities, Barrett Holdings, Barrett Inc. and Mezz57, have constituted Barrett's hair salon business. HBA was requested by Barrett to perform legal services for both Barrett Holdings and Barrett Inc. This is clearly revealed in the time entries in HBA's invoices and HBA's appearances in court proceedings on behalf of and in defense of Barrett Inc. Debtors' are judicially estopped from denying HBA's representation of Barrett Inc. because the

1

engagement of HBA on behalf of Barrett Inc. has been admitted by both Barrett Holdings and Barrett Inc. in pleadings and counterclaims filed by those entities against HBA in litigation in the New York State Supreme Court. Further, given their close affiliate relationship and control, for purposes of legal representation, Barrett Holdings and Barrett Inc. are considered a single client under established Second Circuit precedent. Moreover, Barrett Inc. and Barrett Holdings waived any objections to HBA's fees and disbursements under the legal doctrine of account stated. The invoices were held for many months by Barrett without objection and with promises to pay and with partial payments made. Mezz57 is simply the continuation of Barrett Inc.'s hair salon business and , as such, has successor liability for Barrett Inc.'s indebtedness to HBA.

In sum, HBA's legal services as reflected in the Claims were performed for Debtors at their request and for their benefit. While the invoices were addressed to Barrett Holdings the entries in the invoices describe legal work which was done for both Barret Holdings and Barrett Inc. No objection was ever made to the HBA invoices by Barrett or his entities. Debtors' other argument that HBA failed to offer Barrett Holdings and Barrett Inc. the option of arbitration of their legal fees dispute with HBA is also wrong. The Part 137 Fee Dispute Resolution Program of the Rules of the Chief Administrator of the Courts cited by Debtors expressly does not apply to disputes in excess of $50,000. Here, the legal fees sought to be collected are far in excess of that amount.

## FACTS SUPPORTING HBA'S CLAIMS

I.     BACKGROUND

1.     HBA is a law firm engaged in the general practice of law, including in the areas of corporate law, mergers and acquisitions and commercial litigation, among other areas of practice. HBA's current office address is 1740 Broadway, 15th Floor, New York, NY 10019. See

Affirmation of Michael E. Norton, Esq. dated and affirmed on December 12, 2022, (the "Norton Aff.") at ¶ 2.

2. The individual John Barrett ("Barrett") is and has been, at all relevant times, a "celebrity" hair stylist, hairdresser and hair salon owner and operator. For a number of years Barrett operated a "high-end" hair salon located in the Bergdorf Goodman department store at 754 Fifth Avenue, New York, NY 10019, on the corner of Fifth Avenue and 57th Street. In approximately 2020 Barrett moved his hair salon business to 36 East 57th Street, New York, NY 10022, approximately one block from Bergdorf. At the new location Barrett continued the same hair salon business he had established at Bergdorf Goodman, continuing to employ essentially the same staff of hair stylists and other employees while offering the same personal services to Barrett's well-established clientele. See, Affidavit of John Barrett Pursuant to Local Bankruptcy Rule 1007-2, dated June 3, 2020, at ¶¶ 1, 9-12, attached as Ex. 1 to the Norton Aff.

3. Barrett has at all times conducted his hair salon business through closely held entities which he owned and controlled. Debtor Barrett Inc. is a New York domestic business corporation registered with the New York Secretary of State, NY DOS # 2001803. Barrett Inc. is owned and controlled by Barrett and was engaged in the hair salon business. Barrett Inc. registered the assumed d/b/a name of "John Barrett Salon" with the New York Secretary of State on July 24, 1996. See Ex. 2 to the Norton Aff.

4. Debtor Mezz57 is a New York domestic limited liability company registered with the New York Secretary of State, NY DOS # 5393837. Mezz57 is owned and controlled by Barrett. Like Barrett Inc., Mezz57 registered the assumed d/b/a name of "John Barrett Salon" with the New York Secretary of State on November 8, 2022. Like Barrett Inc., Mezz57 has at all times been engaged in the hair salon business. See Ex. 3 to Norton Aff.

5. John Barrett Holdings LLC ("Barrett Holdings") is a Delaware limited liability company registered with the New York Secretary of State, NY DOS # 458754. Like Debtors Barrett Inc. and Mezz57, Barrett Holdings at all times has been owned and controlled by Barrett. Barrett Holdings has at all times been engaged in Barrett's hair salon business. See Ex. 4 to Norton Aff.

II. HBA IS CONTACTED AND ENGAGED FOR LEGAL SERVICES AND PROVIDES LEGAL SERVICES TO BARRET HOLDINGS AND BARRETT INC.

6. In early 2015 HBA was contacted by James Hedges, an executive working for Barrett, concerning the engagement of HBA for legal services. Shortly thereafter, on February 25, 2015, HBA was formally retained pursuant to a written engagement agreement signed by HBA and Barrett Holdings (the "Engagement Letter"). A true and correct copy of the Engagement Letter is attached as Ex. 5 to Norton Aff. As shown by the Engagement Letter, the address of Barrett Holdings was 754 Fifth Avenue, New York, NY 10019, which was the same address for Barrett's affiliated entity, Barrett Inc., and was also the address of Bergdorf Goodman where Barrett operated his hair salon businesses as of that date.

7. The Engagement Letter contains the engagement of HBA for legal services. It contains the terms of such engagement with respect to the range of legal fees to be charged based on the hourly rates of attorneys and paralegals assigned to specific matters. It provides that legal fees and disbursements will be invoiced to the client on a monthly basis and that the client agrees to promptly pay the legal fees and disbursement so billed. It sets forth that in the event a dispute arises over the fees, "you may have the right to arbitration of the dispute pursuant to Part 137 [of] the Rules of the Chief Administrator of the courts". See, Ex. 5 to Norton Aff.

8. Following execution of the Engagement Letter HBA was requested to perform corporate and litigation services on behalf of Barrett Holdings and Barrett Inc. Specifically, HBA

4

was requested to provide corporate law services in connection with a proposed transaction with Saks & Company, LLC which contemplated Barrett opening hair salons in Saks Fifth Avenue department stores (the "Saks Deal"). Later HBA was requested to and did represent and defend Barrett Inc. in connection with a lawsuit brought against Barrett Inc. by one of Barrett's salon business competitors (the Red Door Litigation").

**The Saks Deal**

9. In February 2015, in connection with the Saks Deal, HBA was requested to review and revise a letter of intent and term sheet which had been previously prepared by another law firm. Subsequently HBA was requested to communicate with outside firms involved in the deal; draft and revise the agreement with Saks; draft and revise a services agreement with Saks; and draft and revise an asset purchase agreement; among other work. The details of the legal services performed by HBA in connection with the Saks Deal are set forth in HBA's invoices dated April 10, 2015; June 4, 2015; July 2, 2015; October 2, 2015; and November 4, 2015. See Ex. 6 to Norton Aff.

10. HBA's unpaid fees and disbursements for its work on the Saks Deal is $9,266.88.

**The Red Door Litigation against Barrett Inc.**

11. In September 2015 Barrett hired away from his nearby hair salon competitor, the Elizabeth Arden Red Door Salon ("Red Door"), five of Red Door's hair stylists and colorists. Each of the Red Door employees was party to a employment agreement containing strict non-compete, non-solicitation and confidentiality provisions. Soon thereafter, on October 14, 2015, Red Door sued Barrett Inc. and the individual hair stylists in an action brought in the Commercial Division of the New York State Supreme Court, New York County entitled Red Door Salons, Inc. v. Georges Reus, et al., Index No. 653439/2015 (the "Red Door Litigation").

Red Door's counsel was the large national law firm Katten Muchin Rosenman LLP. A copy of the Red Door amended complaint is attached as Ex. 7 to the Norton Aff.

12. Red Door's lawsuit sought temporary restraining orders and preliminary and permanent injunctive relief and monetary damages, including punitive damages and legal fees, against all defendants, among other relief. The restrictive covenants in the Red Door agreements prohibited employment at any salon within a one-half mile radius of Red Door's salon. Barrett Inc.'s salon at Bergdorf was within the restricted territory. In addition, the Red Door employees were restricted from soliciting Red Door customers or making use of any of Red Door's "confidential information", which included contact and historical information of Red Door's customers, among confidential information.

13. Red Door's complaint alleged claims against the individual hairdresser defendants for breach of contract, misappropriation of trade secrets and confidential information, breach of fiduciary duty, and other causes of action. The Red Door complaint contained claims against Barrett Inc. for intentional interference with contract, tortious interference with prospective business relations, unjust enrichment and aiding and abetting breach of fiduciary duties of the Red Door ex-employees.

14. Upon commencement of the Red Door action October 14, 2015, HBA was immediately contacted by Barrett and his executive James Hedges requesting that HBA appear in the Red Door litigation on behalf of defendant Barrett Inc., as well as on behalf of the individual employee defendants hired by Barret Inc. At no time did Barrett, Hedges or any other executive employed by Barrett ever state that Barrett Inc. would not be responsible for legal fees incurred in connection with the Red Door litigation.

15. Following these requests and commencing with the hearing on the order to show cause on October 14, 2015, the same day it was first contacted, HBA appeared in the Red Door Litigation on behalf of Barrett Inc. and its employees. The Red Door Litigation commenced on October 14, 2015 and concluded with a final settlement and stipulation of discontinuance filed on May 11, 2016. HBA continued as defendants' counsel during the entire Red Door Litigation. See, NYCEF Docket Sheets of the Red Door Litigation attached as Ex. 8 to the Norton Aff.

16. During the course of the seven months during which the Red Door Litigation continued, there was extensive pre-trial discovery, including approximately 10 depositions, the exchange of voluminous documents requests and document production between the parties. There was extensive briefing and submission of lengthy affidavits and other submissions to the Court. The parties were ordered by the Court to categorize by date of origination and other criteria many hundreds of individual customers of the Red Door salon. Justice Singh conducted a trial on Red Door's preliminary injunction motion. Ultimately the parties entered into a settlement agreement and the litigation was concluded.

17. The details of the legal services performed by HBA in the Red Door Litigation are set forth in HBA's invoices dated November 4, 2015; December 7, 2015; January 7, 2016; February 10, 2016; March 2, 2016; See Ex. 9 to Norton Aff.

18. HBA's unpaid fees and disbursements for its work on the Red Door Litigation is $186,393.50.

V. NON-PAYMENT OF HBA'S LEGAL FEES

19. HBA billed monthly for its legal services. At first the HBA bills for both the Saks transaction and for the Red Door litigation were paid. Subsequently, payment of HBA's invoices became overdue.

20. Between April 10, 2015 and April 6, 2016 HBA issued 12 invoices for its legal fees and disbursements incurred in the Saks deal and the Red Door litigation. True and accurate copies of HBA's invoices are attached to the Norton Aff. at Exs. 6 and 9. As of the last invoice dated April 6, 2016 HBA was owed $9,246.88 for is corporate work on the Saks deal and $186,393.50 for its litigation work in the Red Door litigation, for a total of $195,640.38. These amounts remain outstanding over six years later.

## VI. HBA FILES COLLECTION ACTION AGAINST BARRETT HOLDINGS AND BARRETT INC. IN THE NEW YORK STATE SUPREME COURT

21. HBA billed on a monthly basis for its work on the Saks Deal and the Red Door Litigation. At no time did Barrett, Hedges or any other executive of Barrett Inc. or Barrett Holdings make any complaints or raise any issues concerning the HBA invoices. Partial payments without protest were made on invoices for both the Saks Deal and Red Door Litigation. Barrett and other representatives indicated on a number of occasions that HBA's legal fees would be paid in full. HBA was requested to continue to perform work on the matters. HBA was never asked to stop work nor was HBA ever replaced by other counsel. In sum, HBA invoices were submitted on a regular basis and in the ordinary course from April 2015 through April 2016. Certain partial payments were made as, reflected in the billing history. At no time were any complaints or objections lodged concerning the HBA invoices. Instead promises to pay were proffered. Ultimately however, these promises to pay were not kept.

22. HBA was left with no option but to bring an action to collect its unpaid fees and disbursements. On November 22, 2016, more than seven months following the issuance of HBA's last invoice in April 2016, HBA filed a collection action in the New York State Supreme Court, entitled Hand Baldachin & Amburgey LLP v. John Barrett Inc. and John Barrett Holdings, LLC, Index No. 656125/2016, New York County, Commercial Div. Part 43 ("State

Court Action"). A true and correct copy of HBA's summons and complaint filed and served in the State Court Action is attached as Ex. 10 to the Norton Aff.

24. HBA alleged causes of action against both defendants for breach of the Engagement Letter, quantum meriut, account stated and unjust enrichment for non-payment of legal fees and sought damages in the amount of $195,640.38, plus costs and statutory interest from April 6, 2016.

25. Defendants Barrett Inc. and Barrett Holdings appeared through counsel and responded to the HBA Collection Action. Defendants filed a Verified Amended Answer and Counterclaims on January 19, 2017 ("Defendants' Answer and Counterclaims") A true and correct copy of Defendants' Answer and Counterclaims is attached as Ex. 11 to Norton Aff. The Defendants' Answer and Counterclaims was verified by Barrett for both Defendants. In response to HBA's collection efforts, Defendants alleged malpractice against HBA in connection with the work on both the Saks transaction and the Red Door Litigation.

26. Ultimately, Barrett Inc. filed for bankruptcy on May 29, 2020. In April 2021 lawyers for Barrett Holdings moved to be relieved from the case due to non-payment of their legal fees. On August 26, 2022 the Court granted HBA's motion for default judgment. A copy of the Court's Decision and Order is attached to the Norton Aff. as Ex. 12.

VII. HBA FILES TIMELY PROOFS OF CLAIMS AGAINST DEBTORS

27. On May 22, 2022 HBA filed timely proofs of claims against both debtors in these bankruptcy cases. The claims are for unpaid legal fees and disbursement owed to HBA for legal work provided to Debtors in the Red Door Litigation and the Saks Deal in the amount of $195,640.38. HBA's Proofs of Claim are attached to the Norton Aff. as Exs. 13 and 14.

## THE OBJECTION TO HBA'S CLAIMS SHOULD BE DENIED

### POINT I: DEBTORS ARE JUDICIALLY ESTOPPED FROM ARGUING THAT BARRETT INC. WAS NOT A CLIENT OF HBA OR THAT HBA DID NOT PROVIDE LEGAL SERVICES TO BARRETT INC.

28. In the counterclaims filed against HBA in the State Court Action, Barrett Inc. expressly alleged that it was a client of HBA and that HBA had been engaged to provide legal representation to it. In Defendants' Answer and Counterclaims, at paragraph 4 of the counterclaims, Defendants Barrett Holdings and Barrett Inc. both allege that HBA was retained "to render legal advice and represent [Barrett Holdings] and eventually [Barrett Inc.]. Further, in paragraph 5 of the counterclaims Defendants Barrett Inc. and Barrett Holdings state that "[t]hroughout the course of [HBA's] Representation, [HBA] represented and counseled [Barrett Inc. and Barrett Holdings] in a number of matters and cases, including, [the Saks Transaction and the Red Door Litigation]." At paragraph 6 of the counterclaims, Defendants state that "[HBA] owed [Barret Inc. and Barrett Holdings] a duty to exercise due care as Defendants each maintained an attorney-client relationship with [HBA]". At paragraph 27 of Defendants' counterclaims it is alleged by Barrett Inc. and Barrett Holdings that "As [Barrett Inc.'s and Barrett Holdings's] attorney, [HBA] owed fiduciary duties to Defendants, including the duty of good faith, loyalty, and candor."

29. Further, in its Order and Decision of August 25, 2022 granting default judgment to HBA, the New York Supreme Court specifically found that HBA had performed legal services for Barrett Inc. and had represented it as its attorney in the Red Door Litigation. See Decision

and Order of Supreme Court Justice Robert Reed, dated August 25, 2022 at 1-2, attached to Norton Aff. at Ex. 12.

30. Thus, in the 2016 legal malpractice action filed against HBA in the State Court Action, Barrett Inc. clearly and repeatedly alleged that HBA had acted as and represented Barrett Inc. as its attorney. This assertion was accepted and adopted by the Court in its August 25, 2022 Decision and Order. Given Barrett Inc.'s allegations in the State Court Action, accepted by the Court, Debtors are now judicially estopped from asserting or claiming the absence of legal representation by HBA or the absence of legal services provided to Debtors by HBA for which legal fees are due and owing. See, Intellivision v. Microsoft Corporation, 484 Fed. Appx. 616 (2d Cir. 2012); Walker v. GlaxoSmithKline LLC., 201 A.D. 3d 1272, 163 N.Y.S 3d 260 (App. Div. 3d Dep't 2022); All Terrain Properties Inc. v. Hoy, 265 A.D. 2d 87, 705 N.Y.S. 2d 350 (App. Div. 1st Dep't 2000); Borges v. Placeres, 64 Misc. 3d 92, 105 N.Y.S. 3d 782, Sup.Ct. App. Term 2019). Given the Decision and Order of the Court, Debtors are also barred from such claims here by the doctrine of collateral estoppel. Collateral estoppel bars re-litigation of an issue which has necessarily been decided in a prior action and is determinative of the issues disputed in the present action. Pursuant to collateral estoppel a party is precluded from re-litigating in a subsequent action or proceeding an issue raised and decided in a prior action involving that party or those in privity with the party. See, Buechel v. Bain, 97 N.Y. 2d 295, 740 N.Y.S. 2d 252 (2001); SSJ Development of Sheepshead Bay I, LLC v. Amalgamated Bank, 128 A.D. 3d 674, 10 N.Y.S. 3d 105 (App. Div. 2d Dep't 2015).

**POINT II: BARRETT HOLDINGS AND BARRETT INC. CONSTITUTE A SINGLE CLIENT FOR PURPOSES OF LEGAL REPRESENTATION**

31. Given the extremely close relationship between Barrett Holdings and Barrett Inc., these two affiliated entities constitute a single client for purposes of HBA's engagement and

legal representation. See, GSI Commerce Solutions, Inc. v. Babycenter LLC, 618 F. 3d 204 (2d Cir. 2010). In GSI Commerce Solutions, Inc., the Second Circuit there held that where the relationship between affiliated entities is close, the two entities should be considered a single client for purposes of legal representation. Here, Barret Inc. and Barrett Holdings are owned by a single individual, Barrett, and are, or were at the relevant time, engaged in the same business. The single client doctrine looks mainly to the degree of operational commonality between the two affiliates. Where that level of control and common management is high, the two affiliated entities are held to constitute a single client for the attorney. See, e.g., Discotrade Ltd. V. Wyeth-Ayerst Int'l Inc., 200 F. Supp. 2d 355 (S.D.N.Y. 2002); Hartford Accident & Indem. Co. v. RJR Nabisco Inc., 721 F. Supp. 534, 540 (S.D.N.Y. 2002) (the Court held that RJR Nabisco, through its subsidiary Reynolds Tobacco, was a client of the law firm); Certain Underwriters of Lloyd's London v. Argonaut Ins. Co., 264 F. Supp. 2d 922 (N.D.Cal. 2003) (unity of interest created single client where there are common managers and officers).

Given the nature of Barret's closely held entities which are all in the same business and are all owned and controlled by a single individual, the single client rule should apply to HBA's engagement. Certainly Barrett and his employees treated the Barrett salon business as a single operational entity with respect to the Engagement Letter and HBA's legal work. Accordingly, the Engagement Letter is applicable, and was at all times so regarded by the parties, to all legal work performed by HBA at Barrett's request.

**POINT III: DEBTORS' ACTIONS CREATED AN ACCOUNT STATED WITH HBA**

32. HBA's invoices were issued on a monthly basis over the course of 12 months from April 2015 to April 2016. Neither Barrett Inc. nor Barrett Holdings ever raised any objections to the invoices until December 2016 after they were sued by HBA in the State Court

12

Action. Therefore, for a period of 20 months from the issuance of the first invoice to a period of over 8 months from the issuance of HBA's final invoice, neither Barret Inc. nor Barrett Holdings ever contended that the invoices were inaccurate or excessive or that there were any valid objections to the amounts or contents of HBA's bills. To the contrary, Barrett and his representatives promised to pay the invoices in full. In addition, certain partial payments were made. Under these circumstances, HBA holds an account stated with Debtors which waives any objections now asserted by Debtors to HBA's invoices.

33. To prevail on the legal theory of account stated, a party must establish the following elements: (1) an account or bill was presented; (2) the debtor accepted the statement as correct; and (3) the debtor promised to pay the amount stated. Yiwu Lizhisha Accessories Co., Ltd. V. JJamz, Inc., 336 F. Supp. 3d 179, 183 (S.D.N.Y. 2018). These elements are present here. HBA invoiced for its work on a monthly basis as set forth in the Engagement Letter. Barrett and his executives never questioned the invoices and made promises to pay for a period of many months. Moreover, the second and third elements (i.e., acceptance of the account as correct and a promise to pay the amount stated) may be implied if "a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009). See, LaBoeuf Lamb Greene & MacRae, L.L.P., 185 F. 3d 61, 64 (2d Cir. 1999). Here, HBA's invoices went unobjected to for many months and partial payments were made. Only when HBA brought its collection action did Barrett Inc. raise objections to the invoices. Under these circumstances the doctrine of account stated clearly applies and any objection to the amount and validity of HBA's invoices should be deemed to be legally barred.

**POINT IV: HBA WAS NOT REQUIRED TO OFFER ARBITRATION TO DEFENDANTS IN THE STATE COURT ACTION**

13

34. Debtors argue that the Claims should be expunged because HBA did not provide Defendants Barrett Inc. and Barrett Holdings with notice of a right to arbitrate under the New York State Court Fee Dispute Resolution Program before commencing collection efforts in the State Court Action . Debtors are mistaken. First, it should be noted that Barrett Inc. and Barrett Holdings failed to raise in the State Court Action any issue concerning alleged non-compliance by HBA with the Fee Dispute Resolution Program. Instead, in responding to the action, defendants choose to accept the Supreme Court's jurisdiction and brought counterclaims against HBA alleging malpractice and other claims arising from the admitted attorney-client relationship between the parties. Any argument at this point that the Fee Dispute Resolution Program was not complied with by HBA is now moot and/or waived. See, DeSapio v. Kohlmeyer, 35 N. 2d 402, 405, 362 N.Y.S. 2d 843 (1974) (defendant's filing of counterclaim in judicial action waives its right compel arbitration).

35. Second, in any event, the Fee Dispute Resolution Program was at all times inapplicable to the State Court Action. The statute expressly exempts from the Program fee disputes where the fees in dispute exceed $50,000. Here, HBA's unpaid fees are over $195,000. Therefore, there was no duty on HBA's part to offer arbitration under the Fee Dispute Resolution Program to Barrett Inc. and Barrett Holdings before filing suit against them for non-payment of legal fees. See 22 NYCRR 137.1(a)(b)(2): "This Part shall not apply to any of the following: . . . amounts in dispute involving a sum of less than $1,000 or more than $50,000." Finally, the Fee Dispute Resolution Program does not apply to fee disputes where the client brings claims of professional malpractice against the law firm, as was done here. See, 22 NYCRR 137.1(a)(b)(3); Filemyr v. Hall, 186 A.D. 3d 117, 120, 128 N.Y.S. 3d 479 (App. Div. 1st Dep't 2020)

(requirements of Fee Dispute Resolution Program limited to cases where fee dispute involves amounts between $1000 and $50,000 and also excludes cases involving malpractice claims).

### POINT V: MEZZ57 IS THE SUCCESSOR IN INTEREST TO BARRETT INC.

36. The facts as stated in the Affidavit of John Barrett Pursuant to Local Bankruptcy Rule 1007 show that Debtor Mezz57 is simply the continuation of Barrett's hair salon business which he had conducted through 2020 through his other entity, Barrett Inc. There is a continuation of ownership from Barrett Inc. to Mezz57. The business of Barrett Inc. was "terminated" upon the establishment of the "new" entity. It is undeniable that the business of Mezz57 is identical to the business of Barrett Inc., to wit, a "high end" hair and beauty salon in midtown Manhattan. Moreover, Barrett acknowledges he moved his employees and staff to his "new" business. Certainly he sought to move all of Barrett Inc.'s existing clients and the good will developed by Barrett Inc. at the Bergdorf Goodman location over many years to his "new" salon. While the physical location is not identical, the new salon is only a block away from the old one. In sum there is a continuity of the general business, management, ownership, customers and clientele, personnel, hair stylists, employees and staff, good will and intellectual property which belonged to Barret Inc., as well as the general location of the business. As such Mezz57 has successor liability for Barrett Inc.'s debts, including the indebtedness owed to HBA. Barrett acknowledges, he took most of his 85 employees to his new location and, of course, the clientele he had developed in his 23 years at his Bergdorf Goodman salon. Barrett states, "I discovered new space where I could start over, just like I have done so many times before. See, Barrett Aff. ¶¶ 10-12. The fact that he set up the new LLC under the name Mezz57 does not change the legal fact that Mezz57 is simply the continuation of Barrett Inc. See, Doktor v. Werner Co., 762 F.

Supp. 494 (S.D.N.Y. 2011); Hayes v. Equal Specialities, 740 F. Supp. 2d 474 (S.D. N. Y. 2010). To the extent Debtors deny any of these facts HBA respectfully requests the opportunity to conduct discovery in accordance with the Rules of Bankruptcy Procedure.

### POINT VI: IN ANY EVENT HBA IS ENTITLED TO HAVE ITS FEES AND DISBURSEMENTS PAID UNDER THE DOCTRINE OF QUANTUM MERUIT

37. As acknowledged by Debtors, were the Court to determine that the Engagement Letter was in some way deficient or incomplete, HBA would be entitled under the doctrine of quantum meruit to recover from Debtors its legal fees and disbursements. See, Rubenstein P.C. v. Ganea, 41 A.D. 3d 54, 833 N.Y.S. 2d 566 (App. Div. 2d Dep't 2007). Quantum meruit entitles HBA to recover the reasonable value of its legal services. Here, it is submitted, the reasonable value of HBA's services are the amounts set forth in its unobjected to invoices. Further, HBA's legal fees and disbursements have already been upheld in the State Court Action. Here there was an Engagement Letter setting forth HBA's fees and other terms which was provided to Barrett, the owner of both Barrett Holdings and Barrett Inc. There would be no reason to expect that HBA's terms of service would be ay different between the two entities. Accordingly, in the event the Court finds that HBA was entitled to a quantum meruit recovery, that amount should be found to be the same as set forth in the Engagement Letter and HBA invoices and approved in the State Court Action. See, Tillman v.Komar, 259 N.Y 133 (1932); Liddle & Robinson LLP v. Garrett, 720 F.Supp. 2d 417 (S.D.N.Y. 2010)(quantum meruit award guided by engagement letter).

### POINT VII: DEBTORS' CLAIMS THAT HBA'S LEGAL SERVICES DID NOT PROVIDE VALUE ARE UNSUPPORTED AND WRONG

38. Debtors' self-serving contentions that HBA's legal services did not provide value are entirely unsupported and wrong. Debtors fail to present any evidence or arguments to support

16

their false and conclusory statements. As discussed above and shown by HBA's invoices, HBA provided appropriate, competent and and complete legal services in both the Saks Deal and in the Red Door Litigation. There was never any complaint about HBA's representations and legal work until many months after the fact when HBA was forced to sue Barrett Inc. and Barrett Holdings for its unpaid legal fees and disbursements. In an effort to delay and/or evade payment, the defendants brought completely meritless claims of professional malpractice against HBA. Their bogus claims were never proven by them and were ultimately abandoned, and default judgment was entered against Barrett Holdings. Here, Debtors attempt, without any evidentiary support, to resurrect these false claims against HBA. The claim that HBA "prolonged" the resolution of the Red Door Litigation and that a "fair and reasonable settlement was available at an earlier juncture" is completely false and outrageous. HBA will be happy to disclose (in camera, since it is confidential) the terms of the final settlement it was able to achieve for Barret Inc. in the Red Door Litigation so the Court can compare that amount to Red Door's final demand (which was rejected by Barrett) prior to the Court's decision on Red Door's preliminary injunction motion. Debtors arguments concerning lack of value and/or objectionable billing practices are without support and entirely wrong and should be rejected by the Court.

### POINT VIII: REQUEST TO TAKE DISCOVERY OF DEBTORS AND RELATED PERSONS

39. In the event the Court finds that there are material facts which are in dispute in connection with this contested matter, HBA respectfully requests the opportunity to conduct full discovery of Debtors and related parties in accordance with the Federal Rules of Bankruptcy Procedure.

### CONCLUSION AND RELIEF REQUESTED

Debtors' Objection to the Claims should be denied in its entirety and the Claims should be allowed as filed.

Respectfully submitted,

Dated: New York, New York
December 13, 2022

HAND BALDACHIN & ASSOCIATES LLP
1740 Broadway, 15th Floor
New York, NY 10019
Tel. (347)-860-1075
Email: mnorton@hballp.com

By: /s/ Michael E. Norton
    Michael E. Norton

*Attorneys for Claimant Hand Baldachin & Associates LLP*